# 12-0816-bk

## United States Court of Appeals

*for the*

## Second Circuit

In re: Bernard L. Madoff Investment Securities, LLC.

———————————————

MARSHA PESHKIN,

*Appellant,*

– v. –

JEANNE LEVY-CHURCH, FRANCIS N. LEVY, IRVING H. PICARD,
Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,

*Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANT

BECKER & POLIAKOFF, LLP
*Attorneys for Appellant*
45 Broadway, 8th Floor
New York, New York 10006
(212) 599-3322

*Of Counsel:*
  HELEN D. CHAITMAN

i

# TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries .................................... | A-1 |
| Excerpt of Complaint, filed in *Picard v. Picower, et al.,* Adv. Pro. No. 09-01197 (BRL)........................ | A-7 |
| Hearing Transcript, dated February 18, 2010 ............ | A-11 |
| Order of the Honorable Burton R. Lifland, dated February 18, 2010.................................................... | A-21 |
| Notice of Motion by Marsha Peshkin, and a Non-Exclusive Group of Other Customers of Bernard L. Madoff Investment Securities LLC ("the Movants"), for an Order to Vacate the February 18, 2010 Order, dated February 18, 2011 .............. | A-23 |
| Proposed Order to Set Aside the Order Approving Settlement ............................................................. | A-25 |
| Memorandum of Law, by the Movants, in Support of Motion to Set Aside the Order Approving Settlement, dated February 18, 2011 .................... | A-27 |
| Declaration Helen Davis Chaitman, for the Movants, in Support of Motion to Set Aside the Order Approving Settlement, dated February 18, 2011 ................................................ | A-34 |
| Exhibit A to Chaitman Declaration − Non-Exclusive List of the Movants ....................... | A-37 |
| Exhibit B to Chaitman Declaration − Order of the Honorable Burton R. Lifland, dated February 18, 2010 (Reproduced herein at pp. A-21−A-22) | |

ii

**Page**

Exhibit C to Chaitman Declaration −
Excerpt of the Redacted Complaint filed by the
Trustee in *Picard v. JPMorgan Chase & Co., et
al.*, Adv. Pro. No. 10-04932 (BRL).........................    A-38

Exhibit D to Chaitman Declaration −
Irving H. Picard Press Release "Madoff Trustee
Announces Settlement of $220 Million," dated
January 27, 2010 ....................................................    A-47

Exhibit E to Chaitman Declaration −
(i) Notice of Motion by Irving H. Picard ("the
Trustee") for an Order Approving an Agreement,
dated January 27, 2010 ..........................................    A-48

(ii) Motion, by Irving H. Picard, for an Order
Approving an Agreement, dated January 27, 2010
with Attached Exhibits............................................    A-51

Exhibit F to Chaitman Declaration −
Hearing Transcript, dated February 18, 2010
(Reproduced herein at pp. A-11−A-20)

Exhibit G to Chaitman Declaration −
Letter from SIPC president Stephen Harbeck to
Congressman Scott Garrett, Chair of the House
Subcommittee on Capital Markets, Insurance,
and Government-Sponsored Enterprises, dated
January 24, 2011 ....................................................    A-85

Reply Brief of the Movants, in Further Support of
    Motion to Set Aside the Order Approving
    Settlement, dated March 23, 2011 ........................    A-113

Letter from David J. Sheehan to the Honorable
    Burton R. Lifland, dated March 25, 2011 .............    A-121

Hearing Transcript, dated March 30, 2011 ................    A-122

iii

                                                            **Page**

Order of the Honorable Burton R. Lifland, dated
    March 30, 2011 ......................................................    A-146

Second Redacted Complaint, filed in *Picard v.*
    *JPMorgan Chase & Co., et al.,* Adv. Pro. No.
    10-4932 (BRL)............................................................    A-147

Memorandum and Order of the Honorable Deborah
    A. Batts, dated February 16, 2012 ........................    A-157

Judgment, dated February 22, 2012, Appealed From    A-171

Notice of Appeal, dated February 29, 2012 ...............    A-173

6/4/12                                    SDNY CM/ECF Version 4.2

CLOSED, APPEAL, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:11-cv-03313-DAB

In Re: Bernard L. Madoff Investment Securities, LLC          Date Filed: 05/16/2011
Assigned to: Judge Deborah A. Batts                          Date Terminated: 02/22/2012
Case in other court: USBC-SDNY, 08-01789 (BRL)               Jury Demand: None
Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BA     Nature of Suit: 422 Bankruptcy Appeal
                                                             (801)
                                                             Jurisdiction: Federal Question

**In Re**

**Bernard L. Madoff Investment
Securities, LLC**

**Debtor**

**Bernard L. Madoff Investment
Securities, LLC**

**Appellant**

**Marsha Peshkin**                      represented by   **Helen Davis Chaitman**
                                                         Becker & Poliakoff, P.A
                                                         45 Broadway, 11th Floor
                                                         New York, NY 10006
                                                         212-599-3322
                                                         Fax: 212-557-0295
                                                         Email: HChaitman@becker-poliakoff.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Julie Gorchkova**
                                                         Becker & Poliakoff, LLP
                                                         45 Broadway
                                                         New York, NY 10006
                                                         (718) 300-4704
                                                         Fax: (212)-557-0295
                                                         Email: jgorchkova@beckerny.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Appellee**

A-2

**Jeanne Levy-Church**                    represented by **Carl H Moor**
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
(213) 683-9100
Fax: (213) 687-3702
Email: carl.moor@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cary Bruce Lerman**
Munger, Tolles and Olson
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
(213) 683-9100
Fax: (213) 687-3702
Email: cary.lerman@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek J Kaufman**
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
(213) 683-9210
Fax: (213) 687-3702
Email: derek.kaufman@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melinda Eades Lemoine**
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
(213) 683-9171
Fax: (213) 593-4071
Email: melinda.lemoine@mto.com
*ATTORNEY TO BE NOTICED*

**Appellee**

**Francis N. Levy**                       represented by **Carl H Moor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

6/4/12                    SDNY CM/ECF Version 4.2

**Cary Bruce Lerman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek J Kaufman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melinda Eades Lemoine**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Appellee**

**Irving H. Picard**
*Trustee for the Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

represented by **Seanna R. Brown**
Baker & Hostetler LLP (NYC)
45 Rockefeller Plaza
New York City, NY 10111
(212)-589-4230
Fax: (212) 704-8352
Email: sbrown@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David J. Sheehan**
Baker & Hostetler LLP (NYC)
45 Rockefeller Plaza
New York City, NY 10111
(212) 589-4616
Fax: (212) 589-4201
Email: dsheehan@bakerlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/16/2011 | 1 | NOTICE OF APPEAL FROM THE BANKRUPTCY COURT TO THE S.D.N.Y. from the Order of Judge Burton R. Lifland dated March 30, 2011. Bankruptcy Court Case Numbers: 08-1789 (BRL). Certified copies of file received. Document filed by Marsha Peshkin. Appellant Brief due by 6/3/2011. (Attachments: # 1 Exhibit A)(bkar) (Entered: 05/16/2011) |
| 05/16/2011 | 2 | DESIGNATION OF BANKRUPTCY RECORD ON APPEAL re: 1 Bankruptcy Appeal,. Document filed by Appellant Marsha Peshkin. (bkar) (Entered: 05/16/2011) |

| | | |
|---|---|---|
| 05/16/2011 | 3 | COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellees Francis N. Levy, Jeanne Levy-Church. (bkar) (Entered: 05/16/2011) |
| 05/16/2011 | 4 | COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee Irving H. Picard. (bkar) (Entered: 05/16/2011) |
| 05/16/2011 | | Magistrate Judge Gabriel W. Gorenstein is so designated. (bkar) (Entered: 05/16/2011) |
| 05/16/2011 | | Case Designated ECF. (bkar) (Entered: 05/16/2011) |
| 05/25/2011 | | Mailed letter to the United States Bankruptcy Court - Southern District of New York as notification of filing of Bankruptcy Notice of Appeal (Case Number: 08-01789 (BRL).) with the U.S.D.C. - S.D.N.Y. and the assignment of S.D.N.Y. Case Number: 11-cv-3313 (DAB). (rdz) (Entered: 05/25/2011) |
| 05/25/2011 | | Mailed notice to the attorney(s) of record. (rdz) (Entered: 05/25/2011) |
| 05/26/2011 | 5 | NOTICE OF APPEARANCE by Seanna R. Brown on behalf of Irving H. Picard (Brown, Seanna) (Entered: 05/26/2011) |
| 06/02/2011 | 6 | STIPULATION MODIFYING BRIEFING SCHEDULE: 1.Appellants shall submit their initial brief on or before June 20, 2011; 2. Appellees shall submit their opposing briefs on or before July 20, 2011; and 3. Appellants shall submit their reply brief on or before August 4, 2011. (Signed by Judge Deborah A. Batts on 6/2/11) (js) (Entered: 06/02/2011) |
| 06/20/2011 | 7 | NOTICE OF APPEARANCE by Helen Davis Chaitman on behalf of Marsha Peshkin (Chaitman, Helen) (Entered: 06/20/2011) |
| 06/20/2011 | 8 | Appellant's BRIEF. Document filed by Marsha Peshkin. Appellee Brief due by 7/20/2011. (Chaitman, Helen) (Entered: 06/20/2011) |
| 06/20/2011 | 9 | NOTICE OF APPEARANCE by Julie Gorchkova on behalf of Marsha Peshkin (Gorchkova, Julie) (Entered: 06/20/2011) |
| 06/20/2011 | 10 | CERTIFICATE OF SERVICE. Document filed by Marsha Peshkin. (Gorchkova, Julie) (Entered: 06/20/2011) |
| 07/19/2011 | 11 | NOTICE OF APPEARANCE by Melinda Eades Lemoine on behalf of Francis N. Levy, Jeanne Levy-Church (Lemoine, Melinda) (Entered: 07/19/2011) |
| 07/20/2011 | 12 | Appellee's BRIEF. Document filed by Irving H. Picard. Appellant Reply Brief due by 8/4/2011. (Sheehan, David) (Entered: 07/20/2011) |
| 07/20/2011 | 13 | Appellee's BRIEF. Document filed by Francis N. Levy, Jeanne Levy-Church. Appellant Reply Brief due by 8/4/2011. (Lemoine, Melinda) (Entered: 07/20/2011) |
| 07/20/2011 | 14 | CERTIFICATE OF SERVICE of Appellees' Brief served on Seanna R. Brown; David J. Sheehan; Helen Davis Chaitman; Julie Gorchkova on July 20, 2011. Document filed by Francis N. Levy, Jeanne Levy-Church. (Lemoine, Melinda) (Entered: 07/20/2011) |
| 07/20/2011 | 15 | MOTION for Carl H. Moor to Appear Pro Hac Vice. Document filed by Francis N. |

| | | Levy, Jeanne Levy-Church.(pgu) (Entered: 07/21/2011) |
|---|---|---|
| 07/20/2011 | 16 | MOTION for Derek J. Kaufman to Appear Pro Hac Vice. Document filed by Francis N. Levy, Jeanne Levy-Church.(pgu) (Entered: 07/21/2011) |
| 07/20/2011 | 17 | MOTION for Cary B. Lerman to Appear Pro Hac Vice. Document filed by Francis N. Levy, Jeanne Levy-Church.(pgu) (Entered: 07/21/2011) |
| 07/22/2011 | | CASHIERS OFFICE REMARK on 15 Motion to Appear Pro Hac Vice, 16 Motion to Appear Pro Hac Vice, 17 Motion to Appear Pro Hac Vice in the amount of $600.00, paid on 07/20/2011, Receipt Number 12081. (jd) (Entered: 07/22/2011) |
| 08/03/2011 | 18 | ORDER FOR ADMISSION PRO HAC VICE ON WRITTEN MOTION. granting 15 Motion for Carl H. Moor to Appear Pro Hac Vice. It is hereby ordered that Carl H. Moor is admitted to practice pro hac vice as counsel for Appellees Jeanne Levy-Church and Francis N. Levy. (Signed by Judge Deborah A. Batts on 8/3/2011) (mro) (Entered: 08/04/2011) |
| 08/03/2011 | 19 | ORDER FOR ADMISSION PRO HAC VICE ON WRITTEN MOTION granting 17 Motion for Cary B. Lerman to Appear Pro Hac Vice. It is hereby ordered that Cary B. Lerman is admitted to practice pro hac vice as counsel for Appellees Jeanne Levy-Church and Francis N. Levy. (Signed by Judge Deborah A. Batts on 8/3/2011) (mro) (Entered: 08/04/2011) |
| 08/03/2011 | 21 | ORDER FOR ADMISSION PRO HAC VICE ON WRITTEN MOTION granting 16 Motion for Derek J. Kaufman to Appear Pro Hac Vice. It is hereby ordered that Derek J. Kaufman is admitted to practice pro hac vice as counsel for Appellees Jeanne Levy-Church and Francis N. Levy. (Signed by Judge Deborah A. Batts on 8/3/2011) (mro) (Entered: 08/04/2011) |
| 08/04/2011 | 20 | Appellant's REPLY BRIEF. Document filed by Marsha Peshkin. (Attachments: # 1 Certificate of Service)(Chaitman, Helen) (Entered: 08/04/2011) |
| 02/16/2012 | 22 | MEMORANDUM AND ORDER: The March 30, 2011 Order of the United States Bankruptcy Court, Judge Burton R. Lifland, is hereby AFFIRMED. The Clerk of Court is directed to CLOSE the docket in this case. (Signed by Judge Deborah A. Batts on 2/16/2012) (jfe) (Entered: 02/16/2012) |
| 02/16/2012 | | Transmission to Judgments and Orders Clerk. Transmitted re: 22 Order, to the Judgments and Orders Clerk. (jfe) (Entered: 02/16/2012) |
| 02/22/2012 | 23 | CLERK'S JUDGMENT That for the reasons stated in the Court's Memorandum Order dated February 16, 2012, the March 30, 2011 Order of the United States Bankruptcy Court, Judge Burton R. Lifland, is hereby affirmed; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 2/22/12) (Attachments: # 1 NOTICE OF RIGHT TO APPEAL)(ml) (Entered: 02/22/2012) |
| 02/29/2012 | 24 | NOTICE OF APPEAL from 23 Clerk's Judgment, 22 Order. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Document filed by Marsha Peshkin. Filing fee $ 455.00, receipt number 0208-7240549. (Attachments: # 1 Certificate of Service)(Chaitman, Helen) (Entered: 02/29/2012) |

| 02/29/2012 | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 24 Notice of Appeal,. (nd) (Entered: 02/29/2012) |
|---|---|
| 02/29/2012 | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 5 Notice of Appearance filed by Irving H. Picard, 19 Order on Motion to Appear Pro Hac Vice, 15 MOTION for Carl H. Moor to Appear Pro Hac Vice. filed by Francis N. Levy, Jeanne Levy-Church, 4 Designation of Record on Appeal filed by Irving H. Picard, 14 Certificate of Service Other filed by Francis N. Levy, Jeanne Levy-Church, 16 MOTION for Derek J. Kaufman to Appear Pro Hac Vice. filed by Francis N. Levy, Jeanne Levy-Church, 23 Clerk's Judgment, 12 Appellee's Brief filed by Irving H. Picard, 20 Appellant's Reply Brief filed by Marsha Peshkin, 7 Notice of Appearance filed by Marsha Peshkin, 9 Notice of Appearance filed by Marsha Peshkin, 3 Designation of Record on Appeal filed by Francis N. Levy, Jeanne Levy-Church, 21 Order on Motion to Appear Pro Hac Vice, 13 Appellee's Brief filed by Francis N. Levy, Jeanne Levy-Church, 18 Order on Motion to Appear Pro Hac Vice, 11 Notice of Appearance filed by Francis N. Levy, Jeanne Levy-Church, 24 Notice of Appeal, filed by Marsha Peshkin, 10 Certificate of Service Other filed by Marsha Peshkin, 6 Stipulation and Order, Set Deadlines/Hearings,, 2 Designation of Record on Appeal filed by Marsha Peshkin, 17 MOTION for Cary B. Lerman to Appear Pro Hac Vice. filed by Francis N. Levy, Jeanne Levy-Church, 8 Appellant's Brief filed by Marsha Peshkin, 22 Order, 1 Bankruptcy Appeal, filed by Marsha Peshkin were transmitted to the U.S. Court of Appeals. (nd) (Entered: 02/29/2012) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/04/2012 12:05:24 | | |
| **PACER Login:** | bp2735 | **Client Code:** | vaughan.general |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-03313-DAB |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>JEFFRY M. PICOWER, individually and as trustee for the Picower Foundation;<br><br>BARBARA PICOWER, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation;<br><br>CAPITAL GROWTH COMPANY;<br><br>FAVORITE FUNDS;<br><br>JA PRIMARY LIMITED PARTNERSHIP;<br><br>JA SPECIAL LIMITED PARTNERSHIP; | Adv. Pro. No. _____ (BRL) |

JAB PARTNERSHIP;

JEMW PARTNERSHIP;

JF PARNERSHIP;

JFM INVESTMENT COMPANY;

JLN PARTNERSHIP;

JMP LIMITED PARTNERSHIP;

JEFFRY M. PICOWER SPECIAL CO.;

JEFFRY M. PICOWER, P.C.;

DECISIONS INCORPORATED;

THE PICOWER FOUNDATION;

THE PICOWER INSTITUTE FOR
MEDICAL RESEARCH;

THE TRUST FBO GABRIELLE H.
PICOWER; and DOES 1-25.

Defendants.

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), by and through his undersigned counsel,

for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.        This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated client account

statements for its nearly 7,000 client accounts at BLMIS.  When added together, these statements

purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS.

-2-

least $5.1 billion of that sum was over and above any funds deposited by Defendants and constituted money belonging to victims of the fraud.

        c.      Even Defendants' low annual rates of return were anomalous. In 2000, several of Defendants' regular trading accounts reported significantly *negative* annual rates of return, ranging from negative 74% to negative 779%. A contributing factor to these negative returns was the unwinding in January 2000 of close to $11 billion in short "sales" created in December 1999. As of November 1999, these accounts reflected a total negative cash balance of approximately $3.8 billion. In December 1999, however, Defendants "executed" $8.5 billion of short sales, resulting in the cash balance in these accounts moving from net negative to net positive. In January 2000, Defendants "completed" the short trades, resulting in a new net cash deficit of approximately $6.3 billion. The net effect of the January 2000 transactions was to increase the net cash deficit across these accounts by $2.5 billion over the net cash deficit in November 1999. In other words, Defendants "executed" short trades that reversed Defendants' year-end net cash, making it net positive as of December 31, 1999, but which then resulted in a net loss of $2.5 billion a month later. Such unusual year-end activity reflecting a multi-billion dollar loss would have caused a reasonable investor to question such trades.

        d.      Picower and the other Defendants knew or should have known that fictitious and backdated trading activity was being reported in their accounts, and that their accounts reflected fictitious holdings. For example, Decisions maintained several accounts with BLMIS. One of those accounts, "Decisions Inc.," was used by Picower and the other Defendants as the primary source of cash withdrawals from BLMIS. The account reflected little trading activity and relatively few holdings, but Picower directed quarterly distributions from this account in the millions to hundreds of millions of dollars throughout the 1990s and

-20-

2000s. Indeed, as of the date of Madoff's arrest, the account had a reported negative net cash balance of more than $6 billion. Most distribution requests were signed by Picower and faxed to BLMIS by Freilich, although some were signed by Freilich and in other cases Picower directed that any questions should be addressed to "April [Freilich]."

        e.     Even more brazenly, one account combined outrageous returns with backdating to create trades that "occurred" before the account was even opened by BLMIS. On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began "purchasing" securities in the account, but it backdated the vast majority of these purported transactions to January 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading. The reason for this massive gain: the Decisions 6 April 2006 customer account statement reflected 57 purported purchases of securities between January 10 and January 24, 2006, almost three months before the account was opened or funded. Defendants knew or should have known that the account that they opened in April could not legitimately have purchased securities in January, and that the $125 million deposited on April 18 could not legitimately have grown by more than 30% in less than two weeks, which, annualized, would have resulted in a rate of return of more than 750%. The majority of the securities "purchased" in January were "purchased" near the lowest prices for the period from January to April 2006, and were purportedly chosen in order to create an unusually high unrealized gain by the end of April.

        f.     Additionally, on information and belief, Picower, directly and/or through and/or with the assistance of Freilich, directed fictitious, backdated trades in order to achieve

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

        In the Matter

            of                Case No.

                        1-08-01789


SECURITIES INVESTOR PROTECTION CORPORATION

             V.

BERNARD L. MADOFF INVESTMENT SECURITIES, et al.,

             Debtors.

----------------------------------------x

                     February 18, 2010

                     United States Custom House

                     One Bowling Green

                     New York, New York 10004


        Motion for an Entry of Order Pursuant to Section

105(a) of the Bankruptcy Code and Rules 2002 and 9019 of

the Federal Rules of Bankruptcy Procedure Approving an

Agreement by and Among the Trustee and Jeanne Levy-Church

and Francis N. Levy,  et al.


B E F O R E:

                 HON. BURTON R. LIFLAND,

                     U.S. Bankruptcy Judge

2

```
 1    A P P E A R A N C E S :

 2

 3

 4         BAKER HOSTETLER, LLP

 5         Attorneys for Irving H. Picard, Trustee

 6              45 Rockefeller Plaza

 7              New York, New York 10017

 8    BY:    MARC E. HIRSCHFIELD, ESQ.

 9                -and-

10           PAUL EYRE, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    Proceedings

2              THE COURT:  Securities Investor Protection

3    vs. Bernard L. Madoff Investment Securities.

4                    Is that based on the calendar or caption,

5    The Bankruptcy Link?

6              MR. HIRSCHFIELD:   Calendar.

7              THE COURT:  So we ought to recaption it

8    then.

9              MR. HIRSCHFIELD:   Good morning, Your

10   Honor.

11             THE COURT: Good morning.

12             MR. HIRSCHFIELD:  I am Marc Hirschfield,

13   from the law firm of Baker Hostetler, on behalf of the

14   Trustee.   With me today is my colleague, Paul Eyre, who

15   helped work on the settlement.

16                  Before the Court today is the motion under

17   Bankruptcy Rule 9019 seeking the Court's approval an

18   agreement with Jeanne Levy-Church and Francis Levy, adult

19   children of Betty and Norman Levy drew up an agreement the

20   Levys will return to the Trustee 220 million dollars.

21                  By way of background, Your Honor, Norman

22   Levy was a real estate executive here in New York.   He

23   began investing with Madoff in the mid-1970s.

24                  Over the years, Mr. Levy opened up a number

25   of accounts with BLMIS for himself, for his wife, and for

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

4

1   various members of his family including his children and

2   the family and other charitable trusts.   Mr. Levy passed

3   away in 2005, and throughout his life he placed great trust

4   in Mr. Madoff.

5              In his will, he appointed Madoff as one of

6   his executors and that granted Madoff the authority to make

7   unilateral decisions with regard to nonreal estate assets

8   of his estate.

9              Mr. Madoff unfortunately took advantage of

10  that trust and breached it, and after Mr. Levy's death

11  transferred 220 million dollars of non-Madoff assets.

12              THE COURT:  As an executor --

13              MR. HIRSCHFIELD:   Yes.

14              THE COURT:  -- of the Levy estate?

15              MR. HIRSCHFIELD:   Yes. He transferred it to

16  BLMIS and, of course, that money was lost along with all

17  the other money.

18              THE COURT:  This is a bit of lack of

19  integrity we have not seen before.

20              MR. HIRSCHFIELD:   I think there is no

21  floor to Mr. Madoff's integrity.

22              So, essentially, Your Honor, Madoff stole

23  the 220 million dollars from Mr. Levy's heirs.   Even with

24  this 220 million dollars over the years the Levy account

25  holders took out more money from Madoff than they put in.

5

1          Therefore, Your Honor, under our parlance

2     they are not winners.   Last spring Jeanne and Francis

3     Levy, the two heirs of Mr. Norman Levy approached us

4     through their counsel to begin to discuss their potential

5     liability.   We did not contact them.   They contacted us.

6          From the very beginning, Your Honor, they

7     made it very clear to us they want to do the right thing.

8     They felt badly about having other people's money and they

9     wanted to return to the Trustee the profits they received,

10    which was really other people's money.

11          After discussing with them various things

12    and learning about them and their finances and their assets

13    and their liabilities, the Trustee made a demand of them of

14    220 million dollars, which at that time was the six-year

15    number of the money that they took out.

16          In addition to that, Your Honor, the 220

17    million dollars another 84 million of false profits was

18    withdrawn by the Betty and Norman Levy Foundation, which

19    was a charitable trust which Mr. Levy and his wife had set

20    up.   They told us, the Levis, and they gave us evidence to

21    corroborate all of this 84 million dollars which was

22    donated to charitable causes and the foundation has

23    virtually nothing left to which to return anything to the

24    Trustee.

25          Based upon this, the trustee in his

6

1    business judgment made the decision not to seek any

2    recovery from the trust.   Again, to do so, from the

3    foundation rather, to do so would have been futile because

4    as I said they had nothing to give us.   So, therefore,

5    trying to commence a lawsuit against the foundation would

6    have made no sense.

7            The Trustee does believe that the other

8    money withdrawn by the Levys is recoverable under Section

9    544, 548 and 550 of the Bankruptcy Code.

10            When the Levy executed liability to the

11    trust they agreed to pay us the amount we requested, 220

12    million dollars.   That agreement is set forth in a

13    settlement agreement attached to the motion.

14            I will just highlight a few of the terms of

15    the agreement for the Court's reference.

16            Under the agreement, as mentioned the Levys

17    will pay us at closing which will happen very shortly after

18    an order approving the settlement has become final some 220

19    million dollars in one payment.

20            The Trustee and the Levis will exchange a

21    release and the Trustee will agree not to sue certain

22    entities that are related to the Levis.

23            The Levis have agreed, respectively, they

24    will assist us when asked in our effort to recover other

25    money from other people and, finally, there are two

7

1   children of Francis Levy, who unlike the other Levy

2   members, those accounts that they had with Madoff were not

3   losers.

4              They submitted claims before the bar date

5   and those two proofs of claim will be redeemed withdrawn as

6   part of the settlement.   So there will be no recovery at

7   all on those two claims.

8              We believe the settlement is a very good

9   one and we ask for the Court's approval.   In connection

10  with our motion, the Trustee submitted an affidavit to the

11  Court in which he stated that he believes the settlement is

12  appropriate in his business judgment and that the business

13  agreement falls well above the lowest point of

14  reasonableness.

15             While we believe we would have prevailed if

16  we had to sue the Levis, we don't believe we have collected

17  anything more than just getting this settlement.   So,

18  therefore, we think it makes sense to have the settlement

19  agreement.

20             Your Honor, I just have one additional

21  thing to add, as we set forth in our motion and the public

22  statements, the Trustee very much appreciates the manner in

23  which the Levys conducted themselves throughout these

24  discussions.

25             As I said earlier, the discussions were, in

8

1   fact, initiated by the Levis.  There were a lot of people

2   in this case who withdrew false profits and there are some

3   who are fighting us virtually tooth and nail not to return

4   the money, and others like the Levys and Optimal which we

5   previously settled came forward to voluntarily return the

6   money.

7              The Trustee, the Levis should serve as an

8   example to others in this case in a situation similar to

9   the Levys, and should come forward and like the Levys

10  return to us the amounts they've withdrawn.

11             In conclusion, Your Honor, we very much

12  think the settlement is a satisfactory one and we ask for

13  Your Honor's approval.

14             THE COURT:  Does anyone else want to be

15  heard?

16             Well, I am going to approve the settlement,

17  based upon the papers before me and representations here.

18             It is clear that the Trustee has done an

19  appropriate level of due diligence in recommending the

20  settlement.  Especially with respect to the concept of

21  abandoning certain actions based upon the difficulties

22  associated with the collection, that is with respect to the

23  foundation.

24             The settlement does resolve the spectre of

25  an expensive and protracted litigation, and it allows the

9

1    parties to go forward with a degree of comfort that there

2    are lawyers who are now out of the horizon to a certain

3    extent and certainly, the way the settlement has come about

4    and the amount, although interests could have demanded or

5    based upon information received, subsequent to the first

6    offer, it is clear that this settlement is well above the

7    lowest rung in a range of reasonableness and is right on

8    target in that regard and I will entertain an order

9    approving it.

10                  MR. HIRSCHFIELD:   Thank you, Your Honor.

11                  THE COURT: I have approved the order.

12                  MR. HIRSCHFIELD:   Yes.  Thank you, again,

13   Your Honor.

14                  That would be all we have on the calendar

15   for today.

16                  THE COURT:  Thank you.

17

18                        *        *        *

19

20

21

22

23

24

25

10

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK          }

                                }    ss.:

5    COUNTY OF NEW YORK         }

6                I, MINDY CORCORAN, a Shorthand Reporter

7    and Notary Public within and for the State of New York, do

8    hereby certify:

9                That I reported the proceedings in the

10   within entitled matter, and that the within transcript is a

11   true record of such proceedings.

12               I further certify that I am not related, by

13   blood or marriage, to any of the parties in this matter and

14   that I am in no way interested in the outcome of this

15   matter.

16               IN WITNESS WHEREOF, I have hereunto set my

17   hand this 19th day of February, 2010.

18          Mindy Rothman-    Digitally signed by Mindy Rothman-
            Corcoran          Corcoran
                              DN: cn=Mindy Rothman-Corcoran, o=US
            Corcoran          Reason: I am the author of this document
19                            Date: 2010.02.22 14:39:11 -05'00'
            _____

            MINDY CORCORAN

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

**Hearing Date: February 18, 2010 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>         Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>         Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**ORDER PURSUANT TO SECTION 105(a) OF THE
BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND
AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY**

Upon the motion (the "Motion")[1] of Irving H. Picard, Esq. (the "Trustee") as trustee for

the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC and

Bernard L. Madoff, seeking entry of an order, pursuant to sections 105(a) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and Rules 2002 and 9019 of the Federal Rules of

Bankruptcy Procedure, approving the agreement, by and among the Trustee, on the one hand,

and Jeanne Levy-Church and Francis N. Levy, on the other hand, in substantially the form

annexed to the Motion (the "Agreement"); and it appearing that due and sufficient notice has

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

been given to all parties in interest as required by Rules 2002 and 9019 of the Federal Rules of

Bankruptcy Procedure; and the Court having considered the Affidavit of Irving Picard in support

of the Motion; and it further appearing the relief sought in the Motion is appropriate based upon

the record of the hearing held before this Court to consider the Motion; and it further appearing

that this Court has jurisdiction to consider the Motion and the relief requested therein pursuant to

28 U.S.C. §§ 157 and 1334; and after due deliberation; and sufficient cause appearing therefor; it

is

ORDERED, that the Motion is granted in its entirety; and it is further

ORDERED, that the Agreement between the Trustee on the one hand and Jeanne Levy-

Church and Francis N. Levy on the other hand is hereby approved and authorized; and it is

further

ORDERED, that the Trustee, Jeanne Levy-Church and Francis N. Levy shall each

comply with and carry out the terms of the Agreement.

Dated: New York, New York
      February 18, 2010


                                   *s/ Burton R. Lifland*
                               HONORABLE BURTON R. LIFLAND
                               UNITED STATES BANKRUPTCY JUDGE

A-23

**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

*Attorneys for Marsha Peshkin,*
*and a large group of other customers*

**Hearing Date:   March 11, 2011 at 10:00 a.m.**
**Objection Deadline:  March 4, 2011**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                        Plaintiff,<br><br>           v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>                                        Defendant. | Case No.:  08-01789 (BRL)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated)<br><br><br><br>**NOTICE OF MOTION** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                                        Debtor. | |

**PLEASE TAKE NOTICE** that, upon the Declaration of Helen Davis Chaitman, dated

February 18, 2011, the accompanying Memorandum of Law, and on all the proceedings

heretofore had herein, Marsha Peshkin, and a non-exclusive group of other customers of Bernard

L. Madoff Investment Securities LLC as listed on Exhibit A to the Chaitman Declaration (the

"Movants"), by their undersigned counsel, will move before the Honorable Burton R. Lifland,

United States Bankruptcy Judge, at the United States Bankruptcy Court, the Alexander Hamilton

Customs House, One Bowling Green, New York, New York 10004, on March 11, 2011 at 10:00

a.m., or as soon thereafter as counsel may be heard, seeking entry of an order  pursuant to

Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024: (1) vacating

the February 18, 2010 order (Doc # 1964) of the United States Bankruptcy Court for the

Southern District of New York Approving an Agreement by and among the Trustee and Jeanne

Levy-Church and Francis N. Levy; and (2) granting such other and further relief in the Movants'

favor as the Court deems just and proper.

      **PLEASE TAKE FURTHER NOTICE** that any written objections to this Motion are to

be served upon Becker & Poliakoff LLP, counsel for the Movants, by no later than March 4,

2011.

February 18, 2011

                               BECKER & POLIAKOFF LLP

                               By: /s/ Helen Davis Chaitman
                               45 Broadway
                               New York, NY 10006
                               (212) 599-3322
                               *Attorneys for Marsha Peshkin, and a large*
                               *group of other customers*

**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

*Attorneys for Marsha Peshkin,*
*and a large group of other customers*

**Hearing Date:   March 11, 2011 at 10:00 a.m.**
**Objection Deadline:   March 4, 2011**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                              Plaintiff,<br><br>                    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                              Defendant. | Case No.:  08-01789 (BRL)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                                              Debtor. | |

**ORDER SETTING ASIDE THE ORDER APPROVING THE SETTLEMENT BY AND**
**AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY**
**FOR FAILURE TO DISCLOSE MATERIAL INFORMATION**

Upon the Motion (the "Motion") of Marsha Peshkin, and a non-exclusive group of other

customers of Bernard L. Madoff Investment Securities LLC, as listed on Exhibit A to the

Chaitman Declaration (the "Movants"), seeking an entry of an order, pursuant to Federal Rule of

Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024, setting aside the Order

Approving the Settlement by and among the Trustee and Jeanne Levy-Church and Francis N.

Levy (Doc # 1964); and it appearing that due and sufficient notice has been given to all the

parties in interest; and the Court having considered documents submitted in support of the

A-26

Motion; and it further appearing the relief sought in the Motion is appropriate based upon the

record before this Court; and after due deliberation and sufficient cause appearing; it is:

      ORDERED, that the Movants' Motion is granted in its entirety.

New York, New York
March __, 2011

_____
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone  (212) 599-3322

*Attorneys for Marsha Peshkin*
*and a large group of other customers*

**Hearing Date:   March 11, 2011 at 10:00 a.m.**
**Objection Deadline:  March 4, 2011**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Case No.:  08-01789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF CUSTOMERS' MOTION TO SET ASIDE THE ORDER APPROVING THE TRUSTEE'S SETTLEMENT WITH THE LEVY HEIRS FOR FAILURE TO DISCLOSE MATERIAL INFORMATION**

Marsha Peshkin and a large group of other customers of Bernard L. Madoff Investment

Securities LLC ("BLMIS") ("Movants"),[1] submit this memorandum of law in support

of their motion to vacate the February 18, 2010 order (Doc # 1964) approving the Trustee's

settlement with Jeanne Levy-Church and Francis N. Levy, the heirs of Norman F. Levy (the

---

[1] Becker & Poliakoff LLP files this motion on behalf of all of the Madoff customers listed on Exhibit A to the accompanying Declaration of Helen Davis Chaitman ("Chaitman Decl.").

"Levy Heirs"), pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024. [2]

## PRELIMINARY STATEMENT

Movants were BLMIS customers who lost their life savings as a result of Madoff's Ponzi scheme. It is in their best interests that the Trustee obtain the maximum recovery possible from Madoff's co-conspirators. Based on information that has recently been disclosed, Norman Levy financed Madoff's Ponzi scheme during the period from 1992 through 2001 in an amount exceeding $100 billion. This stunning fact was not disclosed by the Trustee at the time he sought approval of his settlement with the Levy Heirs, despite the fact that the Trustee, by that time, had the benefit of approximately $100 million of forensic accounting analysis of BLMIS' business records. On the contrary, in his motion, the Trustee praised the Levy Heirs for coming forward and offering to settle all claims against them for a mere $220 million. We now know, and presumably the Trustee knew a year ago, that:

    A.    In 1997, Levy transferred $7 billion to BLMIS and BLMIS transferred $7 billion to Levy.

    B.    In 1998, Levy transferred $10 billion to BLMIS and BLMIS transferred $10 billion to Levy.

    C.    In 1999, Levy transferred $15 billion to BLMIS and BLMIS transferred $15 billion to Levy.

    D.    In 2000, Levy transferred $23 billion to BLMIS and BLMIS transferred $23 billion to Levy.

    E.    In 2001 Levy transferred $35 billion to BLMIS and BLMIS transferred $35 billion to Levy.[3]

---

[2] A copy of the Order is attached as Exhibit B to the Chaitman Decl.

[3] See the January 24, 2011 letter from SIPC president Stephen Harbeck to Congressman Scott Garrett, Chair of the House Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises, at 14-15. A copy of the Letter is attached as Exhibit G to the Chaitman Decl.

These transfers were eight times greater than the combined transfers of all other BLMIS customers during this period. *Id.*

During 2002, BLMIS initiated 318 separate transfers from its account at Chase to Levy's account at Chase in the precise amount of $986,301 (collectively amounting to a total of $313,643,718 in transfers). That constitutes more than one transfer per day that Chase was open for business. [4]

In December 2001, BLMIS received daily checks from Levy in the amount of $90 million.[5]

Despite these alarming facts, on January 27, 2010, when the Trustee announced his settlement with the Levy Heirs, he praised them for offering to settle for $220 million.[6]

> I am very pleased that the Levys came to us to discuss the claims that BLMIS has against them and that they agreed to return to BLMIS $220 million, the amount we requested, for the benefit of the victims of Madoff's fraud. **The Levys have acted honorably and are to be commended. We hope that others will follow their example.** [7]

On that same day, the Trustee filed a motion for approval of the Levy settlement (the "Motion") in which he commended the Levy family on its "good faith negotiations" that led to the Settlement.[8] He praised the Levys for being "forthright and sincere in their desire to do the right thing" and "appreciate[d] the manner in which the Levys cooperated with him to obtain the

---

[4] Trustee's complaint in *Picard v. JPMorgan Chase & Co., et als.,* (Adv. Pro. No. 10-04932) (the "Complaint") at para. 224. Relevant excerpt from the Complaint is attached as Exhibit C to the Chaitman Decl.

[5] *Id.* at para. 231.

[6] *See* Press Release of Irving H. Picard, "MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION," dated January 27, 2010, available at http://www.madofftrustee.com/News.aspx (the "Levy Family Press Release"), at 1. A copy of the Levy Family Press Release is attached as Exhibit D to the Chaitman Decl.

[7] *See* the Levy Family Press Release, at 1.

[8] *See* Motion at para. 11. A copy of the Motion is attached as Exhibit E to the Chaitman Decl.

information he needed to arrive at the settlement."[9] He expressed the hope "that other BLMIS customers will come forward, follow suit, and similarly engage in cooperative and candid settlement discussions."[10]

On February 18, 2010, this Court held a hearing on the Motion at which Baker & Hostetler, LLP ("B&H"), appearing on behalf of the Trustee, made no disclosure of the fact that Mr. Levy had financed the Ponzi scheme to the tune of over $100 billion. On the contrary, B&H praised the Levys for reaching out to the Trustee and reported to the Court that the Levys "felt badly about having other people's money and they wanted to return to the Trustee the profits they received, which was really other people's money." Indeed, B&H stated that Madoff took advantage of Mr. Levy by misappropriating $250 million as the executor of Mr. Levy's estate. [11] The Trustee submitted an affidavit to the Court in support of the Motion "in which he stated that he believed the settlement was appropriate in his business judgment." [12]

## ARGUMENT

Federal Rule of Civil Procedure 60(b), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9024, allows the Court to set aside orders and judgments based upon "(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . . or (6) any

---

[9] *See id.*

[10] *Id.*

[11] *See* Transcript of February 18, 2010 Hearing on Motion (the "Hearing Transcript"), at 4, 5 and 7. A copy of the Hearing Transcript is attached as Exhibit F to the Chaitman Decl.

[12] *Id.* at 7.

4

other reason that justifies relief." Fed. R. Civ. P. §60(b). Sufficient grounds exist to set aside the Order under any of the above provisions.

Had Movants been aware of the facts concerning Levy's role in financing the Ponzi scheme, they certainly would have objected to the Levy settlement and, indeed, it is inconceivable that, had the Court been aware of these facts, the Court would have approved the settlement. In light of information that was not disclosed to the Court when it entered the Order, it should be vacated pursuant to subsection Rule 60(b)(2). To prevail under this subsection, the party must show that "'(1) newly discovered evidence is of facts existing at the time of [the prior decision]; (2) the moving party is excusably ignorant of the facts despite using due diligence to learn about them; (3) the newly discovered evidence is admissible and probably effective to change the result of the former ruling; and (4) the newly discovered evidence is not merely cumulative . . . of evidence already offered.'" *Tufts v. Corp. of Lloyd's*, 981 F. Supp. 808, 812 (S.D.N.Y. 1996) (quoting *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 905 F. Supp. 1251, 1264 (S.D.N.Y. 1995)).

While the Trustee had the benefit of over $100 million of forensic accounting analysis of BLMIS' business records at the time he sought approval of the settlement, Movants were not permitted to take any discovery of BLMIS. Thus, they could not possibly have known these facts. Therefore, the Movants' first opportunity to learn of Levy's participation in the fraud was after disclosure of Mr. Harbeck's January 24, 2011 letter. Clearly, the facts set forth in this letter are sufficient "to change the result of the former ruling," and are, therefore, grounds for relief from the Order. *Id.*

The Trustee's failure to disclose material information pertaining to the Levy settlement warrants relief from the Order. Rule 60(b)(3) allows Movants to vacate an order based on fraud,

misrepresentation or other misconduct of a party.  "Ordinarily clause (3) is invoked where

material information has been withheld or incorrect or perjured evidence has been intentionally

supplied."  *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981).   Here, the

Trustee concealed the fact that Levy played a major role in financing Madoff's Ponzi scheme.

At a minimum, such information required disclosure to the Court.  "There can be no informed

and independent judgment as to whether a proposed compromise is fair and equitable until the

bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective

opinion . . . ."  *In re Refco Inc.*, 2006 WL 3409088, at *7 (S.D.N.Y. Nov. 16, 2006) (emphasis

added); *see also In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427 (S.D.N.Y. 1993) (holding that

"[t]he record . . . supports the reasoned decision . . . to approve the settlement, for it indicates that

the Bankruptcy Court took into account and weighed the factors necessary for the determination

of the appropriateness of the settlement.") (emphasis added).

The Trustee's failure to disclose to the Court the crucial information he possessed about

Levy, including the "highly unusual transactions"[13] he engaged in with BLMIS for many years,

was tantamount to a misrepresentation to the Court of Levy's innocence.   Had this information

been available to the Court, clearly, a settlement of $220 million would not have been approved.

Substantial justice also requires that the Order be set aside.  Federal Rule of Civil

Procedure 60(b)(6) permits a Court to vacate a judgment for "any other reason that justifies

relief."  The Second Circuit has held that Rule 60(b)(6) "should be liberally construed" in

instances where its application is critical to bringing about "substantial justice."  *Radack v.

Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963).  The Order prevents

Movants, among other innocent BLMIS customers, from potentially recovering billions of

---

[13] *See* Complaint at para. 223-248.

6

A-33

dollars to compensate them for the tremendous loss incurred as a result of Madoff's Ponzi scheme.

**CONCLUSION**

For the foregoing reasons, the Order should be set aside.

February 18, 2011

**BECKER & POLIAKOFF LLP**

By:    /s/ Helen Davis Chaitman
       Helen Davis Chaitman
       45 Broadway
       New York, New York 10006
       (212) 599-3322

       *Attorneys for Marsha Peshkin
       and a large group of other customers*

**BECKER & POLIAKOFF LLP**
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

**Hearing Date:  March 11, 2011 at 10:00 a.m.**
**Objection Deadline:  March 4, 2011**

*Attorneys for Marsha Peshkin*
*and a large group of other customers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                        Plaintiff,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                        Defendant. | Case No.:  08-01789 (BRL)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                                        Debtor. | |

**DECLARATION OF HELEN DAVIS CHAITMAN**
**IN SUPPORT OF MOTION TO SET ASIDE THE ORDER APPROVING THE**
**TRUSTEE'S SETTLEMENT WITH THE LEVY HEIRS FOR FAILURE TO DISCLOSE**
**MATERIAL INFORMATION**

I, Helen Davis Chaitman, hereby declare, under penalty of perjury pursuant to 28 U.S.C.

§1746, as follows:

I am a partner with Becker & Poliakoff LLP, counsel to Marsha Peshkin, and a large

group of other customers of Bernard L. Madoff Investment Securities Inc. ("Madoff").  A non-

exclusive list of my clients is set forth on **Exhibit A** attached hereto (the "Movants").  I am a

member of the bars of New York and New Jersey, and of this Court.  I submit this declaration in

support of the Movants' motion for an Order pursuant to Federal Rule of Civil Procedure 60 and

Federal Rule of Bankruptcy Procedure 9024: (1) vacating the February 18, 2010 order (Doc #

1964)  of the United States Bankruptcy Court for the Southern District of New York Approving

an Agreement by and among the Trustee and Jeanne Levy-Church and Francis N. Levy (the

"Order"), and (2) granting such other and further relief in the Movants' favor as the Court deems

just and proper.

      1.     A true and correct copy of the Order, which is subject of this motion (Doc #

1964), is attached hereto as **Exhibit B**.

      2.     A true and correct copy of a relevant excerpt of the complaint filed by the Trustee

in *Picard v. JPMorgan Chase & Co.*, *et als.*, (Adv. Pro. No. 10-04932), is attached hereto as

**Exhibit C**.

      3.     A true and correct copy of Irving H. Picard Press Release "MADOFF TRUSTEE

ANNOUNCES SETTLEMENT OF $220 MILLION," dated January 27, 2010, is attached hereto

as **Exhibit D**.

      4.     A true and correct copy of the Trustee's Motion Seeking Court's Approval of an

Agreement by and among the Trustee and Jeanne Levy-Church and Francis N. Levy (Doc #

1833) is attached hereto as **Exhibit E**.

      5.     A true and correct copy of transcript from the February 18, 2010 hearing on

Trustee's Motion seeking Court's Approval of an Agreement by and among the Trustee and

Jeanne Levy-Church and Francis N. Levy is attached hereto as **Exhibit F**.

      6.     A true and correct copy of the January 24, 2011 letter from SIPC president

Stephen Harbeck to Congressman Scott Garrett, Chair of the House Subcommittee on Capital

Markets, Insurance, and Government-Sponsored Enterprises is attached hereto as **Exhibit G**.

I declare under penalty of perjury that the foregoing is true and correct.

February 18, 2011

/s/ Helen Davis Chaitman

Diane and Roger Peskin, Alan and Rita English, Michael and Joan Epstein, Donald A. Benjamin, David Wingate, Sandra Busel Revocable Trust, Joel Busel Revocable Trust, Martin Lifton, Robert F. Ferber, Armand Lindenbaum, Linda Waldman, Mike Stein, Sondra and Norman Feinberg, ChaitmaniSchwebel LLC, Ronald Gene Wohl Credit Shelter Trust, Theresa Rose Ryan, Thomas A. Sherman, Barbara and Robert J. Vogel, Howard Israel, Nancy Feldman, David and Susan Glodstein, Brad E. Avergon and Cynthia B. Avergon and Ronnie Sue Ambrosino, Gross Associates, Sanford Harwood, Stephen and Leslie Ehrlich, Dara Norman Simons, Hannah P.Norman Revocable Trust, Paul Allen, Allen Family Trust, Cynthia and Ted Arenson, Jaqueline and Robert Avergon, William I. Bader, Berkowitz-Blau Foundation, Inc., Morrey Berkwitz, Roz and Hemy Bessel, Michael Brillante, Anna Cohn, Russel Dusek, Sabra and Marvin Englebardt Retirement Plan, Alan and Ritz English, Mark Feldman, Leonard Forrest Revocable Trust, Barbara and Richard Gaba, Sol Ganes, Kuntzman Family LLC, Carla Ginsburg, Sidney and Elaine Glodstein, Leslie Goldsmith, Susan Greer, WDG Associates Inc. Retirement Trust, Robert Halio, Estelle Harwood Family LP, Sanford Harwood Family LP, Toby Harwood, Annette Jungreis Trust, Saulius Kajota, Carol Kamenstein, Sloan Kamenstein, Tracy Kamenstein, Ken and Myrna Kohl, Miller Partnership, Miller Trust Partnership, Mishkin Family Trust, Grace Mishkin, William Mishkin, Carol and Stanley Nelson, Martin R. Harnick, Steven Norton, Preffer Family Trust, Realty Negotiators Inc. Defined Benefit Plan, Marvin and Roberta Plateis, Alan and Linda Rosenthal, Helen Saren-Lawrence, Elaine Schaffer Revocable Trust, Elaine Ruth Schaffer, Alice Schindler, Jeffrey Shankman, Herbert Silvera, Shirley Stone, Gunther Unflat, Carla Szymanski Revocable Trust, Whitman Partnership, Wohl George Partners LP, Robert Yaffe, Triangle Properties #39, and R.R. Rosenthal Associates

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jessie M. Gabriel
Email: jgabriel@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jennifer A. Vessells
Email: jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email: lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email: ldandrea@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br>**COMPLAINT**<br><br>**REDACTED** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

       Plaintiff,

       v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, and J.P. MORGAN
SECURITIES LTD.,

       Defendants.

Adv. Pro. No. 10-04932 (BRL)

should have seen tens of billions of dollars—nearly all of the IA Business's assets under management—moved into T-bills, as that was part of BLMIS's purported investment strategy.

221.    Instead, what JPMC saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading.  Money would come into the 703 Account as customers invested additional funds with BLMIS.  An overwhelming majority of funds would then go directly back out to customers in the form of redemptions.  Any balance that remained in the 703 Account was invested in short-term securities such as overnight sweeps, commercial paper, and certificates of deposit.

222.    JPMC also faced regular account activity that would have been suspicious regardless of the type of business JPMC thought Madoff was running.  The 2000 OCC BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures.  These red flags included:  (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking centers or financial secrecy havens.  The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

223.    In addition, much of this account activity occurred between BLMIS and other JPMC customers.  Most notably, the party transacting with BLMIS most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, REDACTED [BLMIS/JPMC Customer 1].

### Account Activity Red Flags

224.    *Repetitive Transactions:*  BLMIS frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.  For example, during 2002, BLMIS initiated outgoing transactions to [REDACTED] [BLMIS/JPMC Customer 1] in the precise amount of $986,301 hundreds of times—318 separate times, to be exact.  These highly unusual transactions were often sent multiple times on a single day.

225.    As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from [REDACTED] [BLMIS/JPMC Customer 1] were almost always equal to the total monthly dollar amounts going out of the 703 Account to [REDACTED] [BLMIS/JPMC Customer 1].  There was no clear economic purpose for such repetitive transactions that had no net impact on [REDACTED] [BLMIS/JPMC Customer 1's] account at BLMIS.

226.    *Large Dollar Transactions:* The 703 Account reflected a pattern of large dollar transactions.  Between 1998 and 2008, BLMIS transferred $84 billion out of the 703 Account to just four customers.  These transactions represented over 75% of the wires and checks that flowed out of the 703 Account.  It also was typical for BLMIS, through the 703 Account, to enter into individual transactions with the BLMIS feeder funds for hundreds of millions of dollars.

227.    *Spikes in Activity:*  The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMC.  Shortly before the beginning of the credit crisis, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account.  This increase in activity included a significant increase not only in third party wires but also in book transfer activity.  During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

228.    There was also a downward spike in activity between the 703 Account and[REDACTED] [BLMIS/JPMC Customer 1's] account at the Private Bank after December 2001.  In December 2001 alone, BLMIS engaged in approximately $6.8 billion worth of transactions with[REDACTED] [BLMIS/JPMC Customer 1].  Shortly thereafter,[REDACTED] [BLMIS/JPMC Customer 1's] activity with the 703 Account decreased dramatically.

229.    *Wire Activity with Offshore Entities:*  Incredible spikes in the 703 Account's overall activity were accompanied by incredible spikes in offshore activity as well.  Between 2004 and 2008, the dollar amount and volume of the 703 Account's international wire transfers with high and medium risk jurisdictions increased 83% and 67%, respectively.

230.    *Check Activity:*  In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day.  This is not only unusual on its face, but it is particularly unusual given that BLMIS would issue multiple checks on the same day to the same customer.  At the very least, this activity should have prompted a check-kiting investigation, which undoubtedly would have revealed more suspicious behavior.

231.    In addition, the majority of[REDACTED] [BLMIS/JPMC Customer 1's] transactions with the 703 Account were conducted by check.  For example, in December 2001, the 703 Account received checks from[REDACTED] [BLMIS/JPMC Customer 1], each in the amount of $90 million, on a daily basis—a pattern of activity with no identifiable business purpose.

232.    *Private Banking:*  JPMC should have also been monitoring transactions from the perspective of certain JPMC customers that were also BLMIS customers.  A number of BLMIS customers held accounts at JPMC's Private Bank, including[REDACTED] [BLMIS/JPMC Customer 1]. Private banking has long been considered a high risk activity.  That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client

64

activity that is illegal or violates internal bank policy. Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.

233.    Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious. Given that those accounts were held by JPMC, the bank was in a perfect position to investigate. It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

234.    *Automated Account Monitoring:*  The 703 Account's unusual activity should have triggered JPMC's automated account monitoring system as well.      REDACTED

235.    JPMC's transaction monitoring system appears to have been critically flawed in that the formula JPMC programmed into the system failed to issue alerts even when analyzing highly suspicious activities.      REDACTED

However, even though the formula identified many instances of suspicious activity in the 703 Account, the system almost never issued alerts. This prompted compliance personnel at JPMC to ask, after Madoff's arrest, "Why didn't the DDA Account (xxxxx1703) alert . . . ?"

236.    Between June 2005 and September 2008.            REDACTED

Yet,

during that period, only one account alert was generated.

237.    Taking March 2008 as an example, during that month there were approximately

$1.1 billion in transactions in the 703 Account.  This value was so high        REDACTED

Remarkably, JPMC's transaction

monitoring system noted the unusual activity but did not consider it unusual enough to warrant

an alert.  No alert was generated in March 2008.

**JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account**

238.    Once suspicious activity is identified, a bank must further investigate to determine

whether there could be a legitimate explanation for the activity or, rather, if it is indicative of

illegal activity.                            REDACTED

Upon information and belief, in the face of repeated indications of suspicious

transaction activity in the 703 Account, as well as comments from individuals within JPMC

regarding the legitimacy of BLMIS's operations, JPMC never conducted any serious

investigation of the activity in the 703 Account or filed a SAR with the United States

government.

239.    Despite the frequency with which transactions in the 703 Account were far

outside the normal levels, the system issued only **a single account alert**.   REDACTED

REDACTED

240.                    REDACTED

241.   Finally, the reviewer noted that he could not locate a KYC file for BLMIS and, regardless, concluded the investigation.        REDACTED

242.   Even when[REDACTED] [JPMC Employee 1] raised the issue in 2007 that Madoff was operating a Ponzi scheme, no one at JPMC appears to have looked at the transactions in the 703 Account, even though it was a JPMC account.  BLMIS's Client Relationship Manager and account sponsor,[REDACTED] [JPMC Employee 9], learned of[REDACTED] [JPMC Employee 1's] claim, but took no action whatsoever.

243.   Not only did JPMC have access to BLMIS's account history, but JPMC also had access to the bank accounts of a number of BLMIS customers, and was thus provided with even more information indicating fraud.  In fact, JPMC had an extremely close relationship with one of BLMIS's largest and most active customers,[REDACTED] [BLMIS/JPMC Customer 1].

244.   [REDACTED] [BLMIS/JPMC Customer 1] was a client of JPMC's Private Bank for over [REDAC] years.[REDACTED] [BLMIS/JPMC Customer 1] had close business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC.  These individuals included

REDACTED

REDACTED

245.    <sup>REDACTED</sup> [BLMIS/JPMC Customer 1] had two Premier Checking accounts with JPMC's Private Bank:  account XXX-XXXX<sup>REDAC</sup> and account XXX-XXXX<sup>REDAC</sup>

246.    JPMC was acutely aware of<sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] close relationship with Madoff, identifying Madoff as '<sup>REDACTED</sup> [BLMIS/JPMC Customer 1's]<sup>REDACTED</sup> trader," who had helped increase<sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] wealth from $180 million in 1986 to $1.5 billion in 1998.

247.    Upon information and belief, JPMC never meaningfully investigated the connection between Madoff and<sup>REDACTED</sup> [BLMIS/JPMC Customer 1].  The activity in<sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.

248.    Instead of investigating these transactions, JPMC was primarily concerned about maintaining a relationship with<sup>REDACTED</sup> [BLMIS/JPMC Customer 1] and Madoff and maintaining a role in   REDACTED   finances                            REDACTED upon information and belief, JPMC prioritized its relationships with<sup>REDACTED</sup> [BLMIS/JPMC Customer 1] and Madoff over its compliance with regulations that required banks to monitor customer accounts.

**JPMC Had a Duty to Take Action**

249.    Suspecting that illegal activity was occurring, JPMC had a duty to take action. JPMC should have notified Madoff and then closed the account.

68

Media Contact:
Kevin McCue
kmccue@bakerlaw.com
216-861-7576

PRESS RELEASE OF IRVING H. PICARD

MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION

NEW YORK, NY – Irving H. Picard, the SIPA Trustee for the liquidation of the substantively consolidated estates of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff, announced that he has entered into an agreement with Jeanne Levy-Church and Francis N. Levy to resolve claims that BLMIS has against members of the Levy family and certain related entities. Under the agreement, the Levys will pay the Trustee $220 million, the amount demanded by the Trustee, to resolve such claims. This settlement was reached without the need for the Trustee to commence litigation against the Levys since the Levys voluntarily came forward and approached the Trustee about the matter. With this settlement, the Trustee has collected an amount approaching $1.5 billion for the benefit of the victims of Madoff's fraud. The Trustee was represented by his firm, Baker Hostetler, and the Levys were represented by Munger Tolles & Olson.

"I am very pleased that the Levys came to us to discuss the claims that BLMIS has against them and that they agreed to return to BLMIS $220 million, the amount we requested, for the benefit of the victims of Madoff's fraud. The Levys have acted honorably and are to be commended. We hope that others will follow their example," said Mr. Picard.

The Trustee filed a motion with the Bankruptcy Court today seeking approval for the settlement. The Bankruptcy Court will hold a hearing on the settlement on February 18, 2010.

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L.
Madoff*

Hearing Date:  February 18, 2010 at 10:00 a.m.
Objection Deadline:  February 11, 2010

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

NOTICE OF MOTION FOR ENTRY OF ORDER PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN
AGREEMENT BY AND AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH
AND FRANCIS N. LEVY

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, by and through his undersigned counsel, will move before the Honorable Burton R. Lifland, United States Bankruptcy Judge, at the United States Bankruptcy Court, the Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, on February 18, 2010 at 10:00 a.m., or as soon thereafter as counsel may be heard, seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure approving that certain Agreement by and among the Trustee, on the one hand, and Jeanne Levy-Church and Francis N. Levy, on the other hand, as more particularly set forth in the Motion annexed hereto (the "Motion").

PLEASE TAKE FURTHER NOTICE that written objections to the Motion must be filed with the Clerk of the United States Bankruptcy Court, One Bowling Green, New York, New York 10004 by no later than **5:00 p.m. on February 11, 2010** (with a courtesy copy delivered to the Chambers of the Honorable Burton R. Lifland) and must be served upon (a) Baker & Hostetler LLP, counsel for the Trustee, 45 Rockefeller Plaza, New York, New York 10111, Attn: Marc E. Hirschfield and (b) Munger, Tolles & Olson LLP, 355 S. Grand Ave., 35th Floor, Los Angeles, CA 90071, Attn: Ronald L. Olson. Any objections must specifically state the interest that the objecting party has in these proceedings and the specific basis of any objection to the Motion.

2

A-50

Dated: New York, New York
      January 27, 2010

Respectfully submitted,


*s/Marc E. Hirschfield*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

Hearing Date:  February 18, 2010 at 10:00 a.m.
Objection Deadline:  February 11, 2010

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                  Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

---

**MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a)**
**OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**APPROVING AN AGREEMENT BY AND AMONG THE**
**TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY**

TO:    THE HONORABLE BURTON R. LIFLAND
       UNITED STATES BANKRUPTCY JUDGE:

    Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L.

Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors"), by and through

his undersigned counsel, submits this motion (the "Motion") seeking entry of an order,

pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), approving an agreement (the "Agreement")[1] by and

among the Trustee, on the one hand, and Jeanne Levy-Church and Francis N. Levy (the

"Levys"), on the other hand, and, in support thereof, the Trustee respectfully represents as

follows:

### BACKGROUND

    1.  On December 11, 2008 (the "Filing Date"),[2] the Securities and

Exchange Commission ("SEC") filed a complaint in the United States District Court for the

Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV

10791). The complaint alleged that the Debtors engaged in fraud through investment

advisor activities of BLMIS.

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

[2] Section 78*lll*(7)(B) of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA") states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

2. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

3. On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

(i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

(ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

4. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the criminal action filed against him by the United States Attorney's Office for the Southern District of New York, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering, theft and embezzlement. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) On June 29, 2009, Madoff was sentenced to a term of imprisonment of 150 years.

5. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the BLMIS SIPA proceeding.

**THE CLAIMS AGAINST THE LEVYS**

6. Norman F. Levy ("Mr. Levy") was a New York City commercial real

3

estate executive who began investing with BLMIS in the mid-1970's on behalf of himself, members of his family and certain trusts. Mr. Levy continued to invest over the years, until his death in September 2005. Prior to his death, Mr. Levy designated Madoff as an executor of his estate and upon Mr. Levy's death, Madoff was vested with power to make unilateral investment decisions regarding the estate's non-real estate assets. After Mr. Levy's death, Madoff, acting as executor, transferred more than $250 million to BLMIS from Mr. Levy's estate, essentially "stealing" this amount from Mr. Levy's heirs and beneficiaries.

    7.  Prior to his death, Mr. Levy established a number of accounts at BLMIS in his name, the names of his children, and for family trusts and charitable trusts, including the Betty & Norman F. Levy Foundation (the "Foundation") (collectively, the "Levy BLMIS Account Holders"). During the six years prior to the Filing Date, the Levy BLMIS Account Holders withdrew an aggregate of approximately $305 million in excess of the amount of deposits made into such accounts (the "Six Year Transfers").[3] Of the $305 million, approximately $84 million (the "Foundation Transfers") was withdrawn by the Foundation, which maintained its own account at BLMIS that was separate and distinct from the accounts of the other Levy BLMIS Account Holders. The Levys have advised the

---

[3] At the time the Levys approached the Trustee and began discussions on a resolution of the Trustee's potential claims against the Levy BLMIS Account Holders, the Trustee had only identified account statements for the Levy BLMIS Account Holders dating back to 1995. The amount of the Six Year Transfers, and the other numbers set forth herein, represent amounts based on the data available to the Trustee at that time. The Trustee has since located and analyzed microfilm found at BLMIS's offices that provides additional account history for, among others, the Levy BLMIS Account Holders. Because the Trustee's settlement demand to the Levys was based on the older account data, and because the Trustee and the Levys were close to a settlement at the time that the additional account information became available, the Trustee determined that it would not be appropriate to make an additional demand of the Levys. The Trustee also understands that the Levys may be uncollectible for a judgment based upon the more complete account data. Accordingly, proceeding with litigation would not necessarily have yielded a higher return than the settlement contained in the Agreement.

Trustee that all of the money withdrawn by the Foundation was donated to charitable causes, that it has no significant remaining assets, and that it is now winding down its activities.

8.    The Trustee believes that the Six Year Transfers are recoverable. The Trustee believes that, of the Six Year Transfers, certain transfers made within two years prior to the Filing Date are fraudulent conveyances, recoverable by the Trustee pursuant to sections 548 and 550 of the Bankruptcy Code. See section 78fff-2(c)(3) of SIPA. Pursuant to these sections, a trustee may avoid and recover, for the benefit of the estate, any transfer of an interest of the debtor in property made by the debtor (i) with actual intent to hinder, delay, or defraud an entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; and (ii) the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. 11 U.S.C. §§ 548 and 550.

9.    Applying these sections of the Bankruptcy Code to the instant case, it is undisputed that Madoff intended to defraud the investors of BLMIS, as he admitted to doing so at the Plea Hearing. See Plea Hr'g Tr. 23:20-21. There is also ample evidence to show that BLMIS was insolvent at all times relevant hereto. In fact, the liabilities of BLMIS were billions of dollars greater than its assets.

10.    The Trustee has also asserted that the Levys may be liable to the BLMIS estate under section 544(b) and 550 of the Bankruptcy Code and the New York Uniform Fraudulent Conveyance Law (New York Debtor and Creditor Law §§ 270 – 281). See section 78fff-2(c)(3) of SIPA. Section 544(b) of the Bankruptcy Code allows a trustee to avoid a transfer that is voidable under state law. The New York Uniform Fraudulent Conveyance Law provides a six year look-back period for fraudulent transfers.

5

## SETTLEMENT DISCUSSIONS WITH THE LEVYS

11.    In the Spring of 2009, the Levys, through their counsel, approached the Trustee to try to reach an agreement with the Trustee on the Levy BLMIS Account Holders' potential liability to the Trustee.  While the Levys informed the Trustee that they dispute that they or the other Levy BLMIS Account Holders had any liability to the Trustee, the Levys nevertheless engaged in good faith negotiations with the Trustee that yielded the settlement set forth in the Agreement.  Throughout the discussions, the Trustee found the Levys to be forthright and sincere in their desire to "do the right thing" to negotiate a return of the fictitious profits that the Trustee had calculated the Levy BLMIS Account Holders received from BLMIS.  The Trustee had the opportunity to investigate the circumstances surrounding Mr. Levy's investment with BLMIS and whenever the Trustee made inquiry of the Levys, the Trustee received answers from them to his satisfaction.  The Trustee appreciates the manner in which the Levys cooperated with him to obtain information he needed to arrive at the settlement set forth in the Agreement, and the Trustee hopes that other BLMIS customers will come forward, follow suit, and similarly engage in cooperative and candid settlement discussions with him.

12.    The Trustee believes that the Six Year Transfers made to each of the Levy BLMIS Account Holders are recoverable pursuant to Bankruptcy Code provisions and state law.[4]  As part of the settlement discussions, the Levys informed the Trustee that prior

---

[4] The Levys have informed the Trustee that they dispute the legal and factual bases of liability for some of the withdrawals.  In particular, the Levys contend: that they do not bear any liability for their good-faith withdrawals made prior to two years before the Filing Date; that withdrawals from their Levy BLMIS Accounts were comprised of invested principal and investment earnings to which they are legally entitled as opposed to fictitious profits; and that the account balances for the Levy BLMIS Accounts were real as of December 31, 1991.  Nevertheless, the Levys

*continued on the following page…*

to the Filing Date, the Foundation had contributed the funds it received from BLMIS to various charitable causes and that the Foundation has no remaining significant assets. Accordingly, given the inability to pay any judgment against it, the Trustee has determined not to pursue recovery in respect of amounts withdrawn by the Foundation.[5]  Upon making this determination, the Trustee demanded that the Levys return to BLMIS all other net amounts withdrawn by the Levy BLMIS Account Holders within the six years of the Filing Date, i.e., $220 million.  The Levys have agreed to pay the amount of $220 million in full and final settlement of all claims under sections 544(b), 547, 548 and 550 of the Bankruptcy Code, and any other claims of the Trustee or the BLMIS estate against the Levys.

**THE AGREEMENT**

13.    The principal terms and conditions of the Agreement are generally as follows (as stated, the form of Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):[6]

- At Closing, the Levys shall pay to the Trustee for the benefit of the fund of customer property, the sum of $220,000,000.00, which is nearly one hundred percent of the amount demanded from the Levys by the Trustee, and which amount the Trustee believes equals the amounts transferred to or for the benefit of the Levys and their family members in the six years prior to the Filing Date (minus the charitable contributions discussed above).

---

*...continued from the preceding page*
wish to settle all disputes with the Trustee, and under the Agreement, they do so without admitting liability.

[5]  The Trustee reserves the right to engage in discussions with the charities that received money from the Foundation about returning to the Trustee amounts they received that constitute customer property.

[6]  Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement.  In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

- Upon payment of the above-referenced amount at Closing, the Trustee (a) will release the Levy Releasees (listed in Attachment B to the Agreement) from any and all past, present or future claims or causes of action that are, have been, could have been or might in the future be asserted by the Trustee against any of the Levy Releasees and that are based on, arise out of or relate in any way to the affairs of BLMIS or the Levy BLMIS Accounts; and (b) grant a covenant not to sue to (i) any person related by blood or marriage as of the Closing to any of the Levy Releasees (other than Mr. Levy's former son-in-law) and (ii) any entity in which any of the Levy Releasees held or hold, as of or prior to the Closing, a financial interest, in the case of (i) and (ii) for Avoiding Powers Claims but only to the extent that such person or entity is an immediate or mediate transferee of any of the Levy Releasees under section 550(b) of the Bankruptcy Code.

- Each of the Levy Releasees, through the execution by an authorized representative of a Release Subscription (the form of which is annexed to the Agreement), will release, acquit and absolutely discharge the Trustee and all his agents and BLMIS and its estate from any and all actions or causes of action asserted or unasserted, known or unknown, now existing or arising in the future in any way related to BLMIS.

- The Levys will submit to the Bankruptcy Court's jurisdiction with respect to the SIPA Proceeding and any Avoiding Power Claims.

- The Levys agree to reasonably cooperate with the Trustee in his efforts to recover funds for the BLMIS estate.

- The claims filed by Zeno F. Levy and Titus R. Levy, children of Francis N. Levy and his wife Hallie D. Cohen, will be deemed withdrawn by them.

### RELIEF REQUESTED

14.    By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Order annexed hereto as Exhibit "B" approving the Agreement.

### LEGAL BASIS

15.    Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under

Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate. In re Ionosphere Clubs, Inc., 156 BR 414, 426 (S.D.N.Y. 1993), accord, 17 F.3d 600 (2d Cir. 1994) (citing Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

  16. The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.), cert. denied sub nom. Cosoff v. Roman, 464 U.S. 822 (1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972)); accord Nellie v. Shugrue, 165 B.R. 115, 121-22 (S.D.N.Y. 1994); In re Ionosphere Clubs, 156 B.R. at 426; In re Purified Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

  17. In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

   (i) the probability of success in the litigation;

   (ii) the difficulties associated with collection;

   (iii) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

   (iv) the paramount interests of the creditors.

Nellis v. Shugrue, 165 B.R. at 122 (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. denied, 506 U.S. 1088 (1993)).

18.    The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. See In re Purified Down Prods., 150 B.R. at 522; In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505.  The competency and experience of counsel supporting the settlement may also be considered.  Nellis v. Shugrue, 165 B.R. at 122.  Finally, the court should be mindful of the principle that "the law favors compromise."  In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505 (quoting In re Blair, 538 F.2d 849, 851 (9th Cir. 1976)).

19.    The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court.  The Agreement resolves all issues regarding the Trustee's claims against the Levys (the "Claims") without the need for protracted, costly, and uncertain litigation.  (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit") ¶ 2.  A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit "C.")  Litigating the Claims would undoubtedly be expensive and would require a significant commitment of time by the various professionals involved in the matter.

20.    Given the cost and complexities involved in proceeding with litigation, the Trustee has determined that the proposed settlement with the Levys represents a fair compromise of the Claims.  As discussed above, the Trustee determined that proceeding against the Foundation was fruitless because of its lack of significant assets and inability to pay any judgment against it.  Moreover, under the settlement, the Levys will return to the Trustee the amount that the Trustee demanded from them, $220,000,000.  The Trustee believes that such amount represents nearly one-hundred percent of the amount that the Levy BLMIS Account Holders withdrew from BLMIS during the six-year period before

10

the filing (using the data available to the Trustee at the time he made the demand). The Agreement also furthers the interests of the customers of BLMIS by adding a substantial amount of money to the fund of customer property now. Id. ¶ 3.

21.    In sum, the Trustee submits that the Agreement should be approved for two reasons: (a) to avoid burdensome and expensive litigation; and (b) and because it represents a reasonable compromise of the Claims that benefits the estate and the customers of BLMIS. Accordingly, since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order approving the Agreement.

**Notice**

22.    In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all known creditors of BLMIS. The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case. The Trustee submits that no other or further notice need be given and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

A-62

Dated: New York, New York
      January 27, 2010

Respectfully submitted,

*s/Marc E. Hirschfield*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

EXHIBIT A

FORM OF AGREEMENT BETWEEN
TRUSTEE AND THE LEVYS



EXECUTION VERSION

## AGREEMENT

This AGREEMENT, dated as of January 27, 2010, is made by and among IRVING H. PICARD, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, as amended ("SIPA") of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and JEANNE LEVY-CHURCH and FRANCIS N. LEVY (collectively, the "Levys"), on the other hand (each of the Trustee and the Levys, a "Party").

## BACKGROUND

A.    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "Commission") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Bernard L. Madoff ("Madoff"). On December 12, 2008, the District Court entered an order which among other things appointed a receiver (the "Receiver") for the assets of BLMIS (No. 08-CV-10791(LSS)).

C.    On December 15, 2008, pursuant to section 5(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with the application of SIPC. Thereafter, SIPC filed an application in the District Court under section 5(a)(3) of SIPA alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 5(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 5(b)(4) of SIPA, where it is currently pending as Case No. 08-01789 (BRL) (the "SIPA Proceeding"). The Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

D.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud. At a plea hearing on March 12, 2009, in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS.

E.    Norman F. Levy ("Mr. Levy"), a New York City commercial real estate broker, began investing with BLMIS in the mid-1970's. Over the years, Mr. Levy invested a significant portion of his assets with BLMIS.

F.    Prior to his death in September of 2005, Mr. Levy designated Madoff as an executor of his estate. As executor, Madoff was vested with power to make unilateral investment decisions regarding the estate's non-real estate assets.

G.    After Mr. Levy's death, acting as the executor, Madoff transferred to BLMIS from the estate more than $250,000,000.

H.    A number of Mr. Levy's family members, family trusts, and charitable trusts established by the family were also BLMIS customers. Their BLMIS client numbers and account names are listed in Attachment A ("Levy BLMIS Accounts"), which is intended to be part of this Agreement. If any accounts were inadvertently omitted from Attachment A, the Levys and the Trustee agree to act in good faith to revise Attachment A to include such accounts. For the avoidance of doubt, the term Levy BLMIS Accounts does not include any accounts held by Jeff Hinte ("Mr. Hinte").

I.    During the six years prior to the Filing Date, approximately $305,000,000 was withdrawn from the Levy BLMIS Accounts in excess of the amounts that were deposited into them. Of this amount, the Betty & Norman F. Levy Foundation, a charitable organization, withdrew approximately $84,000,000 in excess of the amount that it had deposited into its account, and all of those funds were donated to charitable causes.

J.    Jeanne Levy-Church and Francis N. Levy (together, the "Levys") are Mr. Levy's children. The Levys were customers of BLMIS, and they maintained the customer accounts listed in their names on Attachment A. Before the Madoff fraud was discovered, both were heavily involved in philanthropic work.

K.    Zeno F. Levy ("Zeno") and Titus R. Levy ("Titus") are the children of Francis N. Levy and his wife, Hallie D. Cohen. BLMIS accounts were established for Titus and Zeno under the New York Uniform Gifts to Minors Act ("UGMA Accounts"). Zeno is now 25 years old, and Titus is 21 years old.

L.    In the spring of 2009, the Levys initiated discussions with the Trustee. The Levys were among the first group of former BLMIS customers to approach and seek resolution with the Trustee. After their initial meeting, the Parties entered into good faith discussions. At all times, the Levys shared information and documents about themselves and about the Levy BLMIS Accounts with the Trustee and his counsel. The Levys have been cooperative and, from an early point in the discussions, indicated a desire to resolve their situation fairly. Their cooperation has sped resolution and minimized Trustee expenses.

M.    The Trustee has asserted that the Levys are liable to the BLMIS estate under 11 U.S.C. §§ 544(b), 547, 548 and 550 (collectively, the "Avoiding Powers Claims"), and may also be liable under the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270-281), for the Levys' net withdrawals of fictitious profits within the statutory period.

N.    The Levys dispute the legal and factual bases of liability for some of the withdrawals. In particular, the Levys contend: that they do not bear any liability for their good-faith withdrawals made prior to two years before the effective date of this Agreement; that withdrawals from their Levy BLMIS Accounts were comprised of invested principal and investment earnings to which they are legally entitled as opposed to fictitious profits; and that the account balances for the Levy BLMIS Accounts were real as of December 31, 1991.

2

Nevertheless, the Levys wish to settle all disputes with the Trustee, and they do so without admitting any liability.

      O.    Zeno and Titus have asserted that they are both entitled to allowance of a customer claim in the BLMIS liquidation proceeding in an amount equal to the capital invested in their UGMA Accounts under the provisions of SIPA or to the benefit of SIPC advances under section 9 of SIPA in the SIPA Proceeding upon compliance with the applicable provisions of SIPA and the Bankruptcy Code. Both Zeno and Titus filed customer claims under SIPA prior to the July 2, 2009 bar date (the "Zeno and Titus Claims").

      P.    The Trustee, on the one hand, and the Levys, on the other hand, wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation.

      NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Trustee and the Levys agree:

## AGREEMENT

      1.    The Levys' Agreement to Bankruptcy Court Jurisdiction. The Levys agree that the agreements with BLMIS that they each had in connection with the Levy BLMIS Accounts and their respective communications and trading activities with respect to the Levy BLMIS Accounts, submit them to the jurisdiction of the Bankruptcy Court for the purpose of the SIPA Proceeding and any Avoiding Power Claims that the Trustee may bring against them under section 544, 547, 548 and/or 550 of the Bankruptcy Code; provided, however, that prior to Bankruptcy Court approval of this Agreement, the Levys shall not be deemed, by their having executed this Agreement, to have (a) consented to the jurisdiction of the Bankruptcy Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Levys, or (b) waived or released their right to trial by jury.

      2.    Payment to Trustee. The Levys shall pay, by wire transfer by the Closing (as defined in paragraph 7), to the Trustee the sum of $220,000,000 in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against the Levys.

      3.    Withdrawal of Zeno and Titus Claims. As part of the consideration to the Trustee hereunder, the Zeno and Titus Claims shall be deemed withdrawn with prejudice upon the occurrence of the Closing.

      4.    Release by Trustee; Covenant Not to Sue. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, upon the payment of all amounts set forth in paragraph 2 hereof and his receipt of a Release Subscription (in the form annexed hereto) for each of the Levy Releases (as defined below), the Trustee will be deemed to have (a) released, remised and forever discharged each of the people and entities listed on Attachment B (collectively, "Levy Releasees") from any and all past, present or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages

3

(including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements), known or unknown, that are, have been, could have been or might in the future be asserted by the Trustee against any of the Levy Releasees and that are based on, arise out of or relate in any way to the affairs of BLMIS or the Levy BLMIS Accounts and not in any other context or capacity and (b) granted a covenant not to sue to (i) any person related by blood or marriage as of the Closing to any of the Levy Releasees (other than Mr. Hinte) and (ii) any entity in which any of the Levy Releasees held or hold, as of or prior to the Closing, a financial interest, in the case of (i) and (ii) for Avoiding Powers Claims but only to the extent that such person or entity is an immediate or mediate transferee of any of the Levy Releasees under section 550(b) of the Bankruptcy Code; provided, however, that the foregoing covenant not to sue shall not apply to any Avoiding Powers Claims based on a transfer of funds that does not constitute an immediate or mediate transfer of funds from a Levy Releasee to the entity. For the avoidance of doubt, the term Levy Releasees does not include Mr. Hinte and nothing herein shall release or be deemed to be a release by the Trustee of Mr. Hinte and, further, nothing herein shall be or be deemed to be a covenant not to sue by the Trustee of Mr. Hinte for any liability he may have to the Trustee.

5. <u>Release by Levys</u>. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Levy Releasees, by having an authorized representative sign a Release Subscription for each Levy Releasee, hereby releases, acquits and absolutely discharges the Trustee and all his agents, BLMIS and its estate, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS.

6. <u>Cooperation</u>. Upon reasonable request of the Trustee, the Levys agree, on behalf of themselves and to the extent they may bind each of the other holders of the Levy BLMIS Accounts, to reasonably cooperate with the Trustee, in connection with any efforts to recover funds invested in BLMIS.

7. <u>Closing</u>. There shall be a closing ("<u>Closing</u>") within 30 days after the date on which this Agreement becomes effective and binding on the Parties under paragraph 8, on a date agreed by the Parties, at the offices of Trustee's counsel in New York, N.Y. At the Closing, (a) the Levys shall make, or shall have made, the payment required under paragraph 2 above; (b) the releases contained in paragraphs 4 and 5 shall become effective without any further action by any of the Parties; and (c) the Zeno and Titus Claims shall be deemed withdrawn as provided in paragraph 3.

8. <u>Bankruptcy Court Approval; Effective Date; Termination</u>. This Agreement is subject to, and shall become effective and binding on the Parties upon and only upon, the Bankruptcy Court's approval of this Agreement in the SIPA Proceeding by an order that is no longer subject to appeal, review or rehearing. The form of the approval order shall be subject to

4

the Levys' reasonable approval. The Trustee shall use his best efforts to obtain such approval as promptly as practicable after the date of this Agreement. The Trustee shall provide the Levys with a draft of any motion to the Bankruptcy Court for approval of this Agreement, which shall be subject to the Levys' reasonable approval. If this Agreement does not become effective, (a) this Agreement (other than this paragraph and paragraphs 18 and 19) shall terminate and be null and void for all purposes, (b) all of the statements, admissions, consents and agreements contained in the Agreement (other than this paragraph and paragraphs 18 and 19) shall be null and void, and (c) neither the Trustee nor the Levys may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the SIPA Proceedings, any case or proceeding relating to the SIPA Proceeding or any case or proceeding relating to BLMIS or Madoff and (d) the Levys shall not be deemed, on account of their having executed this Agreement, to have consented to the jurisdiction of the Bankruptcy Court or released their right to trial by jury.

9.    Authority. The Levys, as well as the authorized representatives of each Levy Releasee, represent and warrant to the Trustee as of the date hereof that each of them has the full power, authority and legal right to execute and deliver, and to perform its respective obligations under, this Agreement and has taken all necessary action to authorize the execution and delivery of, and the performance of its respective obligations under, this Agreement.

10.    Further Assurances. The Trustee and the Levys shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.

11.    Entire Agreement. This Agreement and any confidentiality agreement between the Trustee and the Levys constitute the entire agreement and understanding between and among the Parties and supersede all prior agreements, representations and understandings concerning the subject matter hereof.

12.    Amendments, Waiver. This Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties. No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

13.    Assignability. No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

14.    Successors Bound. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

15.    No Third Party Beneficiary. Except as expressly provided in paragraphs 6 and 7, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

16.    No Admission of Liability or Wrongdoing. By entering into this Agreement, the Levys do not admit and they expressly deny that they owe any liability to the Trustee other than provided for herein, or to any other person or that they engaged in any wrongdoing.

5

17.    Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

18.    Exclusive Jurisdiction.  The Parties agree that any action for breach or enforcement of this Agreement may be brought only in the Bankruptcy Court.  No Party shall bring, institute, prosecute or maintain any action pertaining to the enforcement of any provision of this Agreement in any court other than the Bankruptcy Court.

19.    Captions and Rules of Construction.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this Agreement to a paragraph is to a paragraph of this Agreement.  "Includes" and "including" are not limiting.

20.    Counterparts; Electronic Copy of Signatures.  This Agreement and attachments may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document.  The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.  The Levy Releasees may evidence their execution of the Release Subscription by delivery to the Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

21.    Termination of BLMIS Account Agreements with BLMIS.  All agreements between holders of the Levy BLMIS Accounts and BLMIS are terminated as of the Closing.

22.    Notices.  Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax or by electronic transmission to:

| If to the Trustee, c/o: | If to the Levys, c/o: |
|---|---|
| Marc Hirschfield | Ronald L. Olson and Cary B. Lerman |
| Baker & Hostetler LLP | Munger, Tolles & Olson LLP |
| 45 Rockefeller Center, Suite 1100 | 355 S. Grand Ave., 35th Floor |
| New York, NY 10111 | Los Angeles, CA  90071 |
| F: (212) 589-4201 | F: (213) 683-9100 |
| E: mhirschfield@bakerlaw.com | E: ron.olson@mto.com, cary.lerman@mto.com |

*[Signature page follows]*

6

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee

_____

FRANCIS N. LEVY

_____

JEANNE LEVY-CHURCH

_____

## RELEASE SUBSCRIPTION

The undersigned is a "Levy Releasee" as defined in the Agreement dated as of January 27, 2010, by and among Irving H. Picard, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, as amended, of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and Jeanne Levy-Church and Francis N. Levy (the "Levys"), on the other hand.  For and in consideration of the Trustee's release of the undersigned under paragraph 4 of the Agreement, the undersigned subscribes to the release set forth in paragraph 5 of the Agreement (and only to such release) with the same force and effect as if the undersigned were a party to the Agreement.  By signing this Subscription, the undersigned does not become a Party to the Agreement and is not undertaking any rights or obligations under any other provisions of the Agreement, except that paragraphs 18, 19, 20, 21, and 22 of the Agreement apply to this Subscription as though such paragraphs were a part of this Subscription.

Dated _____, 201__.

_____

By: _____
     Name:
     Title:

ATTACHMENT A: LEVY BLMIS ACCOUNTS

| Account Number | Account Name |
|---|---|
| 1L0027 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO ATTN: PAUL KONIGSBERG |
| 1L0028 | NORMAN F LEVY SPECIAL KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0086 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0088 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0099 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0101 | NORMAN LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0171 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0175 | NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0236 | ESTATE OF NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0300 | ESTATE OF NORMAN F LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0308 | ESTATE OF NORMAN LEVY-RE C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0024 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0078 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0084 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0090 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0102 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0169 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0179 | FRANCIS N LEVY C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0026 | JEANNE LEVY-CHURCH C/O PAUL KONIGSBERG |
| 1L0075 | JEANNE LEVY-CHURCH C/O PAUL KONIGSBERG |
| 1L0085 | JEANNE LEVY-HINTE C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0089 | JEANNE LEVY-HINTE C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0103 | JEANNE LEVY CHURCH C/O PAUL KONIGSBERG |



| 1L0170 | JEANNE LEVY HINTE C/O KONIGSBERG WOLF & CO PC ATTN: PAUL KONIGSBERG |
| 1L0178 | JEANNE LEVY-CHURCH C/O PAUL KONIGSBERG |
| 1C1061 | HALLIE D COHEN |
| 1F0074 | FRANJEAN 39TH STREET REALTY CO C/O KONIGSBERG WOLF & CO ATTN: PAUL KONIGSBERG |
| 1L0025 | TRUST M-B FRANCIS N LEVY U/I/D 07/24/91 JEFFREY LEVY-HINTE TRUSTEE |
| 1L0029 | TITUS RAY LEVY UGMA FRANCIS LEVY CUSTODIAN C/O PAUL KONIGSBERG |
| 1L0030 | ZENO FRANCIS LEVY UGMA FRANCIS LEVY CUSTODIAN C/O PAUL KONIGSBERG |
| 1L0302 | GST EXEMPT TRUST U/W/O NORMAN F LEVY, FRANCIS N LEVY, JEANNE LEVY-CHURCH, BERNARD L MADOFF TRUSTEES |
| 1L0305 | CHARITABLE LEAD ANNUITY TRUST U/W/O NORMAN F LEVY FRANCES N LEVY, JEANNE LEVY-CHURCH, BERNARD L MADOFF TRUSTEES |
| 1L0313 | THE ZENO F LEVY TRUST JEFFREY LEVY-HINTE TRUSTEE |
| 1L0314 | THE TITUS R LEVY TRUST JEFFREY LEVY-HINTE TRUSTEE |
| 1P0131 | THE PHILOCTETES CENTER INC |
| 1L0023 | THE BETTY AND NORMAN F LEVY FOUNDATION INC C/O PAUL KONIGSBERG |
| 1L0073 | NORMAN F LEVY REVOCABLE TRUST U/I/D 4/1/93 C/O ALBERT MALTZ, TRUSTEE |
| 1L0083 | LEVY FASHION CENTER ASSOCIATES LLC C/O PAUL KONIGSBERG |
| 1L0168 | TRUST M-B FRANCIS N LEVY U/I/D 7/24/91 C/O PAUL KONIGSBERG |

ATTACHMENT B: LEVY RELEASEES

1. The Estate of Norman F. Levy
2. Francis N. Levy
3. Jeanne Levy-Church
4. Ken Levy-Church
5. Hallie D. Cohen
6. Zeno F. Levy
7. Titus R. Levy
8. The Zeno F. Levy Trust
9. The Titus R. Levy Trust
10. Zeno Francis Levy UGMA
11. Titus Ray Levy UGMA
12. The Betty & Norman F. Levy Foundation Inc.
13. The Philoctetes Center, Inc.
14. The Charitable Lead Annuity Trust u/w/o Norman F. Levy, et al.
15. GST Exempt Trust u/w/o Norman F. Levy, et al.
16. The Francis N. Levy Mutual Benefit Trust
17. FranJean 39th Street Realty Co.
18. Francis N. Levy & Jean D. Levy, JV
19. Levy Fashion Center Associates LLC

EXHIBIT B

PROPOSED ORDER

A-76

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| | (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

Debtor.

### ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY

Upon the motion (the "Motion")[1] of Irving H. Picard, Esq. (the "Trustee") as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, seeking entry of an order, pursuant to sections 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, approving the agreement, by and among the Trustee, on the one hand, and Jeanne Levy-Church and Francis N. Levy, on the

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

A-77

other hand, in substantially the form annexed to the Motion (the "Agreement"); and it appearing that due and sufficient notice has been given to all parties in interest as required by Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure; and the Court having considered the Affidavit of Irving Picard in support of the Motion; and it further appearing the relief sought in the Motion is appropriate based upon the record of the hearing held before this Court to consider the Motion; and it further appearing that this Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and after due deliberation; and sufficient cause appearing therefor; it is

ORDERED, that the Motion is granted in its entirety; and it is further

ORDERED, that the Agreement between the Trustee on the one hand and Jeanne Levy-Church and Francis N. Levy on the other hand is hereby approved and authorized; and it is further

ORDERED, that the Trustee, Jeanne Levy-Church and Francis N. Levy shall each comply with and carry out the terms of the Agreement.

Dated: New York, New York
      February __, 2010

 

HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT C

AFFIDAVIT OF IRVING PICARD

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>              Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>              Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**AFFIDAVIT OF IRVING H. PICARD, TRUSTEE, IN SUPPORT OF MOTION FOR
ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE
AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY**

## PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY

Irving H. Picard, Esq., being duly sworn, hereby attests as follows:

1.    I am Trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff.  I submit this Affidavit in support of the Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, dated January 27, 2010 (the "Motion"), seeking approval of an Agreement by and among the Trustee and Jeanne Levy-Church and Francis N. Levy (the "Agreement").  I make this Affidavit based upon my own personal knowledge or upon information that I believe to be true.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2.    I believe that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court.  The Agreement resolves all issues regarding my claims against the Levys (the "Claims") without the need for protracted, costly, and uncertain litigation.  Litigating the Claims would undoubtedly be expensive and would require a significant commitment of time by the various professionals involved in the matter.

3.    Given the cost and complexities involved in proceeding with litigation, I have determined that the proposed settlement with the Levys represents a fair compromise of the Claims.  I have also determined that proceeding against the Betty & Norman F. Levy Foundation is fruitless because of its lack of significant assets and inability to pay any judgment against it.  Moreover, under the settlement, the Levys will return the amount that I demanded from them, $220,000,000.  I believe that such amount represents nearly one-hundred percent of the amount

A-81

that the Levy BLMIS Account Holders withdrew from BLMIS during the six-year period before the filing (using the data available to the me at the time I made the demand). The Agreement also furthers the interests of the customers of BLMIS by adding a substantial amount of money to the fund of customer property now.

IRVING H. PICARD

Sworn to before me this 27th
day of January, 2010

Notary Public

DAMIAN SMITH
Notary Public, State of New York
No. 01SM6169097
Qualified in New York County
Commission Expires June 18, 2011

3

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

## CERTIFICATE OF SERVICE

I, NIKKI M. LANDRIO, hereby certify that on January 27, 2010, I served true copies of

the

- **Notice of Motion For Entry Of Order Pursuant To Section 105(a) Of The Bankruptcy Code And Rules 2002 And 9019 Of The Federal Rules Of Bankruptcy Procedure Approving An Agreement By And Among The Trustee And Jeanne Levy-Church And Francis N. Levy; and**

- **Motion For Entry Of Order Pursuant To Section 105(a) Of The Bankruptcy Code And Rules 2002 And 9019 Of The Federal Rules Of Bankruptcy**

300069429

A-83

**Procedure Approving An Agreement By And Among The Trustee And Jeanne Levy-Church And Francis N. Levy (with Exhibits attached)**

upon the interested parties who receive electronic service through ECF, by emailing the interested

parties true and correct copies via electronic transmission to the email addresses designated for

delivery and/or by placing true and correct copies thereof in sealed packages designated for

regular U.S. Mail to those parties as set forth on the attached Schedule A.

Dated: New York, New York
January 27, 2010                           s/Nikki M. Landrio
                                           NIKKI M. LANDRIO

**SCHEDULE A**

Internal Revenue Service
District Director
290 Broadway
New York, New York 10008

Internal Revenue Service
Centralized Insolvency Operation
Post Office Box 21126
Philadelphia, PA  19114

U.S. Department of Justice, Tax Division
Box 55
Ben Franklin Station
Washington, DC 20044

**Chapter 7 Trustee**
Alan Nisselson, Esq.
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, NY 10019

**Securities Investor Protection Corporation**
Kevin Bell – kbell@sipc.org
Josephine Wang – jwang@sipc.org

**Securities and Exchange Commission**
Alistaire Bambach – bambacha@sec.gov
Alexander Mircea Vasilescu – vasilescua@sec.gov
Terri Swanson – swansont@sec.gov
Preethi Krishnamurthy – krishnamurthyp@sec.gov

**United States Attorney for SDNY**
Marc Litt – marc.litt@usdoj.gov
Lisa Baroni – lisa.baroni@usdoj.gov
Natalie Kuehler - natalie.kuehler@usdoj.gov

**Counsel to the JPL**
Eric L. Lewis – Eric.Lewis@baachrobinson.com

**Notices of Appearance**
Service via Electronic Notification through ECF Filing

**Counsel to Jeanne Levy-Church and Francis N. Levy**
Ronald L. Olson, Esq. – ron.olson@mto.com
Cary B. Lerman, Esq. - cary.lerman@mto.com

300069429                                    3



**SECURITIES INVESTOR PROTECTION CORPORATION**
**805 FIFTEENTH STREET, N. W., SUITE 800**
**WASHINGTON, D. C. 20005-2215**
**(202) 371-8300    FAX (202) 371-6728**
**WWW.SIPC.ORG**

January 24, 2011

<u>**BY MESSENGER**</u>

The Honorable Scott Garrett
Chairman
Subcommittee on Capital Markets and
   Government-Sponsored Enterprises
House Financial Services Committee
United States House of Representatives
2244 Rayburn House Office Building
Washington, D. C. 20515

RE:  <u>**Request for Additional Information on Madoff Matter**</u>

Dear Chairman Garrett:

This is in response to your letter of December 9, 2010, requesting additional information in connection with the failure of the Bernard L. Madoff Investment Securities LLC ("BLMIS") brokerage firm. Members of the SIPC staff and the Trustee's staff have assembled data in response. Before answering your specific inquiries, I believe it makes sense to bring you up to date on a number of recent events, all of which are very positive for the customers of BLMIS firm. Also provided is some background information on the use of avoiding powers.

**Settlements Which Will Increase The Distribution To Customers**

The Securities Investor Protection Act, 15 U.S.C. §78aaa <u>et</u> <u>seq.</u> ("SIPA"), provides that cases under SIPA are to be conducted in accordance with specified provisions of the Bankruptcy Code, to the extent the two statutes are consistent. This allows Irving Picard, the trustee in the BLMIS case, to use the tools that are available to a bankruptcy trustee to recover assets, in order to make the equitable distribution called for under SIPA. Among those tools is the ability to reverse, or, in the statutory parlance, "avoid" transfers of assets made prior to the initiation of the liquidation.

The Honorable Scott Garrett
January 24, 2011
Page 2

Mr. Picard's use of the avoidance powers has been very successful. But Mr. Picard and his attorneys are mindful of the human toll of such lawsuits, and have used discretion and compassion in dealing with the unprecedented realities presented by the largest Ponzi scheme in history.

<u>Successful Negotiations</u>

- Mr. Picard negotiated a settlement with Swiss bank Union Bancaire Privée, which was approved by the Bankruptcy Court. The settlement will result in the addition of approximately $500 million to "customer property" for distribution to customers of BLMIS.

- Mr. Picard negotiated a $550 million settlement with Carl Shapiro, Robert Jaffe, and related entities, which was approved by the Bankruptcy Court. In conjunction with the United States Attorney for the Southern District of New York, the $550 million and an additional $75 million will be distributed by Mr. Picard as Special Master, to Madoff victims as part of a civil forfeiture.

- Mr. Picard negotiated settlements with a number of charitable and nonprofit institutions that received avoidable transfers, in the sum of $80 million. These settlements are practical and equitable solutions to the terrible problems caused by Bernard Madoff. These settlements balance the concerns of both the charities that innocently received stolen funds, and the people whose money was stolen and who will receive distributions as a result of these agreements.

- Teaming with the United States Attorney for the Southern District of New York, Mr. Picard negotiated a settlement with the Estate of Jeffry Picower in the total amount of $7.2 billion. Under the agreement with the Trustee, which was approved by the Bankruptcy Court, $5 billion will come to the Trustee for distribution to customers in the SIPA proceeding. The $2.2 billion received by the United States Attorney also will benefit the victims. This will be distributed by Mr. Picard in the separate capacity of Special Master.

The Trustee will need Bankruptcy Court approval to distribute the funds to customers. The preparation of an application for such relief is underway.

The benefits of these settlements, in both dollars to the victims, and as a template for other future settlements in the BLMIS case, cannot be overstated. It must be emphasized that persons whom the Trustee is suing in avoidance are persons who received <u>other investors' money</u>. In a Ponzi scheme, a dollar more for one victim means a dollar less for another victim. Thus, in the BLMIS case, every dollar received by an investor above the amount that the investor deposited with BLMIS is one dollar less for the investor to whom the money actually belonged. Unless the Trustee is allowed to pursue the avoidance suits, some investors will continue to benefit at the expense of others, even if all are equally innocent.

It also must be emphasized that the customer's "net equity" under SIPA will not necessarily govern a trustee's ability to bring avoidance actions. What a customer is owed in a

A-87

The Honorable Scott Garrett
January 24, 2011
Page 3

SIPA case, that is, the customer's "net equity," is as defined in SIPA. Conversely, a trustee's power to avoid transfers is pursuant to provisions of the Bankruptcy Code made applicable under SIPA to a SIPA proceeding.

## The Practical Aspects of Using the Avoiding Powers

The Trustee is using the avoidance powers rationally, with discretion and compassion, and with tangible results. As is evidenced by the settlements with the various charities, there is a balance to be struck here, and I believe the Trustee has done an excellent job of finding the correct solutions on a case by case basis.

The Trustee's balanced approach is evidenced by the Hardship Program implemented before the "avoidance action" complaints were filed. At the start of the liquidation proceeding, in December, 2008, the Trustee instituted a Hardship Program to identify the BLMIS claimants suffering hardship and to accelerate the processing and payment of their claims in the proceeding. The Trustee has announced that he will continue the Hardship Program in connection with the avoidance actions. The Program is designed to encourage investors who have been sued to come forward and to explain to the Trustee why he should not continue the suit against them. Among the factors that the Trustee has announced he will consider are the investor's age, financial condition, medical situation, need to return to work after having retired, inability to pay for the care of dependents, the extent to which withdrawals were made from a BLMIS account to pay for taxes on fictitious sums, and other demonstrated hardship. The Trustee also has set up a toll-free hotline to answer any concerns investors have with respect to avoidance suits. All of this information, as well as the hardship application, is available on the Trustee's web site at www.madofftrustee.com.

In addition, together with each complaint, the Trustee has sent to each "good faith" investor a letter containing the above information and urging the investor to contact the Trustee to discuss the complaint. The Trustee is mindful of the fact that some people who have withdrawn assets periodically over an extended period of time simply have no ability to make any return of assets. Neither SIPC nor the Trustee has any interest in pursuing litigation that is as distressing as it is pointless. But the Trustee also must investigate the facts of each such case, and has established a mechanism to do so.

Further, in anticipation of the "avoidance actions," the Trustee obtained a procedural order in the liquidation proceeding, sent to every party who has been sued, which provides for confidentiality of financial information and mediation of the suits. In most instances, the costs of mediation will be paid for not by the party who has been sued, but by the debtor's estate, with funds advanced by SIPC.

In short, the Trustee is doing, and will do, everything possible to dismiss or settle suits where the financial situation of a party warrants such relief, and otherwise to resolve as expeditiously as possible, all other suits against investors who unknowingly received other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 4

**The Use of Avoidance Powers In a SIPA Case**

It also should be noted that there are reasons unique to SIPA why an "innocent investor" is less often the subject of an avoidance action in a SIPA case than in ordinary bankruptcy.

When a party receives a distribution prior to the collapse of a brokerage firm, it is less likely that the <u>facts</u> are such that a preference or fraudulent transfer may be recovered, at least when all allowed claims are within the limits of SIPA protection.

Here is why:

1. A trustee may recover, in an avoidance action, an amount that <u>exceeds</u> what that person would have received in the liquidation had the distribution not been made. <u>See</u>, for example, 11 U.S.C. §547(b)(5), made applicable to the BLMIS case by 15 U.S.C. §78fff-2(c)(3).

2. In the overwhelming majority of SIPA cases, a theft is identified before a high percentage of customer property is missing. The combination of (i) SIPC advances and (ii) a high percentage of customer property distribution means that the person receiving the pre-liquidation distribution would have received the same amount in the liquidation. Thus, it makes no sense to initiate an avoidance action when the target of such a suit would get the assets back.

To illustrate:

John has a securities account worth $1,000,000 at Brokerage X. He has had that balance for years. He sells his securities, closes the account, and receives a check for $1 million, on December 1. After John cashes the check, Brokerage X is placed into a SIPA proceeding on December 15. At the time of the failure, 10% of all assets owed to customers is missing, and therefore 90% of the assets that are supposed to be held for customers are in fact secure.

What does this mean for John, who received a $1,000,000 distribution during the avoidance period? It means that even if the statutory criteria for bringing an avoidance suit were met, it would make no sense for the trustee to initiate an avoidance action, so long as all allowed customer claims do not exceed the limits of SIPA protection. If John were to return the funds, the trustee would immediately return the exact same amount to him. John would receive $900,000 from customer property, and SIPC would advance $100,000 to the trustee for subsequent distribution to John.[1]

---

[1]    An avoidance suit would be necessary if there were over-the-limits customers in the proceeding, that is, customers who would not be made whole through a distribution of customer property in the possession of the trustee combined with the advance of SIPC funds. For example, assume all of the facts in the above hypothetical, except that in addition to John, there is a second customer named Joan with a valid $12 million claim. A 90% distribution of customer property would result in Joan receiving $10.8 million. Coupled with a SIPC advance of $500,000, Joan's total recovery would be $11.3 million, leaving her still owed $700,000. If the trustee were to sue John in avoidance, John, based on the above analysis, would still be made whole because of the SIPC

The Honorable Scott Garrett
January 24, 2011
Page 5

The foregoing example, and innumerable others that could be constructed, show that it would typically take a huge shortfall in customer property, coupled with a very large withdrawal, before an avoidance action is meaningful. That is why avoidance actions in SIPA cases are less common.

3. As illustrated above, the availability of SIPC funds in a SIPA proceeding often reduces the need for avoidance suits unlike the situation in ordinary bankruptcy, where avoidance of preferences is more common. Unfortunately, because of the large sums at stake in BLMIS, and the substantial amounts by which some investors will benefit at the expense of others if he fails to act, the Trustee has no choice but to seek to recover funds by means of avoidance.

A final point before proceeding to the answers to your questions.

As noted above, the Trustee is empowered by both SIPA and the Bankruptcy Code, to the extent consistent with SIPA, to gather assets of the estate for the benefit of all of the creditors, including customers, to the proceeding. The SIPA statutory scheme provides for a priority to be given to those customers who have positive net equity balances in their customer accounts. The BLMIS matter being a Ponzi scheme, there were no earnings or profits, but only other people's money. Thus, the customers who had a positive net equity in their BLMIS accounts are those who did not get all of their money back from BLMIS. These are the customers who are entitled to priority under the SIPA statute. The Trustee utilizes his powers under SIPA and the Bankruptcy Code to gather in assets to form a fund of customer property to take care of these priority claimants in the first instance.

However, as the Trustee for BLMIS, the Trustee is also the representative of all other creditors, including customers, to the proceeding. Once he has fulfilled his obligations to the priority claimants by assembling a customer fund sufficient to return to them all of the money they invested in BLMIS, he can then turn to the effort of satisfying those customers and creditors who were not given priority. In the BLMIS case, the customers and creditors who were not given priority are those "net winners" who were customers of BLMIS but who in fact received more money than they put in. Once the Trustee has satisfied all of the "net losers" who did not get all of their money out, those net losers will then be on the same footing as the net winners, and thereafter, both the net winners and the net losers will be treated as general unsecured creditors who have claims for fraud to the extent of any damages.

The claims for fraud by both the net losers and net winners are predicated upon the fact that Mr. Madoff misrepresented to all of them that he was in fact engaging in a legitimate securities business when in fact he was actually operating a Ponzi scheme. As a result of Mr. Madoff's misrepresentations, all of the customers of BLMIS may have suffered damages which can be recognized as general creditor claims in the BLMIS proceeding.

---

advance. However, Joan would fare better because the additional sum recovered in avoidance from John would be added to the fund of customer property, and result in a larger distribution to Joan. No actual harm comes to John, and SIPC pays a higher amount. That is the situation in the Madoff case.

The Honorable Scott Garrett
January 24, 2011
Page 6

As you know, according to the falsified books and records maintained by Mr. Madoff, BLMIS owed all of its customers the purported sum of at least $65 billion.  It is currently the Trustee's estimate that a customer fund of at least $20 billion will be necessary to satisfy the net losers and put them on an equal footing with the net winners in the BLMIS proceeding.  Once the Trustee has achieved the $20 billion figure, he will then continue to pursue his avoidance actions and his claims for damages against financial institutions and related entities for the purpose of seeking to obtain additional sums in order to satisfy all of the general creditor claims in the proceeding, including claims for fraud.  As has been well publicized, the Trustee has instituted suits against a variety of institutions pursuing avoidance actions and seeking damages in excess of $90 billion.  While the outcome of litigations cannot be predicted with any degree of accuracy, it is the goal of the Trustee and his counsel to vigorously pursue all of these litigations in order to recover as much of the damages that have been suffered by all of the customers and creditors of BLMIS.  As noted above, the Trustee has had some degree of success already, and it is respectfully submitted that his goal is not only a worthy one, but one which he has demonstrated that if given the opportunity to utilize all of the avoidance powers and litigation authority available to him, he will do his very best to achieve the result.  Thus, if the powers afforded the Trustee are left unfettered, he will be in the best position to help all of the victims in BLMIS.

Set forth below is each of your requests for information, followed by the response.

## SECTION ONE

1a.     **(Regarding question 1 of the August 20 letter)  Please update the data showing the balance sheet of the SIPC fund, as of December 1, 2010.**

**Response:**

The SIPC Fund, as defined under SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of December 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,228,500,000 |
| Cash on hand or on deposit | $7,700,000 |
| Total | $1,236,200,000 |

1b.     **Additionally, provide the total paid in advances to Madoff customers, the number of accounts paid, the average payment, and the average elapsed time between claim filing and advance payment.**

The Honorable Scott Garrett
January 24, 2011
Page 7

**Response:**

This question and those that follow use the term "claims" with respect to the information being sought. The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 1b as well as subsequent questions is as follows:

i.  As of December 31, 2010[2], the total in advances committed by SIPC to BLMIS customers was $780,193,242.27 and the total advances paid to claimants was $762,259,841.26. The difference between the SIPC advances committed and the SIPC advances paid is due to the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

ii.  As of December 31, 2010, the total number of accounts committed to be satisfied was 2,053. The number of allowed claims associated with these 2,053 accounts was 2,363 and the total number of accounts for which a payment was made was 1,992 which relate to 2,283 allowed claims. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

iii.  As of December 31, 2010, the average of the SIPC advances committed to these 2,053 accounts was $380,025.93 and the average SIPC advance paid to the 1,992 accounts was $382,660.56. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

iv.  As of December 31, 2010, the average elapsed time between the filing of the claims related to the 2,053 allowed accounts and the commitment of advance payment was 8.8 months.

As discussed in earlier correspondence with Congressman Kanjorski and you, there are certain facts that are very important for a complete understanding of the time needed to determine claims. First, this is not a typical SIPA proceeding in which most customer securities or cash are accounted for, because they are on hand at the time of the failure of

---

[2] Where available, data as of December 31, 2010 has been used in compiling responses to your questions.

The Honorable Scott Garrett
January 24, 2011
Page 8

the brokerage house. Instead, BLMIS involved a Ponzi scheme in which the principal assets were other people's money. Furthermore, the Ponzi scheme was of long standing, extending back over at least 30 years. Since SIPA requires that the investor get back what he put into the scheme, the Trustee was required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money due to each customer.

More than 16,000 "customer" claims were filed in the proceeding. The forensic analysis for many of the claims involved not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Because of the longstanding nature of the Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, an extensive analysis of multiple accounts going back several decades was required, in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Finally, the length of time needed to determine claims was not only impacted by the above factors, but significantly, by the fact that a widespread and serious fraud was involved. Determining who was a participant in and beneficiary of the fraud required the Trustee to scrutinize each claim carefully against the firm's books and records and against the information learned in his investigation of BLMIS and its activities.

**2a.**   **(Regarding question 4 of the August 20 letter) For the 1149 approved accounts with claims of $500,000 or greater, provide the aggregate sum for these claims and the aggregate sum of claims using the Final Statement Method (FSM).**

**<u>Response</u>:**

As discussed in more detail below in the response to Question 2c of Section 1, the "Final Statement Method" is based on the last account statement issued by BLMIS to investors. Uniformly, the statements in question reflect non-existent securities "trades" invented by Bernard Madoff to yield fake profits that he decided investors should "receive." When withdrawn, the fake profits that the customers received were actually other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 9

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued over $500,000 increased to 1,207, and accordingly, 1,207, instead of 1,149, is used below:

    i.   Total Number of Allowed Accounts over $500K: 1,207
   ii.   Total Allowed Net Equity: $5,762,794,392.30
  iii.   Total Fictitious Equity under a final fictitious statement method: $12,045,355,425.58

**2b.**    **For the 744 approved accounts with claims of less than $500,000, provide the aggregate sum of those claims and the aggregate sum of those claims using the FSM.**

**Response:**

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued at less than or equal to $500,000 increased from 744 to 846. Accordingly, 846, instead of 744, is used below:

    i.   Total Number of Allowed Accounts under and equal to $500K: 846
   ii.   Total Allowed Net Equity: $176,538,242.27
  iii.   Total Fictitious Equity under a final fictitious statement method: $1,577,286,679.78

**2c.**    **Prepare a stratification table in segments of $100,000, and for each segment show total number of accounts, total claims using the Net Investment Method (NIM), and total claims using FSM.**

**Response:**

The term "Net Investment Method" ("NIM") is a term that has been used by certain claimants in the BLMIS case. It refers to the calculation of a customer's net equity based on the total amount deposited by the customer into his account, less the total amount of withdrawals from the account.

As mentioned above, the Final Statement Method ("FSM") refers to the value of the customer's account as shown on the customer's last account statement which in this case, includes fictitious profits invented by Bernard Madoff and non-existent trades fabricated by him that do not reflect market reality.

This question seeks a comparison of the net equity value and the fictitious statement value of all allowed accounts with an adjusted cash balance less than or equal to $500,000. However, this comparison is not reliable. The number of accounts that would be allowed under a fictitious statement approach obviously is significantly higher than the number of accounts that have been allowed under the net equity approach. Under the fictitious statement approach, the amount allowed will be higher on an account by account basis because claimants would be entitled to recover the fake profit in addition to their principal.

The Honorable Scott Garrett
January 24, 2011
Page 10

It should be noted that allowance of claims under a fictitious statement approach necessarily reduces the amount of customer property available to satisfy those claimants who have yet to recover their principal since such property is shared pro rata by customers. Enlarging the pool of claimants sharing in customer property means less property for those who have yet to recover their principal and more property for those who, while the firm was in business, withdrew their principal and received other investors' money in the form of fake profits. In other words, investors who already recovered their principal continue to receive fake profits when the firm is in liquidation to the continued detriment of those investors still owed their principal. In addition, because the SIPC advance supplements the distribution of customer property, under a fictitious statement approach, SIPC funds are used to pay customers fake profits the amount of which has been determined by the thief.

Based on the 11/30/2008 customer monthly statements, there were 4,881 customer accounts with a positive fictitious statement method balance, totaling $73,481,352,153.68.[3] The table below provides a stratification of these 4,881 accounts based on their fictitious balance. It should be noted that claims were not filed for some of these 4,881 accounts.

| Category | Accounts | Fictitious Statement Balance |
|---|---|---|
| $0K up to $100K | 222 | $9,236,502.70 |
| $100K up to $200K | 236 | $34,942,027.78 |
| $200K up to $300K | 214 | $52,391,337.08 |
| $300K up to $400K | 177 | $61,967,863.82 |
| $400K up to $500K | 161 | $72,718,064.15 |
| Sub-Total | 1,010 | $231,255,795.53 |
| Greater than $500K | 3,871 | $73,250,096,358.15 |
| Grand Total | 4,881 | $73,481,352,153.68 |

3a.    **(Regarding question 5 of the August 20 letter) With respect to the payment of advances, explain the process by which SIPC, through subrogation, establishes a claim to share in customer property. In the priority ranking of claims, where do these claims, as subrogee, stand in relationship to the customer claims? Please cite the authority in SIPA.**

---

[3] The $73.5 billion figure represents the fictitious equity shown on the final fictitious statement for the 4,881 customer accounts with "positive" FSM balances. The difference between this amount and the well-documented figure of $64.8 billion reflects certain accounts with reported negative "equity" balances totaling in excess of $8 billion, 99% of which are in accounts in the name of Jeffry Picower and the children of Norman Levy.

The Honorable Scott Garrett
January 24, 2011
Page 11

**Response**:

Under 15 U.S.C. section 78fff-3(a), SIPC is subrogated, to the extent of its advances, to the claim of any fully satisfied customer. SIPC may not exercise its right of subrogation as to a customer until that customer has been fully satisfied.

Subrogation works as follows:
If all customer property were immediately available to a SIPA trustee at the start of a liquidation proceeding, customer claims would be satisfied <u>first</u>, through the <u>pro rata</u> distribution of customer property, and <u>second</u>, to the extent of any shortfall, through advances of funds from SIPC, within statutory limits. <u>See</u> 15 U.S.C. §§78fff-2(c)(1)(B) and 78fff-3(a). In that situation, SIPC would never share as subrogee in customer property because all customer property would have been distributed initially to customers and none would remain for distribution to SIPC.

In practice, however, because assembling customer property may require the trustee to investigate the debtor's business and to sue third parties – all of which takes time -- SIPC advances may be used initially to satisfy customers notwithstanding that there has been no showing or determination that customer property would be insufficient. 15 U.S.C. §78fff-2(b)(1). Customers may thus be satisfied promptly and not made to wait while the collection of customer property is achieved.

If a customer has been fully satisfied through a SIPC advance by the time customer property becomes available for distribution, then allowing that customer to receive his <u>pro rata</u> share of the property would result in the customer receiving a double recovery on his claim. Instead, SIPC stands in the customer's shoes in the distribution of such property. In that manner, the end result is the same as if customer property first had been fully collected and distributed, and SIPC funds used only to make up the difference between the amounts owed to customers and the customer property available to them.

**3b.**    **It is reported that in the payment of advances to Madoff customers, SIPC is demanding that recipients execute assignment of claims to customer property. Does such assignment give SIPC a higher priority to customer property than is accorded through subrogation? If so, provide the statutory authority for this improvement in claims priority.**

**Response**:

A report that SIPC is demanding the execution of assignments is incorrect. The Trustee is an independent fiduciary and it is he who determines claims and in consideration of the satisfaction of claims requests assignments from the satisfied customers. The request for an assignment is consistent with and as provided under 15 U.S.C. §78fff-2(b). The assignment does not give SIPC a higher priority in the distribution of customer property. Rather, a central purpose of the assignment is to give the trustee the capacity to sue,

The Honorable Scott Garrett
January 24, 2011
Page 12

standing in the shoes of the person whose claim he has satisfied, in order to recover property from third parties for distribution to all customers.

4.    **(Regarding question 6 of the August 20 letter)  How many accounts are involved in the receipt of the 90,000 disbursements?  Beginning with the first year in which these disbursements occurred, list for that year and each succeeding year the number of disbursements, the aggregate value of the disbursements, the number of accounts, the number of disbursements related to account closing and the average amount involved in each such transaction.**

**Response**:

The table that follows includes the number of disbursements in excess of deposits, the aggregate value of disbursements in excess of deposits, the average disbursement amount, the number of accounts, and the number of disbursements related to the closing of an account.

| Year | Number of Disbursements in Excess of Deposits | Aggregate Value of Disbursements in Excess of Deposits | Average Disbursement Amount | Number of Accounts | Account Closing Related Disbursements[4] |
|---|---|---|---|---|---|
| 1981 | 10 | $239,466 | $23,947 | 9 | 6 |
| 1982 | 36 | 487,199 | 13,533 | 23 | 13 |
| 1983 | 37 | 2,431,473 | 65,715 | 19 | 13 |
| 1984 | 38 | 782,991 | 20,605 | 23 | 9 |
| 1985 | 192 | 7,135,066 | 37,162 | 71 | 14 |
| 1986 | 375 | 18,858,068 | 50,288 | 92 | 14 |
| 1987 | 497 | 14,174,763 | 28,521 | 111 | 5 |
| 1988 | 722 | 35,995,555 | 49,855 | 164 | 23 |
| 1989 | 992 | 49,914,278 | 50,317 | 184 | 18 |
| 1990 | 1,122 | 45,713,503 | 40,743 | 225 | 19 |
| 1991 | 1,469 | 71,552,235 | 48,708 | 283 | 33 |
| 1992 | 1,858 | 519,368,321 | 279,531 | 313 | 27 |
| 1993 | 2,500 | 228,463,943 | 91,386 | 424 | 74 |
| 1994 | 2,667 | 282,226,802 | 105,822 | 447 | 74 |
| 1995 | 3,133 | 479,946,926 | 153,191 | 456 | 54 |
| 1996 | 3,932 | 539,182,466 | 137,127 | 528 | 98 |
| 1997 | 3,003 | 668,343,286 | 222,559 | 703 | 344 |
| 1998 | 2,443 | 786,614,902 | 321,987 | 483 | 90 |
| 1999 | 2,995 | 999,865,155 | 333,845 | 625 | 51 |

[4] There could be more than one disbursement related to closing a single account.  However, the table above only includes the final disbursement for each respective account.

The Honorable Scott Garrett
January 24, 2011
Page 13

| 2000 | 3,848 | 1,149,561,399 | 298,743 | 848 | 65 |
| 2001 | 4,340 | 1,352,096,251 | 311,543 | 922 | 70 |
| 2002 | 4,974 | 1,391,790,937 | 279,813 | 1,082 | 61 |
| 2003 | 6,278 | 1,675,967,743 | 266,959 | 1,288 | 40 |
| 2004 | 6,913 | 1,572,900,380 | 227,528 | 1,439 | 61 |
| 2005 | 7,453 | 1,576,183,767 | 211,483 | 1,627 | 72 |
| 2006 | 8,739 | 1,227,904,383 | 140,509 | 1,840 | 79 |
| 2007 | 9,573 | 1,732,389,729 | 180,966 | 2,072 | 80 |
| 2008 | 9,220 | 1,901,590,538 | 206,246 | 2,090 | 82 |
| **Total** | **89,359** | **$18,331,681,525** | | | **1,589** |

5.    **(Regarding question 7 of the August 20 Letter) How many applications for hardship relief have been filed, how many have been granted, and how many have been denied? In the case of denials, what is the average size of the account, and what are the Trustee's reasons for denial? Also, what is the standard being used to identify "hardship" cases? Is the standard objective or subjective?**

**Response**:

As of December 31, 2010, 394 hardship applications had been received. Of these 394 applications, 44 did not meet the qualifications to participate in the Hardship Program. Most of the ineligible applications were filed on behalf of entities or were filed by individuals who were indirect investors. Of the 350 eligible applications, 275 (78.5%) were approved and 75 (21.5%) were not approved.

The 75 applications that were not approved relate to 77 customer accounts. Of these 77 accounts,

- 22 were net losers with a net equity of $41,605,142.23 at an average of $1,891,142.83. The claims of these claimants were allowed outside of the hardship program.

- 52 were net winners with a net equity of negative $29,648,007.42 at an average of negative $570,153.99.

- 3 were net zeros with a net equity of $0.00 at an average of $0.00.

The standards are by and large objective and the criteria that are the basis for hardship relief are identified in the Trustee's web site at www.madofftrustee.com. As previously discussed, they include:

a.   Advanced age.

b.   Inability to pay for necessary living expenses, such as housing (including loss of home to foreclosure), food, utilities and transportation.

The Honorable Scott Garrett
January 24, 2011
Page 14

    c. Inability to pay for necessary medical expenses.

    d. Necessity to return to work after having previously retired from former employment (special consideration will be given to individuals who can no longer return to their former work).

    e. Declaring personal bankruptcy.

    f. Inability to pay for the care of dependents.

    g. The extent to which withdrawals of fictitious profits were used to pay taxes on fictitious sums.

    h. Otherwise suffering from extreme financial hardship as demonstrated by other circumstances not addressed by the foregoing.

6.    **(Regarding question 10 of the August 20 letter) The Table presented shows that in years 1998 through 2001 deposits and withdrawals were significantly higher than in other years. Please provide a detailed explanation for this change in fund flows. Were these the transactions of institutional investors? If so, provide detailed information in tabular form for each year by type of institution (hedge fund, mutual fund, etc., and whether foreign or domestic) showing sums deposited and withdrawn and rates of return. Were there any relationships presenting unusual characteristics (short-term with high return, etc)? If so, provide detail.**

**Response**:

    The Table presented under question 10 of the August 20 letter related to the years 1992 through 2008. The below tables therefore relate to years 1992 through 2008. The years specifically addressed for 1998 through 2001 are in bold print. The significant increase in deposits and withdrawals in years 1998 through 2001 was due to the activity in one Investment Advisory account: No. 1L0027 – Norman F. Levy. The first table below shows the cash in/cash out activity for just Account No. 1L0027 and the second table shows the total activity in all accounts, with the cash activity for Account No. 1L0027 *excluded* from the results. Norman Levy, now deceased, was an individual investor and not an institutional investor.

**Norman Levy Account 1L0027**

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | $1,108,364,660 | ($994,048,201) |
| 1993 | $1,387,358,368 | ($1,517,903,726) |
| 1994 | $2,279,645,611 | ($2,128,805,955) |
| 1995 | $3,542,773,369 | ($3,453,047,453) |
| 1996 | $5,372,928,546 | ($5,471,231,206) |
| 1997 | $7,067,467,981 | ($7,377,869,833) |
| **1998** | **$10,102,787,010** | **($10,039,234,425)** |
| **1999** | **$15,316,343,975** | **($15,227,808,969)** |

The Honorable Scott Garrett
January 24, 2011
Page 15

| | | |
|---|---|---|
| **2000** | **$23,044,584,696** | **($23,103,627,635)** |
| **2001** | **$35,095,634,103** | **($35,154,090,159)** |
| 2002 | $862,232,070 | ($898,796,993) |
| 2003 | $307,000,000 | ($246,934,119) |
| 2004 | $161,511 | ($49,478,915) |
| 2005 | $137,576 | ($35,629,433) |
| 2006 | $0 | $0 |
| 2007 | $0 | $0 |
| 2008 | $0 | $0 |

**All Accounts Excluding No. 1L0027**

| Year | Cash In | Cash Out |
|---|---|---|
| 1992 | $904,272,560 | ($1,018,689,670) |
| 1993 | $664,370,878 | ($609,219,797) |
| 1994 | $577,959,780 | ($651,932,259) |
| 1995 | $884,907,897 | ($955,450,002) |
| 1996 | $1,303,802,139 | ($1,076,280,471) |
| 1997 | $1,995,752,125 | ($1,259,163,989) |
| **1998** | **$2,718,098,944** | **($1,657,646,062)** |
| **1999** | **$2,606,597,014** | **($1,866,578,080)** |
| **2000** | **$2,584,913,116** | **($2,598,132,080)** |
| **2001** | **$2,309,389,766** | **($2,425,894,417)** |
| 2002 | $2,453,094,123 | ($2,664,015,048) |
| 2003 | $2,855,614,441 | ($3,423,072,194) |
| 2004 | $4,045,208,942 | ($3,477,761,846) |
| 2005 | $3,616,547,123 | ($4,767,292,175) |
| 2006 | $5,950,968,943 | ($4,385,862,882) |
| 2007 | $7,284,217,506 | ($4,506,919,231) |
| 2008 | $6,308,498,696 | ($10,556,646,750) |

## SECTION TWO

1a.   For each year, beginning on January 1, 1992, through the closing of Bernard L. Madoff Investment Securities LLC (BLMIS) in December, 2008, provide opening and closing balances and annual average balances in the Madoff 703 Account at Chase Bank (later JPMorgan Chase). For each of those years, provide the annual earnings and the source of those earnings. Have those earnings been credited to customers in the application of the NIM?

The Honorable Scott Garrett
January 24, 2011
Page 16

**Response**:

Monthly account statements for the Madoff 703 Account are available to the Trustee for the period from December 1998 through December 2008. The table below shows the annual and monthly average Closing Ledger Balance in the account.[5] These balances **_exclude_** any short term or other investments related to the Madoff 703 Account (discussed in further detail below).

| As of: | Madoff 703 Account Only | |
|---|---|---|
| | Closing Ledger Balance | Average Monthly Closing Ledger Balance |
| 12/31/1999 | $2,320,237 | $5,061,827 |
| 12/31/2000 | $20,493,643 | $6,707,467 |
| 12/31/2001 | $26,581,003 | $8,599,687 |
| 12/31/2002 | $2,401,631 | $1,492,461 |
| 12/31/2003 | $4,061,657 | $1,369,215 |
| 12/31/2004 | $1,084,601 | $1,262,028 |
| 12/31/2005 | $323,218 | $1,238,669 |
| 12/31/2006 | $394,700 | $498,220 |
| 12/31/2007 | $742,309 | $633,968 |
| 12/31/2008 | $229,407,266 | $20,116,566 |

Available funds in the Madoff 703 Account were invested in various short term investments, including:

- Overnight Investment Sweeps;
- Overnight Deposits;
- Certificates of Deposit (approximately 1 week outstanding);
- Commercial Paper (approximately 3-4 days outstanding); and
- Treasury Bills (approximately 1-6 months outstanding). [6]

In addition to the short term investments noted above, certain investors deposited Federal Home Loan Bank Notes into Madoff custody accounts held at JPMorgan Chase (account nos. G 54276 and G 13414). The proceeds from redemption and the related interest were

---

[5]    Because only one month of records is available for December 1998, information relating to 1998 is not included.

[6]    Prior to 2002, BLMIS held treasury notes with maturities ranging from 3-10 years. Due to incomplete records for Madoff accounts held at JPMorgan Chase, the date, amount and source of funding for the initial purchase cannot be confirmed for all of these treasury notes. However, as the related interest was received by the Madoff 703 Account, the outstanding balances of the treasury notes are included in this analysis. In the event that the purchase price could not be confirmed, the face value of the treasury notes was used to estimate the outstanding balance.

The Honorable Scott Garrett
January 24, 2011
Page 17

received by Madoff and recorded in the Madoff 703 Account. The face value and related interest of these securities are included in the amounts in the table below.

The following table shows the combined ending balances including the Closing Ledger Balance of the Madoff 703 Account and the outstanding amounts of short term investments and Federal Home Loan Bank Notes. The table also includes the average monthly combined ending balances and the combined annual earnings on the short term investments and the Federal Home Loan Bank Notes.

| | Madoff 703 Account and Related Investments | | |
|---|---|---|---|
| As of: | Combined Ending Balances | Average Monthly Combined Ending Balances | Combined Annual Earnings |
| 12/31/1999 | $794,791,409 | $718,345,089 | $47,122,618 |
| 12/31/2000 | $281,064,815 | $664,061,973 | $43,085,153 |
| 12/31/2001 | $415,806,003 | $311,525,813 | $12,409,793 |
| 12/31/2002 | $403,674,195 | $400,460,464 | $8,895,959 |
| 12/31/2003 | $270,130,888 | $328,438,232 | $5,045,753 |
| 12/31/2004 | $766,510,629 | $522,076,623 | $6,885,896 |
| 12/31/2005 | $231,086,387 | $441,768,824 | $12,460,792 |
| 12/31/2006 | $1,965,795,098 | $888,512,252 | $41,626,409 |
| 12/31/2007 | $4,432,658,084 | $3,992,008,548 | $184,030,207 |
| 12/31/2008 | $229,407,266 | $4,056,000,343 | $106,121,744 |
| | | TOTAL: | $467,684,323 |

Property in the 703 Account was customer property, as defined in 15 U.S.C. §78lll(4), and therefore, interest earned on such property would be customer property as well, to be shared pro rata by customers. Indeed, such property was used as customer property throughout the operation of the Ponzi scheme as the liquidity generated from such interest earned was made available to pay customers and the income still held in the 703 account, upon the liquidation of BLMIS, was part of the customer property seized by the Trustee. Although any earnings would be shared by customers in satisfaction of their net equity claims, the amount of customers' net equities would not be increased due to the fact that interest may have been earned on the 703 Account. There is no basis in the law for such an adjustment. See the definition of net equity at 15 U.S.C. §78lll(11). Moreover, the exercise would be impossible. Tracing dollars into and out of the account as to each and every customer would be impossible given the level of activity in the account and the fungible nature of dollars.

**1b.   If, for the same period, Madoff, BLMIS, or other Madoff-controlled businesses had other accounts at U.S. or foreign banks or other financial institutions, provide annual balance data for these accounts. Provide the annual earnings for each year, and the amount of those earnings credited to BLMIS customers in the application of NIM.**

The Honorable Scott Garrett
January 24, 2011
Page 18

**Response**:

In addition to the Madoff 703 Account and the two BLMIS custody accounts held at
JPMorgan Chase as discussed in response to Section Two, Question 1a above, an additional
127 accounts held by Madoff, BLMIS or other Madoff related entities have been identified
to date as a result of the investigation.  It is important to note that the records available to
the Trustee are incomplete and the Trustee does <u>not</u> have a complete population of monthly
statements for these 127 accounts.  In fact, the level of completeness varies significantly for
each account and in some cases, the Trustee has statements for only a few months, or in
some cases, no monthly statements for accounts that have been identified.  As such, the
data presented below and the ability to respond to your inquiry is limited to the information
available to the Trustee as of the date of this letter.

Of these 127 accounts, there were eleven (11) accounts which had transfers to and from the
Madoff 703 Account, and the year-end balances and annual earnings information is shown
on the schedule attached hereto as Exhibit A to the extent the information is available.

Of the remaining 116 accounts that have been identified, there are ten (10) accounts that
had a balance greater than $1 million during at least one year-end period for which the
Trustee has available records.  The other accounts identified either had no available
monthly statements or did not report a balance at any year-end date of $1 million or more
during the period that monthly statements are available.

It should also be noted that, in addition to these 127 accounts, there were accounts held by
Madoff Securities International Ltd. ("MSIL") at various banks and other financial
institutions in London.  Transfers to and from the Madoff 703 Account and MSIL were
through two primary banking institutions in London: Barclays Capital and Royal Bank of
Scotland.  The average year-end balance in MSIL's USD account at Barclays Capital
between 2002 and 2008 was approximately £1.9 million and the average year-end balance
in MSIL's USD account at Royal Bank of Scotland between 1996 and 2008 was
approximately £1.8 million.  Based on the available MSIL records, the combined interest
earned on all bank accounts was approximately £8.8 million from 1999 to 2008.[7]

To the extent that the interest earned on these additional Madoff related accounts was
transferred into the 703 Account, those amounts have been considered customer property,
as defined in 15 U.S.C. §78lll(4), and  made available to pay customer claims.  However,
as noted above, tracing these dollars into and out of the account as to each and every

---

[7] Available MSIL records report interest on USD bank accounts separately for years 2000 to 2002
only.  The total interest earned during these years on USD accounts was approximately £125,000.
In all other years, interest received from all bank accounts, including accounts denominated in
currencies other than USD, were grouped together in one line in MSIL's accounting records.
Therefore, the amount included in the response above includes interest earned on all MSIL bank
accounts.

The Honorable Scott Garrett
January 24, 2011
Page 19

customer would be impossible given the level of activity in the 703 Account and the fungible nature of cash in the account.

2.    **During the period 1992 – 2008, when Madoff was actively pursuing his Ponzi fraud, he was engaged in market making and proprietary trading. For each of these years provide data on trading volumes and the annual gross and net revenues from this trading activity.    Did any of this trading involve the "split-strike conversion" strategy?  Can the funding for this trading be traced to customer deposits in BLMIS?**

<u>Answer</u>:

The table below includes annual revenue, net income and trading volumes as reported in the FOCUS Reports filed by Madoff with regulatory authorities.  Madoff FOCUS Reports were available back to 1983. Therefore, the chart includes data from 1983 to 2008.

| Calendar Year | Reported Revenue | Reported Net Income | Average Monthly Reported Trade Ticket Executions |
|---|---|---|---|
| 1983 | $16,199,780 | $7,478,860 | 8,135 |
| 1984 | 17,111,112 | 2,768,562 | 11,961 |
| 1985 | 19,134,313 | 5,050,340 | 18,588 |
| 1986 | 24,482,469 | 9,006,605 | 34,312 |
| 1987 | 23,826,151 | 6,748,913 | 44,240 |
| 1988 | 25,993,191 | 7,656,011 | 61,382 |
| 1989 | 29,820,883 | 7,291,998 | 147,796 |
| 1990 | 36,381,387 | 5,815,034 | 206,892 |
| 1991 | 45,445,605 | 11,581,744 | 328,892 |
| 1992 | 53,883,499 | 13,218,255 | 403,789 |
| 1993 | 67,365,633 | 16,011,925 | 438,867 |
| 1994 | 82,193,420 | 19,242,696 | 398,360 |
| 1995 | 94,534,180 | 29,896,450 | 506,476 |
| 1996 | 93,155,506 | 25,692,597 | 563,095 |
| 1997 | 102,105,686 | 31,403,757 | 781,390 |
| 1998 | 104,842,134 | 30,000,000 | 1,213,357 |
| 1999 | 164,600,984 | 50,000,000 | 1,932,106 |
| 2000 | 209,788,597 | 41,000,000 | 2,300,629 |
| 2001 | 169,110,236 | 47,000,000 | 2,015,081 |
| 2002 | 106,009,938 | 27,000,000 | 2,238,367 |
| 2003 | 128,868,567 | 40,000,000 | 2,986,238 |
| 2004 | 138,684,401 | 49,000,000 | 3,173,810 |
| 2005 | 113,506,829 | 27,000,000 | 3,217,668 |
| 2006 | 163,150,034 | 57,000,000 | 3,527,327 |

The Honorable Scott Garrett
January 24, 2011
Page 20

| 2007 | 167,439,512 | 63,000,000 | 3,489,387 |
| 2008[8] | 98,344,669 | 34,000,000 | 5,930,580 |

**In response to the question "Did any of this trading involve the "split-strike conversion" strategy?"**

No. The trading within the market making and proprietary trading businesses did not involve BLMIS's purported "split-strike conversion" strategy.

**In response to the question "Can the funding for this trading be traced to customer deposits in BLMIS?"**

The table below includes amounts transferred directly or indirectly from the Madoff 703 Account at Chase Bank, the primary bank account used by House 17 (the investment advisory business), to the Madoff 621 Account at The Bank of New York, the primary bank account used by House 5 (the proprietary trading and market making business). House 5 received funds directly and indirectly from the IA business. The direct payments were in the form of checks from the Madoff 703 account that were deposited directly to the Madoff 621 Account. The indirect payments were wire transfers from the Madoff 703 Account to Madoff affiliated domestic brokerage accounts and/or to Madoff Securities International Limited ("MSIL") and subsequent wire transfers from the domestic brokerage accounts and/or MSIL to the Madoff 621 Account. As data is unavailable for complete calendar years prior to 2000, the chart includes data from 2000 to 2008.

| Calendar Year | Direct Transfers | Indirect Transfers | Total |
|---|---|---|---|
| 2000 | $42,996,679 | $32,500,000 | $75,496,679 |
| 2001 | $12,410,095 | $59,993,500 | $72,403,595 |
| 2002 | $8,855,299 | $51,628,142 | $60,483,441 |
| 2003 | $4,982,025 | $92,384,791 | $97,366,815 |
| 2004 | $6,852,980 | $82,113,022 | $88,966,002 |
| 2005 | $5,406,024 | $63,901,013 | $69,307,037 |
| 2006 | $0 | $73,217,622 | $73,217,622 |
| 2007 | $0 | $121,243,288 | $121,243,288 |
| 2008[9] | $0 | $75,459,701 | $75,459,701 |
| **Total** | **$81,503,101** | **$652,441,077** | **$733,944,178** |

---

[8] Reported revenue and net income amounts represent year-to-date information through October 31, 2008, the date of the last filed FOCUS Report.

[9] $19,087,449 was received after the last FOCUS Report was filed for October 31, 2008.

The Honorable Scott Garrett
January 24, 2011
Page 21

Because the direct and indirect transfers from House 17 to House 5 were in cash, which is fungible, the transfers cannot be directly traced to House 5 trades. However, the funds transferred from House 17 were recorded by House 5 as revenue and represented a substantial portion of House 5's liquidity. Without these funds from the IA business, House 5 would have incurred annual net losses (i.e., reported net income less funds from the IA business results in a net loss for each period with available data). Notwithstanding the inability to trace these funds to House 5 trades or individual BLMIS customer accounts, the Trustee has treated the proceeds of the sale of the market making and proprietary trading businesses as customer property, and therefore those funds will be included in the amounts distributed to customers with approved claims.

3.   **Provide up-to-date and projected total aggregate cost data, by entity, for amounts billed and amounts paid to Trustee Picard, the Baker Hostetler law firm, and all other entities involved in the SIPC liquidation of BLMIS and its related businesses.**

<u>Response</u>:

The amounts are as follow:

|  | Entity | Amounts Paid Through 12/31/10 |
|---|---|---|
| *Trustee* | Trustee | $3,275,173.77 |
| *Trustee's Counsel* | Baker & Hostetler LLP | $127,938,847.58 |
| *Special Counsel* | Attias & Levy | $631,183.64 |
|  | Eugene F. Collins | $216,383.85 |
|  | Higgs & Johnson | $238,793.40 |
|  | Kugler Kandestin, LLP | $19,013.09 |
|  | Hogan Lovells International LLP | $2,392,861.22 |
|  | Mishcon de Reya | $65,926.23 |
|  | SCA Creque | $153,197.02 |
|  | Schifferli Vafadar Sivilotti | $13,928.00 |
|  | Schiltz & Schiltz | $341,908.01 |
|  | Williams, Barristers & Attorneys | $644,767.61 |
|  | Windels, Marx, Lane & Mittendorf, LLP | $6,004,460.48 |
|  |  |  |
| *Consultants* | AlixPartners | $48,554,739.11 |
|  | FTI Consulting | $84,590,786.44 |
|  | Renaissance Assoc., Ltd. | $2,580,432.16 |
|  |  |  |
| *Other Consultants* |  | $8,974,193.33 |
|  |  |  |
| *Other* |  | $1,683,848.95 |
|  |  |  |

The Honorable Scott Garrett
January 24, 2011
Page 22

| Total: | | $288,320,443.89 |
|--------|---|-----------------|

**Estimated Future Costs  (2011 – 2014)**

| Entity | Amount |
|--------|--------|
| Irving H. Picard, Trustee | $12,523,164.81 |
| Baker & Hostetler LLP | $603,217,651.28 |
| Special Counsel | $39,893,950.00 |
| Consultants | |
|    AlixPartners | $123,028,096.57 |
|    FTI | $250,327,741.98 |
|    Renaissance | $1,275,000.00 |
| Other Consultants | $65,362,500.00 |

| Total: | $1,095,628,104.64 |
|--------|-------------------|

I would note that these administrative expenses are not paid for by using "customer property." SIPC advances the funds for these costs.

4.      During a recent Capital Markets Subcommittee hearing, at which testimony was presented by several members of SIPC's Modernization Task Force, there was general agreement that avoidance actions by the Trustee were limited to two years prior to the debtor's bankruptcy under the Federal Bankruptcy Code and to six years under applicable New York statutes.  Accordingly, in the BLMIS case, it would appear that disbursements made prior to December, 2002, would be protected from avoidance actions by the statutes of limitation.

Since most of the accounts subject to avoidance actions are those determined to have a negative "net equity" under the Trustee's NIM, a very serious consideration is the propriety of using disbursements made earlier than December, 2002, in the calculation of net equity, which, depending on the outcome, may cause the account to be subject to an avoidance action.

Given the seriousness of this issue, as it relates to proper adherence to the protections intended and accorded by the statutes of limitation, I ask that the following information be provided with the greatest precision possible.  For the 1000 accounts under review by the Trustee for possible avoidance actions, indicate the number of accounts for which disbursements prior to December, 2002, were used in the NIM calculation of net equity, the year/s of disbursement/s, and the aggregate amount disbursed in each year.

The Honorable Scott Garrett
January 24, 2011
Page 23

**Response:**

It is important to understand that as previously mentioned, the calculation of a customer's net equity and the trustee's use of the avoidance powers are pursuant to separate statutory authority, and involve different concepts. Each customer's "net equity" as of the filing date is based upon the account activity for the entire account history, and is not and cannot be limited to the final two-year and/or six-year period preceding the bankruptcy. Computation of net equity merely measures the account holder's total cash deposits less withdrawals. Once the calculation of each customer's net equity is determined, the trustee can then determine which transfers made by the Estate are avoidable during the two-year and/or six-year period preceding the filing date.
Under SIPA, the customer's net equity reflects the amount of property on deposit with a broker-dealer and therefore owed by the broker-dealer to the customer when the firm fails financially. Disbursements made by a broker to a customer in the ordinary course of business and according to ordinary business terms would not be subject to avoidance by a trustee and, by the same token, would not factor into what the customer is owed as his "net equity," because the disbursed property is no longer in the broker's possession and therefore no longer owed by the broker to the customer.

As a matter of law, in the case of a Ponzi scheme, however, there is no ordinary course of business. In that situation, under SIPA, what the customer is owed is still the property custodied by the customer with the broker. But to the extent the investor received transfers of property from the broker, before the broker failed, which, for example, were for less than reasonably equivalent value or would result in the customer receiving more than he would in liquidation, then the trustee may seek to avoid such transfers.

In the BLMIS case, with the exception of the avoidance of preferential transfers made during the 90 days preceding the filing date, the Trustee is not seeking to recover from any innocent transferee any amount of the customer's principal, that is, the amount deposited by the transferee as a customer with the broker. Instead, against such transferees, the recovery is limited only to fake profits constituting other investors' money. Even assuming that, for the sake of argument only, the Trustee were to seek to recapture principal and be successful, the transferee would have a customer claim for the returned principal, as discussed above under the Use of Avoidance Powers In a SIPA Case.

**5.     How many accounts under consideration for avoidance action were established with Madoff prior to the inception of the Ponzi scheme? In making the NIM determination of net equity for these accounts, has the Trustee used any of the pre-Ponzi disbursements? If so provide details: number of accounts, year and amount of disbursements.**

**Response:**

Based on the Trustee's investigation and upon review of the earliest records available to him, the Trustee has found no evidence indicating that the BLMIS Investment Advisory

The Honorable Scott Garrett
January 24, 2011
Page 24

business has been operated as anything but a Ponzi scheme. Therefore, the Trustee does not believe that there are any accounts under consideration for avoidance action that were established with BLMIS prior to the inception of the Ponzi scheme. However, it should be noted that there are 380 accounts that were established with BLMIS prior to the earliest document/customer account statement included in the net equity calculation. For these accounts, the trustee has taken the most conservative approach – and most beneficial to the account holder – for the dollars allegedly held in such accounts at the time of the earliest records. The net equity determination grants a "Principal Credit" to the account holder for the cash and reported cost basis of the securities allegedly held on behalf of those customers on the first statements included in the net equity determination as if the "equity" in the account had been real. A total of $164,023,720 of initial "Principal Credit" has been credited to these 380 accounts established prior to the earliest customer account statement included in the net equity determination.

**6a.    During its existence, how many broker-dealer bankruptcies has the SIPC resolved? In how many of those cases has the NIM been used to determine customer net equity? If there are such cases, describe the circumstances.**

**Response:**

Since its inception, SIPC has resolved to completion 314 liquidation proceedings and Direct Payment Procedures under SIPA. A calculation of net equity representing the difference between what the broker owes the customer and what the customer owes the broker is consistent with SIPA, see 15 U.S.C. §78lll(11), and therefore, has been applied in determining net equity in every SIPA case.

In the BLMIS case, the Trustee gave effect to the last account statement to the extent of treating the customers' claims as ones for securities instead of cash. The statement provided proof of the customer's reasonable expectation that securities were being held for him. As such, consistent with the law in the Second Circuit, the customer became eligible for up to $500,000 of protection from SIPC, instead of $100,000 which was the limit of protection for cash claims at that time. The Trustee did not honor the last account statement beyond that, because the statements reflected fake profits and non-existent securities transactions invented by Bernard Madoff to yield fake returns pre-determined by him.

SIPC does not keep a record of the number of cases in which the last account statement was not followed because it did not reflect market reality. However, below are some cases presenting such facts:

In re First Ohio Secs. Co. (Plumbers & Steamfitters Local No. 490 Severance and Ret. Fund v. Appleton, Case No. 93-3313, 1994 U. S. App. LEXIS 31347 (6th Cir. Nov. 1, 1994) (sale of fictitious CDs));

The Honorable Scott Garrett
January 24, 2011
Page 25

In re New Times Securities Servs. Inc., 371 F.3d 68 (2d Cir. 2004) (non-existent money market funds). The Court noted the "potential absurdities created by reliance on the entirely artificial numbers contained in the fictitious account statements." 371 F.3d at 88.

Northstar Securities, Inc., Case No. 01-3722-BJH (Bankr. N. D. Tex.): A fictitious bank CD sold by a principal of the brokerage involving a Ponzi scheme. The trustee allowed customer claims for the "CDs" based upon the amount of cash deposited with the brokerage for investment in the CD, minus withdrawals made by the customer in the form of redemptions. Payments of fictitious interest to the customer were deemed by the trustee to be a return of principal.

In re Old Naples Securities, Inc., 311 B. R. 607 (M. D. Fla. 2002): A Ponzi scheme involving the fake "sale" of bonds yielding fictitious returns. The Court characterized as "illogical" "permitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction...." 311 B.R. at 617.

In re C. J. Wright & Co., 162 B. R. 597 (Bankr. M.D. Fla. 1993): Case involving a Ponzi scheme in which claimants were issued documents showing their participation in a "Deposit Account" investment program, with a fixed interest rate to be received by the investor. The Court held the claimants to be customers, entitled to receive only the principal they invested since that was the amount converted by the broker. Claimants would not be entitled to the purported interest on their investments and any such interest received would be a reduction against the amount recoverable in the SIPA case.

Cases discussed below in Question 6b.

6b.    **In assembling customer property in any of the previous resolutions, has SIPC ever resorted to avoidance actions against the debtor's customers based on a NIM calculation or any legal basis other than complicity with the debtor?**

The below information may be incomplete because SIPC does not keep a record of such data. However, examples of cases in which trustees have initiated such avoidance suits include the following:

Adler Coleman Clearing Corp.: Hanover Sterling, a brokerage that cleared its trades through Adler Coleman, made a market in "house stocks." Shortly before its demise, Hanover caused Adler to send statements to Hanover customers purporting to show the sale in these customers' accounts of the house stocks at very high prices. The stocks supposedly were bought by other customers, but those customers never ordered the purchases. The trustee sought to avoid the trades. The Bankruptcy Court upheld the position of the trustee, noting that the trades were unenforceable, among other reasons, because they were subject to avoidance under the Bankruptcy Code, New York State law, and SIPA, and because they were illegal transactions under New York State law and as a matter of contract. See In re Adler Coleman Clearing Corp., 218 B. R. 689 (Bankr.

The Honorable Scott Garrett
January 24, 2011
Page 26

S.D.N.Y. 1998).  See also In re Adler Coleman Clearing Corp., 247 B. R. 51 (Bankr. S.D.N.Y. 1999), aff'd, 263 B. R. 406 (S.D.N.Y. 2001).

Donahue Securities, Inc. and S. G. Donahue & Co., Inc., Adv. Case No. 01-1027 (Bankr. S.D. Ohio): 26 former customers received payments to which they were not entitled.  The payments consisted of false profits and were of amounts that exceeded the customers' cash investment.  The trustee sent letters to the 26 former customers asking for repayment of the false profits.  Nine customers negotiated repayment amounts with the trustee.  The remaining 17 customers were sued by the trustee.  All of the cases were settled.

Park South Securities, LLC:  Trustee sued to avoid transfers made to investors who had received payments from the broker that actually consisted of other investors' money.  Following the denial of a motion to dismiss most counts of the complaint, the matter was settled.  See In re Park South Securities, LLC, 326 B. R. 505 (Bankr. S.D.N.Y. 2005).

S. J. Salmon & Co. Inc.:  The firm was placed in liquidation in 1972, shortly after the enactment of SIPC on December 30, 1970.  The firm was a market maker for securities sold to some of its customers.  With its closure imminent, the firm recorded on the firm's books and records purported sales of the customers' securities positions, knowing that the securities would plunge in value upon the demise of the firm.  Following the initiation of the SIPA proceeding, the customers demanded the inflated cash that had been credited to their accounts as a result of the fictional transactions.  The trustee sought to avoid the phony sales as fraudulent and void under the Bankruptcy Act and New York State law.  The Bankruptcy Court (then Referee in Bankruptcy) upheld the trustee's position, among other things, rejecting the claimants' argument of "fair consideration" and remarking that the evidence showed that the purported "market value had no relationship to reality and that the securities in question simply could not be sold at the purported 'market' quotation."  See SIPC v. S. J. Salmon & Co., 1973 U. S. Dist. LEXIS 15606, *32 (S.D.N.Y. Aug. 8, 1973).  See also SIPC v. S. J. Salmon & Co., No. 72 Civ. 560, Decision #2 on Trustee Motion for Summary Judgment Avoiding Certain Transactions Which Occurred February 2d, 1972 (S.D.N.Y. Feb. 5, 1974).

The Honorable Scott Garrett
January 24, 2011
Page 27

I apologize for the time that it has taken to reply to your letter, however, assembling the information and data that you requested required a sizeable commitment of time and resources by both the SIPC and Trustee staffs.  If we can assist in any other way, please let me know.

Sincerely,

Stephen P. Harbeck
President and Chief Executive Officer

SPH/pmd

cc:  The Hon. Spencer Bachus
The Hon. Barney Frank
The Hon. Maxine Waters
Irving H. Picard, Trustee
David J. Sheehan, Esq.

Att.

A-112

EXHIBIT A

Madoff Related Accounts - Year End Balances and Annual Earnings
Accounts with Transfers to and from the Madoff 703 Account
*Amounts are limited to account statements available to the Trustee*

| Name on Account | Bank Name | Acct Number(s) | Purpose of Account | Date Range of Available Statements | Description of Amount | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernard L. Madoff / Ruth Madoff | Bank of New York | 1200202690 | Bernie and Ruth Personal Checking | 12/97-7/10 | Year End Balance | 39,655 | 65,919 | 93,922 | 239,081 | 29,692 | 773,102 | 3,278,144 | 1,297,373 | 1,171,094 | 1,999,211 | 852,506 | 52,842 | - |
| | | | | | Annual Earnings | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bernard L. Madoff[2] | Bank of New York | 866-1126-621 | Primary Account (House 5) | 1/98-1/09 | Year End Balance | | 680,335 | 6,354,198 | 1,498,833 | 6,131,902 | 5,209,602 | 4,159,060 | 5,410,529 | 16,366,286 | 2,617,740 | 8,129,987 | 6,439,530 | - |
| | | | | | Annual Earnings | | - | - | - | - | - | - | - | - | - | - | - | - |
| Bernard L. Madoff Investment Counsel LLC | Bank of New York | 234239 | Investment Counsel Account | 3/05-5/07 | Year End Balance | | | | | | | | | (168) | - | | | - |
| | | | | | Annual Earnings | | | | | | | | | | | | | |
| Bernard L. Madoff | Bankers Trust Company | 00-810-599 | Funded by 703; outflows primarily to IA customers | 12/98-7/00 | Year End Balance | | 708,926 | - | - | | | | | | | | | - |
| | | | | | Annual Earnings | | - | | | | | | | | | | | |
| Bernard L. Madoff | Barclays (Lehman) | 831-04598 | Brokerage Account | 1/01-11/08 | Year End Balance[4] | | | | 371,006,169 | 340,367,242 | 220,083,332 | 28,234,070 | 26,959,179 | 11,469,885 | 48,908 | 51,395 | 3.70 | 63,098,564 |
| | | | | | Annual Earnings | | | | 20,497,464 | 19,908,743 | 12,358,038 | 7,106,281 | 2,102,391 | 1,529,473 | 192,504 | 2,508 | 1,162.23 | |
| Bernard L. Madoff | Barclays (Lehman) | 831-76152 | Brokerage Account | 6/03-5/06 | Year End Balance | | | | | | | 49,960,815 | 50,693,956 | 16,568,041 | 131,311 | | | 13,800,959 |
| | | | | | Annual Earnings | | | | | | | 1,892,500 | 7,515,958 | 4,261,200 | | | | |
| Bernard L. Madoff Investment Securities LLC | Barclays (Lehman) | 831-04435 | Brokerage Account | 5/07-11/08 | Year End Balance[4] | | | | | | | | | | | 103,078,880 | 317 | 141,062 |
| | | | | | Annual Earnings | | | | | | | | | | | 53,602 | 87,460 | |
| Bernard L. Madoff[3] | Bear Stearns | 037-72698-163 | Brokerage Account | 6/98-4/06 | Year End Balance | | 561,631,631 | 551,755,445 | 536,818,066 | 385,049,812 | 372,995,578 | 342,554,863 | 267,551,560 | 21,573,290 | - | | | 172,907,626 |
| | | | | | Annual Earnings | | 15,679,551 | 31,191,962 | 32,524,644 | 34,727,625 | 25,893,695 | 12,594,129 | 10,623,376 | 9,995,758 | 30,886 | | | |
| Bernard L. Madoff | Fidelity | X09-289043 | Brokerage Account | 12/99-1/09 | Year End Balance | | 205,555,278 | 411,010,358 | 386,650,402 | 342,929,789 | 226,658,251 | 71,345,093 | 79,570,671 | 44,988,642 | 3,153 | 3,234 | 3,309 | 101,799,888 |
| | | | | | Annual Earnings | | 2,695,654 | 16,520,420 | 24,445,254 | 23,523,790 | 10,936,631 | 7,682,045 | 7,215,623 | 8,963,020 | 19,296 | 102 | 55 | |
| Bernard L. Madoff Investment Securities LLC | M & T Securities | A2Z4674039 | Brokerage Account | 5/07-1/09 | Year End Balance | | | | | | | | | | | 101,845,006 | 4,030,782 | 56,515 |
| | | | | | Annual Earnings | | | | | | | | | | | 23,048 | 33,467 | |
| Bernard L. Madoff | Morgan Stanley | 663010719 | Brokerage Account | 12/99-1/09 | Year End Balance | | | 99,250,006 | 578,186,906 | 503,465,897 | 500,026,904 | 359,300,226 | 359,126,442 | 149,439,444 | 347,670 | 364,447 | 370,913 | 16,288,200 |
| | | | | | Annual Earnings | | | | 52,301 | 2,687,559 | 74,657 | 7,355,485 | 1,600,245 | 3,255,279 | 1,850,351 | 16,667 | 6,555 | |
| | | | | | | | | | | | | | | | | | | $ 369,292,955 |

NOTES:
[1] The earliest available statement was in 1997. Therefore, 1997 is the first period shown in this schedule.
[2] The name on this account changed to Bernard L. Madoff Investment Securities LLC in May 2001.
[3] The name on this account changed to Bernard L. Madoff Investment Securities LLC in May 2004.
[4] The 2008 Year End Balance represents account balance as of 11/20/2008.

A-113

**BECKER & POLIAKOFF LLP**                    Hearing Date:    March 30, 2011 at 10:00 a.m.
Helen Davis Chaitman
HCHAITMAN@BECKER-POLIAKOFF.COM
45 Broadway
New York, New York 10006
Telephone (212) 599-3322

*Attorneys for Marsha Peshkin*
*and a large group of other customers*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,
                                            Plaintiff,          Case No.:  08-01789 (BRL)

                    v.                                          SIPA LIQUIDATION
                                                               (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                            Defendant.

In re:

BERNARD L. MADOFF,
                                            Debtor.

---

### REPLY BRIEF IN FURTHER SUPPORT OF MOTION
### TO SET ASIDE THE ORDER APPROVING THE TRUSTEE'S SETTLEMENT WITH
### THE LEVY HEIRS FOR FAILURE TO DISCLOSE MATERIAL INFORMATION

Marsha Peshkin and a large group of other customers (the "Movants") of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), submit this reply brief in further support of their

motion (the "Motion") to vacate the February 18, 2010 order (Doc # 1964) (the "Order")

approving the Trustee's settlement (the "Settlement") with Jeanne Levy-Church and Francis N.

Levy, the heirs of Norman F. Levy (the "Levy Heirs"), pursuant to Federal Rule of Civil

Procedure 60 and Federal Rule of Bankruptcy Procedure 9024.

## PRELIMINARY STATEMENT

The Trustee owes a fiduciary duty to the investors and a duty of utter candor to the Court.

*See In re Center Teleproductions, Inc.*, 112 B.R. 567, 576 (Bankr. S.D.N.Y. 1990) (quoting *In re*

*Chochise Park College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983)) ("'A bankruptcy . . .

trustee is a fiduciary of each creditor of the estate . . . .'"); *Protective Committee for Independent*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (recognizing that

bankruptcy court's decision to approve settlement must be well-informed).

As a SIPA trustee, the Trustee has a further obligation, under 15 U.S.C. §78fff-1(d) to:

> (1) as soon as practicable, investigate the acts, conduct, property,
> liabilities, and financial condition of the debtor, the operation of its
> business, and any other matter, to the extent relevant to the
> liquidation proceeding, and report thereon to the court;
>
> (2) examine, by deposition or otherwise, the directors and officers
> of the debtor and any other witnesses concerning any of the
> matters referred to in paragraph (1);
>
> **(3) report to the court any facts ascertained by the trustee with
> respect to fraud, misconduct, mismanagement, and
> irregularities, and to any causes of action available to the
> estate**; and
>
> (4) as soon as practicable, prepare and submit, to SIPC and such
> other persons as the court designates and in such form and manner
> as the court directs, a statement of his investigation of matters
> referred to in paragraph (1).

The Trustee has utterly failed to fulfill his statutory functions in this case and has gone

even further by deliberately concealing material information about Norman Levy's criminal

activities in order to improperly obtain the Court's approval for a sweet-heart deal for the Levy

Heirs. The Trustee's dishonesty is of particular concern because, since December 11, 2008, the

Trustee and his professionals have had exclusive access to the records of BLMIS. The Trustee's

2

dishonesty in procuring the Settlement[1] raises the question whether any of his factual contentions

– such as the contention that BLMIS never purchased the securities shown on the investors'

statements – can be trusted.  Under these circumstances, the Trustee and his counsel should be

immediately removed.

In his motion for approval of the Settlement, the Trustee not only withheld explosive

information proving Norman Levy's criminal conduct, but he deceitfully praised the Levy Heirs

for being "forthright and sincere in their desire to do 'the right thing.'"[2]

**The Trustee and his counsel made the following representations of fact to the Court and the investors in his application for approval of the Settlement:**

1.      Norman Levy had established a number of accounts at BLMIS in his name, in the names of his children, and for family trusts and charitable trusts, including the Betty & Norman F. Levy Foundation (the "Foundation).  During the six years prior to the Filing Date, the Levy BLMIS Account Holders withdrew an aggregate of approximately $305 million in excess of the amount of deposits made into such accounts, of which $84 million was withdrawn by the Foundation.[3]

2.      The Trustee did not demand that the Foundation re-pay the $84 million that it withdrew and the Levy's offered to pay the remaining $220 million that they withdrew in excess of what they invested.[4]

3.      Mr. Madoff "stole" $250 million from the Levy estate which he invested in BLMIS.[5]

4.      The $220 million offer from the Levy Heirs represented "the entire amount" that the Trustee was entitled to recover.[6]

**The Trustee now admits he knew but concealed the following facts from the Court and the investors in the application for approval of the Settlement:**

---

[1] Capitalized terms have the same meaning as used in the Motion.

[2] 02/18/2011 Declaration of H. Chaitman ("Chaitman Decl.") (Doc # 3862) Ex. E (Trustee's Levy Settlement Motion) Motion for Entry of Order . . . Approving Agreement by and among the Trustee and Jeanne Levy-Church and Francis N. Levy (the "Settlement Motion") at  ¶11; Chaitman Decl. Ex. F (2/18/2010 Hrg. Trans. on Settlement Motion (the "Hrg. Trans.") at 7-8.)

[3] Chaitman Decl. Ex. E, Settlement Motion at ¶7.

[4] Chaitman Decl. Ex.E, Settlement Motion ¶12; Chaitman Decl. Ex. F, Hrg. Trans. at 5-6.

[5] Chaitman Decl. Ex. E, Settlement Motion at ¶6; Chaitman Decl. Ex. F, Hrg. Trans. at 4.

[6] See Chaitman Decl. Ex. E, Settlement Motion at ¶12-13; Chaitman Decl.l Ex. F, Hrg. Trans. at 5-6.

1.      The evidence known to the Trustee at the time he moved for approval of the Settlement proved that, like Picower, Norman Levy was Madoff's criminal co-conspirator.  From 1992 through 2001, Levy financed Madoff's Ponzi scheme in an amount exceeding $100 billion.[7]

2.      During 2002, BLMIS initiated 318 separate transfers from its account at J.P. Morgan Chase ("Chase") to Norman Levy's account each in the precise amount of $986,301.[8] This constitutes more than one transfer per day that Chase was open for business in 2002.

3.      As of December 11, 2008, the Levy Heirs had a $2 billion margin loan from BLMIS.[9]

The Trustee's concealment of material information from the Court and the investors, when he has had exclusive access to all of the BLMIS records for over two years, is not only inexplicable but compels the conclusion that he is not fit to serve as Trustee in this case.  Madoff perpetrated the largest financial crime in history.  There is a compelling public interest in learning precisely how Madoff carried out his scheme so that steps can be taken to assure that a crime of this proportion does not re-occur.

Rather than fulfill his statutory obligation to disclose all material information concerning the operations of BLMIS' criminal conspiracy, the Trustee has affirmatively chosen to shield and protect the criminals (Picower and Levy) and their relatives, while at the same time persecuting innocent investors who did nothing more than withdraw from their accounts money they believed was theirs and on which they have paid taxes.

---

[7] *See* Chaitman Decl. Ex G (The January 24, 2011 letter from SIPC president Stephen Harbeck to Congressman Scott Garrett, Chair of the House Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises (the "Letter") at 14-15.)

[8] Chaitman Decl. Ex. C (Trustee's complaint in *Picard v. JPMorgan Chase & Co., et als.,* Adv. Pro. No. 10-04932 (the "Complaint") at ¶224.)

[9] SIPC president, Stephen Harbeck, admitted that, as of the date of Madoff's arrest, Picower and the Levy Heirs had a negative net equity balance, or margin loan, of $8 billion.  *See* Chaitman Decl. Ex G, Letter at 10, fn. 3.  In the *Picard v. Picower, et als.* complaint, Adv. Pro. No. 09-1197 (Doc # 1) (the "Picower Complaint"), the Trustee asserted that one of Picower's accounts reported a staggering margin balance of approximately $6 billion.  Picower Complaint at ¶63(d).  Thus, the Levy Heirs had a $2 billion margin loan.

4

Under these circumstances, the Trustee and his counsel should be immediately removed and an independent investigator should be appointed to examine their conduct throughout this case and report to the Court, to the investors, and to the U.S. Attorneys' Office.   Removal is appropriate where there is a mere breach of fiduciary duty.  *See In re Livore*, 2010 WL 1849322, at *4 (Bankr. D.N.J. May 6, 2010).  Here, the Trustee's behavior raises the possibility of something much more serious.

At a minimum, the Trustee should be held personally liable for the damages his conduct has caused the investors.  *See In re Gorski*, 766 F.2d 723, 727 (2d Cir. 1985) (holding that in appropriate circumstances, "a surcharge is imposed on the fiduciary in the amount of actual or estimated financial harm suffered . . ."); *In re Center Teleproductions, Inc.*, 112 B.R. at 578 (holding that trustee's actions are not immune from personal liability "[w]here the trustee . . . negligently obtains a court order, or negligently or willfully carried out a court order he knew or should have known he wrongfully procured").

## ARGUMENT

**I.      The Trustee's Concealment of Material Facts from the Court is Inexcusable.**

The Trustee cannot justify his concealment of the undisclosed facts concerning the Levy family's dealings with BLMIS.  In appalling arrogance, he argues that this Court's approval of the Levy Settlement without any objection from investors demonstrates that the Settlement was in the best interests of the estate [10] despite the fact that he deliberately withheld the explosive information that would have allowed the investors to object to the Settlement.  While, as a matter of law, the Trustee stands in the shoes of Mr. Madoff, that does not mean that he has a license to act dishonestly and defraud the investors.

---

[10] *See* Trustee's Opposition to Customers' Motion to Set Aside the Order Approving the Trustee's Settlement with the Levy Heirs for Failure to Disclose Material Information (the "Opposition") at 4.

5

Moreover, the Trustee's attempt to focus on the alleged reasonableness of the Settlement is a red herring;[11] it does not relieve him of his duty to disclose all material facts pertaining to a proposed settlement to the Court.  "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion."  *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir. 1987) (". . . [B]ankruptcy judge must actually exercise his discretion. He may not simply accept the trustee's word that the settlement is reasonable, nor may he merely "rubber-stamp" the trustee's proposal.").  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993) (citing *In re Energy Cooperative Inc.*, 886 F.2d 921, 924 (7th Cir. 1989)).

In obtaining this Court's approval of the Settlement, the Trustee fraudulently concealed Mr. Levy's criminal conduct and the fact that the Levy Heirs had a $2 billion margin loan from BLMIS as of December 11, 2008.  Under these circumstances, the Settlement cannot possibly be reasonable and it is, in any event, the product of the Trustee's fraud.

Arrogantly, the Trustee argues that the Court should not vacate the Settlement because the statute of limitations has run on avoidance actions against the Levy Heirs.[12]  Aside from the remedies available against the Trustee and his counsel, the Levy Heirs are liable for aiding and abetting the breach of fiduciary duty of the Trustee and his counsel.  The statute of limitations has not run on that claim, which only became known after disclosure of Mr. Harbeck's January 24, 2011 letter to Scott Garrett.

## II.    Relief under Fed. R. Civ. P. 60(b) is Warranted

---

[11] *See id.* at 4-5.

[12] *See* Opposition at 8.

The Trustee argues that the Movants are not entitled to relief under Rule 60(b) because the Trustee's concealment of material facts does not amount to "exceptional circumstances."[13] The Trustee's conclusion is flawed for multiple reasons. First, courts have applied the "exceptional circumstances" test only to the catch-all provision in clause (6) – a clause applicable where "any other reason justifying relief" exists. *See Matter of Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981) (citing *Ackerman v. United States*, 340 U.S. 193, 199 (1950)) (recognizing that subsection (6) of Rule 60(b) "is properly invoked when there are extraordinary circumstances . . . or where the judgment may work an extreme and undue hardship."). Even so, this clause is broadly interpreted in this Circuit to bring about "substantial justice." *Raddack v. Norwegian Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963); *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda--Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Rule 60(b) provides for relief 'upon such terms as are just.'").

Second, even if the Court determines that clause (6) is inapplicable, clause (3), which "provides for relief from fraud, misrepresentation or other misconduct of an adverse party," enables this Court to set aside the Order because it was procured on the basis of the Trustee's fraudulent conduct. *See Matter of Emergency Beacon Corp.*, 666 F.2d at 759.

Even if this Court determines that all grounds of Rule 60(b) require presence of "exceptional circumstances," surely the Trustee's deliberate concealment of material facts meets this standard. The Trustee's assertion that his wrongdoing would likely not have changed the Court's decision to approve the Settlement[14] is pure speculation. Had the Movants been aware of the withheld facts at the time of the application for approval of the Settlement, they certainly would have objected and it is inconceivable that the Court would have approved the Settlement.

---

[13] *Id.* at 5-6.

[14] Opposition at 6-7.

7

A-120

Furthermore, a trustee is liable where he "negligently obtains a court order, or negligently or willfully carries out a court order he knew or should have known he wrongfully procured." *See In re Center Teleproductions, Inc.*, 112 B.R. at 578. Surely, if misstatements to a court strip a trustee of his immunity, concealment of material information would constitute "exceptional circumstances" for purpose of Rule 60(b).

## CONCLUSION

This Court has allowed the Trustee and his counsel to have exclusive access to all of the BLMIS records. Based on that exclusive access, the Trustee has taken positions in this case that are devastating to the investors. The Trustee's dishonesty in procuring the Settlement raises the question whether any of his factual contentions – such as the contention that BLMIS never purchased the securities shown on the investors' statements – can be trusted. Under the circumstances, the integrity of the Court compels the removal of the Trustee and his counsel, as well as the vacating of the Order approving the Settlement.

March 23, 2011

                                      **BECKER & POLIAKOFF LLP**

By:   /s/ Helen Davis Chaitman
         Helen Davis Chaitman
         45 Broadway
         New York, New York 10006
         (212) 599-3322

         *Attorneys for Marsha Peshkin*
         *and a large group of other customers*

8

A-121

# Baker Hostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

David J. Sheehan
direct dial: 212.589.4616
dsheehan@bakerlaw.com

March 25, 2011

Honorable Burton R. Lifland
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 1004-1408

Re:    *Securities Investor Protection Corporation v. Bernard L. Madoff Investment
Securities LLC*
<u>Adv. Pro. No. 08-01789 (BRL) (Substantively Consolidated)</u>

Dear Judge Lifland:

We are in receipt of the reply brief filed by Ms. Helen Chaitman on behalf of
Marsha Peshkin and other claimants in further support of a motion (the "Motion") to
vacate the Order approving the Trustee's settlement with Jeanne Levy-Church and
Francis N. Levy, the heirs of Norman Levy, pursuant to Federal Rule of Civil Procedure
60 and Federal Rule of Bankruptcy Procedure 9024. The reply brief seeks to raise the
issue of the removal of the Trustee and his counsel, which is beyond the scope of the
Motion and should be disregarded by the Court.

The Motion sought to vacate the Order entered by this Court approving the
settlement between the Trustee and the Levy Heirs. It did not seek, nor set forth a
basis for, the removal of the Trustee and his counsel. As such, the attempt to remove
the Trustee and counsel in a reply brief is procedurally flawed and lacks any
foundational support. Moreover, it is a baseless, fallacious, and unprofessional attack
upon the integrity of the Trustee and his counsel. Accordingly, Ms. Chaitman's
representations deserve no consideration by the Court, should be summarily rejected,
and the Motion to vacate the Order should be denied.

Sincerely,

David J. Sheehan

DJS/ds

Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa
Denver    Houston    Los Angeles    New York    Orlando    Washington, DC

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Lead Case No. 09-11893(BRL); Adv. Case No. 08-01789(BRL)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7    BERNARD L. MADOFF,

8              Debtor.

9    - - - - - - - - - - - - - - - - - - - -x

10   SECURITIES INVESTOR PROTECTION CORPORATION,

11             Plaintiff,

12   v.

13   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC

14             Defendant.

15   - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             March 30, 2011

21             10:21 AM

22

23   B E F O R E:

24   HON. BURTON R. LIFLAND

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2  HEARING re Motion Seeking Entry of an Order Pursuant to Federal

3  Rule of Civil Procedure 60 and Federal Rule of Bankruptcy

4  Procedure 9024 Vacating the February 18, 2010 Order (Doc #

5  1964) of the United States Bankruptcy Court for the Southern

6  District of New York Approving an Agreement By and Among the

7  Trustee and Jeanne Levy-Church and Francis N. Levy filed by

8  Helen Chaitman on behalf of Marsha Peshkin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

Page 3

```
1

2      A P P E A R A N C E S :

3      BAKER & HOSTETLER LLP

4           Attorneys for Irving H. Picard, Esq., Trustee for the

5            Substantively Consolidated SIPA Liquidation of

6            Bernard L. Madoff Investment Securities LLC and

7            Bernard L. Madoff

8            45 Rockefeller Plaza

9            New York, NY 10111

10

11     BY:   DAVID J. SHEEHAN, ESQ.

12

13     BECKER & POLIAKOFF, LLP

14          Attorneys for Marsha Peshkin and a Non-Exclusive Group

15           of Other Customers of Bernard L. Madoff Investment

16           Securities LLC

17           45 Broadway

18           New York, NY 10006

19

20     BY:   HELEN DAVIS CHAITMAN, ESQ.

21

22

23

24

25
```

Page 4

1

2    MUNGER, TOLLES & OLSON LLP

3         Attorneys for Jeanne Levy-Church and Francis Levy

4         355 South Grand Avenue

5         35th Floor

6         Los Angeles, CA 90071

7

8    BY:   CARY B. LERMAN, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 5

```
1                    P R O C E E D I N G S
2          THE COURT:  Be seated, please.
3          THE CLERK:  SIPC v. BLMIS.
4          MS. CHAITMAN:  Good morning, Your Honor.
5          THE COURT:  Good morning.
6          MR. SHEEHAN:  Good morning, Your Honor.
7          MS. CHAITMAN:  Helen Davis Chaitman of Becker &
8  Poliakoff on behalf of --
9          THE COURT:  Good morning, Ms. Chaitman.
10         MS. CHAITMAN:  Good morning.
11         THE COURT:  It's your motion.
12         MS. CHAITMAN:  Yes.  Thank you.  You want to take
13  appearances?
14         THE COURT:  Please.
15         MR. SHEEHAN:  David Sheehan on behalf of the trustee,
16  Your Honor.
17         MR. LERMAN:  Good morning.  Cary Lerman on behalf of
18  Jeanne Levy-Church and Mr. Francis Levy.
19         MS. CHAITMAN:  Good morning, Your Honor.  Based on the
20  information that is now available to the public, Norman Levy,
21  the father of the Levy children, financed Mr. Madoff's Ponzi
22  scheme to the tune of a hundred billion dollars during the
23  period from 1992 to 2001.  And if Your Honor has had the
24  opportunity to look at Mr. Harbeck's letter to the chairman of
25  the Subcommittee on Capital Markets dated January 24th, 2001.
```

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 6

1    At pages 14 and 15, you can see the transfer of funds between

2    Mr. Levy's account at Chase and the BLMIS account at Chase.

3    And I confess that I can't figure out what they were doing with

4    the money but, clearly, it could not have been a legal

5    transaction.  And indeed --

6            THE COURT:  Well, I don't know whether it is or is

7    not.  As a matter of fact, that happened to be the subject of

8    another adversary proceeding involving Chase and the litigation

9    with the trustee.

10           MS. CHAITMAN:  Exactly.  And in that litigation, Your

11   Honor, the trustee has alleged that Chase knew or should have

12   known of the Ponzi scheme because it would --

13           THE COURT:  But I'm not trying the Chase case.

14           MS. CHAITMAN:  -- because it -- actually, I thought

15   that issue hadn't been determined yet, Judge.

16           THE COURT:  I said I'm not dealing with that.  The

17   media may be dealing with it, but I'm not.

18           MS. CHAITMAN:  Okay.  But --

19           THE COURT:  It's not before me --

20           MS. CHAITMAN:  -- in the --

21           THE COURT:  -- at this time.

22           MS. CHAITMAN:  In the Chase complaint, the trustee

23   alleged that by virtue of observing the activity between the

24   Levy account and the BLMIS account, Chase was put on notice of

25   the crimes that were being committed.  The fact of those

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 7

1    transactions was not disclosed to Your Honor or to the public

2    when the trustee sought approval of the settlement with the

3    Levy children.

4              In addition, according to Mr. Harbeck's letter, as of

5    December 11th, 2008, there was an 8.3 billion dollar margin

6    loan outstanding to Mr. Picower and the Levy children.  Now,

7    Mr. Picard has alleged in his complaint against Mr. Picower

8    that he had a 6.3 billion dollar margin loan.  So I have

9    assumed that the Levy children had a margin loan of two billion

10   dollars.  That fact was not disclosed when the trustee sought

11   approval from this Court of the settlement with the Levy

12   children.

13             Now, what was disclosed to the Court according to the

14   trustee was that the Levy heirs were forthright and sincere in

15   their desire to do the right thing and that they had agreed to

16   pay 220 million dollars on a clawback exposure of 305 million

17   dollars.  There was no disclosure of the two billion dollar

18   margin loan.  There was no disclosure of the fact that Mr. Levy

19   was Mr. Madoff's co-conspirator.  And I cannot believe, Your

20   Honor, that if all of these facts had been disclosed to the

21   Court that the Court would have approved such a sweetheart deal

22   for the children of someone who is just as much a criminal as

23   Mr. Madoff based on the facts that we now know.  And it's on

24   that basis, Your Honor, that I'm asking that the Court void the

25   settlement.

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 8

1           In opposition, the trustee has said that his time to

2    sue the Levy children has passed because December 11th, 2010

3    was the late date he could file an action against them.  But I

4    believe there's a claim against both the trustee and the Levy -

5    - against the trustee for breach of fiduciary duty and against

6    the Levy children for aiding and abetting a breach of fiduciary

7    duty because it is absolutely fundamental, Your Honor, that the

8    Court can't function and the creditors can't function without

9    honest and complete disclosure to the Court of all the relevant

10   facts with respect to a settlement.

11          Now this is a case where the trustee is officiating

12   over the liquidation of the business which perpetrated the

13   largest financial crime in the history of the world.  And the

14   trustee and his professionals have had exclusive access to the

15   records of BLMIS.  And if we can't rely --

16          THE COURT:  So is the U.S. attorney.

17          MS. CHAITMAN:  And the U.S. attorney.

18          THE COURT:  And the FBI.

19          MS. CHAITMAN:  I understand that.  But they're not

20   reporting to Your Honor and they're not coming to you and

21   asking for your approval of a settlement.  We, as creditors,

22   can only rely upon the integrity of the trustee to accurately

23   report the facts as he knows them.  He has admitted that he

24   knew these facts when he filed the application for approval of

25   the Levy settlement.  And it's not an issue of whether it was

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 9

1   in his business judgment.  It's not in his business judgment to

2   conceal material facts.  He could have disclosed those facts

3   and nevertheless told the Court that in his business judgment

4   it was the right decision to settle on this sweetheart basis.

5   But he had to disclose the facts.  And that's why I'm asking

6   that the settlement be set aside and if Mr. Picard does not

7   want to sue the Levy children that the Court permit the

8   investors to pursue the Levy children.  Thank you.

9           THE COURT:  Thank you.

10          MR. SHEEHAN:  Coming here this morning, I face quite a

11  dilemma.  On the one hand, I thought I should just address this

12  in a very mundane manner, that there's no basis whatsoever

13  before Your Honor for granting the relief requested, and sit

14  down.  I think I'd make that argument and sit down.  But there

15  have been some outrageous, truly outrageous statements made by

16  Ms. Chaitman in their papers, not alluded to here, but truly

17  outrageous in public.  And they cannot -- cannot go unrefuted.

18          To suggest that this trustee is dishonest is

19  outrageous.  To suggest that he's arrogant is ridiculous.  What

20  this trustee has done and what he has accomplished here is a

21  public record.  What he has done is amassed already ten million

22  dollars on behalf of the victims in this case.  In so doing, as

23  Your Honor has pointed out, the U.S. attorney is not only aware

24  of what we're doing, he works hand-in-glove with us to achieve

25  those results.  We work with him on a daily basis to make that

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

1    happen.

2            This trustee, since his appointment, has brought in

3    for these victims eighteen million dollars a day.  Eighteen

4    million dollars a day.  He's dishonest?  He's arrogant?  He's

5    not doing his job?  He somehow fouled this up beyond

6    recognition?  It's absurd, really absurd.  And quite frankly,

7    Ms. Chaitman owes everyone here an apology for this,

8    particularly Irving Picard.

9            Let's deal with what she's talking about here.  On the

10   one hand, Ms. Chaitman, interestingly enough, objects to

11   Picower, which she raises here today -- objects to Picower's

12   too much money.  We didn't leave enough on the table for her to

13   come in and litigate and sue.  We shouldn't have gotten the 7.2

14   billion dollars or the five that the trustee garnered.

15   Shouldn't have done that.

16            And complained.  Complains because we stopped her from

17   suing.  And is now appearing in front of Judge Codel (ph.)

18   complaining about that.  And yet here today, says we didn't get

19   enough.  Somehow we can be overly aggressive and expansive in

20   the use of the trustee's powers, in one instance, but in the

21   other, we fail miserably.  Somehow we've come feckless, can't

22   find our way in the weeds of the insolvency law.  It's absurd.

23   Knew exactly what we were doing from day one.  And we garnered

24   in a very nice substantial reward for the trustee and for, more

25   accurately, for the victims in this case by getting the 220

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 11

1   million dollars from the children -- the children of the person

2   that did the things that Ms. Chaitman alludes to, a factor that

3   bears great weight with the trustee and should in terms of

4   exercising his discretion here.

5           On the other hand, she now asked today for permission

6   -- she needs no permission.  The Levy heirs did not ask for the

7   same restraints that the Picowers did.  She is free to sue, to

8   gather her evidence, to do the hard work the trustee has done,

9   the due diligence, the accounting, the pleadings.  All the hard

10  work that then results in the kind of results we get in this

11  case, she should do.  Let her go out and do that work if she

12  thinks there's money to be had from the Levys.  Go right ahead.

13  The door's wide open.  Don't have to ask anybody for

14  permission.

15          What is the basis then --

16          THE COURT:  I would appreciate your not burdening the

17  Court with another piece of litigation on top of the thousands

18  I already have.

19          MR. SHEEHAN:  Your Honor, I promise that after today,

20  I intend to have no more further litigation with regard to the

21  Levy matter, if it's up to the trustee.

22          One other thing I want to point out here, Your Honor,

23  and that is what is the basis here for what's being brought

24  before Your Honor.  We're supposedly dishonest and not

25  disclosing things.  It's fascinating, absolutely fascinating

Page 12

1   'cause where does the information come from?  Public

2   disclosures by the trustee.  The trustee took the evidence that

3   we had with regard to Mr. Chase.  All right?  Dead since 2005.

4   All right.  And utilized that information appropriately.  That

5   is, utilized, as Your Honor has noted, in litigation involving

6   JPMorgan Chase.  And without getting into the ballots of that

7   litigation here this morning, what's obvious to everyone who's

8   read it is that something stunk in Denmark.  There's no

9   question that all those activities going on on a daily basis

10  that -- one thing Ms. Chaitman and I can agree upon -- there's

11  something wrong there.  But we raised it appropriately.  We

12  raised it with regard to the bank.  What were they doing?  And

13  that's yet to be before Your Honor and some day it will.

14           But in the meantime, there was no hiding of the ball.

15  How can you hide the ball when you're putting in a public

16  complaint for all the world to see?  How can you hide the ball

17  when you put it in the documents to be given to Congress which

18  gets on the website and to everyone in the world within a day

19  of it being filed?

20           There's no hiding the ball here, Your Honor.  There

21  was an exercise of wisdom and judgment and discretion by the

22  trustee totally appropriate within the context of 9019.  He

23  brought it before Your Honor.  He put before you the salient

24  facts that were necessary for Your Honor to make a considered

25  judgment on what was appropriate here and whether the trustee

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 13

1   properly exercised his business judgment here.  He did

2   everything he was supposed to do.  Everything that has been

3   raised here today doesn't change that one iota.

4            So I go back to where I started, Your Honor.  I don't

5   think there's any basis for granting the relief here this

6   morning and I request it be denied.

7            MR. LERMAN:  Good morning, Your Honor.  Cary Lerman

8   for the Levy children.  I appear before you, Your Honor,

9   because this motion is unsupported.  It's based on rank

10  speculation and is contrary to the record that was before the

11  Court at the time the settlement was approved and before the

12  Court today.  It's the same record.  It's a misguided attempt

13  to smear the reputation of an honest man, Mr. Norman Levy, a

14  man of great integrity.  The record before this Court over a

15  year ago and today is that Mr. Norman Levy so put his trust in

16  Mr. Madoff that he made him the sole executor of his estate

17  with sole investment authority over non-real estate assets.

18  And when Mr. Levy died in 2005, he was in his early nineties,

19  what did Madoff do?  He immediately stole more than 250 million

20  dollars from that estate.  Mr. Levy was not complicit in

21  anything that he thought was illegal.  You do not make a known

22  fraudster the executor of your estate with sole investment

23  authority.  You just don't do that.

24            We heard about this exchange of checks.  And, Your

25  Honor, I'll frankly say that we'll never know what was behind

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 14

1    that exchange.  Mr. Levy is dead and Mr. Madoff is a

2    pathological liar.  But what we do know or at least what I

3    believe is a reasonable imprint is that Madoff was somehow

4    manipulating Mr. Levy in connection with those checks that were

5    exchanged.  If one looks at the exchanges set forth in the

6    January 24 letter and adds them up, one would see that Mr. Levy

7    gave Mr. Madoff 211 million dollars -- 211 million dollars more

8    than he received from Mr. Madoff.  Again, Mr. Madoff taking

9    money from Mr. Levy.

10            What we think is clear is that --

11            THE COURT:  You think he was money laundering?

12            MR. LERMAN:  Pardon?

13            THE COURT:  You think Madoff was money laundering?

14            MR. LERMAN:  I don't think it was that, Your Honor.  I

15    really don't.  I don't think it was money laundering at all.

16    There's a suggestion in the JPMorgan Chase complaint that maybe

17    it's check hiding.  You don't have check hiding if both

18    accounts are at the same bank.  You had the Madoff account was

19    at the JPMorgan Chase Bank.  You had the Levy account.

20            THE COURT:  Well, again, the litigation vis-à-vis the

21    trustee and Chase is not before me at this time.

22            MR. LERMAN:  Absolutely, Your Honor, absolutely.  But

23    there are accusations made and I just didn't want them to go

24    unanswered.

25            The Levy children who settled with the trustee

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 15

1   voluntarily approached the trustee.  Did it very early on.

2   Settled before just about anybody else settled.  Did not

3   require the trustee to come sue them and spend money seeking

4   the money.  They settled because it was the right thing.  And

5   when they agreed to pay 220 million dollars, it was virtually

6   one hundred percent of the amount that the trustee was seeking.

7   It was a settlement negotiated at arm's length, in good faith,

8   with all the facts on the table.  It was a fair and reasonable

9   settlement.  And the Levy children are now entitled to rely on

10  that settlement and get on with their lives.

11          Just one more comment, Your Honor.  Contrary to what

12  Mr. Sheehan said, we don't think that the door is open to sue

13  the Levys.  They got a full release from the trustee.  These

14  are claims that belong to the trustee.  These are not claims

15  that belong to any of the creditors.  And any lawsuit against

16  the Levys would not be procedurally well-founded as well as

17  substantively well-founded.  Thank you.

18          MS. CHAITMAN:  Nothing further.

19          THE COURT:  Nothing further?  Well, that's

20  interesting, Ms. Chaitman, because when you stood up to argue,

21  you were arguing against a background of the papers that were

22  filed with the Court.  And the last document from you was the

23  reply brief which I find is replete with excessive and

24  unnecessary hyperbole and perhaps it was calculated to draw out

25  the rather intense response from your adversary here.

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 16

1          Your reply brief is essentially an improper ad hoc

2    motion to remove the trustee and counsel.  And if I were -- and

3    I do treat the trustee's submission by a letter, filed letter,

4    of March 25th as a sur-reply.  I do find that your ad hoc

5    motion is more than procedurally flawed.  Among other things,

6    it's brought by adversarial counsel to the group generally

7    described as net winners without any notice at all to the other

8    victims that are also denoted as losers.  And certainly, to

9    bring it forth in such a way is almost like making this a

10   telephone booth motion.

11          So under the circumstances, I am not going to give

12   your reply brief any consideration.  That leaves you with your

13   motion and all the motion papers.

14          And in that regard, I do rule as follows.  Marsha

15   Peshkin and a large group of other creditors, who are a subset

16   of claimants generally known as net winners, have moved to set

17   aside the order approving the Levy settlement, moving

18   essentially under Federal Rule of Civil Procedure 60(b) on the

19   grounds that certain facts were not disclosed to this Court by

20   the trustee when he sought approval of the settlement.

21          The facts with which the movants take issue specify

22   the amounts transferred back and forth between Norman Levy and

23   BLMIS from 1992 through 2001.  When added up together, these

24   transfers exceed one hundred billion dollars.  The movants

25   assert that had they been aware of these facts at the time of

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 17

1   the approval, they certainly -- they "certainly" would have

2   objected to the settlement.  They further contend that had I

3   been aware of these facts, it is "inconceivable" that I would

4   have approved the Levy settlement.

5           I disagree and, for the following reason, find that

6   none of the basis upon which the movants relied to bring its

7   motion require me to vacate the settlement order -- settlement

8   approval order until Rule 60(b).

9           Federal Rule of Civil Procedure 60(b) made applicable

10  to this bankruptcy proceeding by Federal Rule of Bankruptcy

11  Procedure 9024 allows Courts to set aside orders and judgments

12  based upon (1)"newly discovered evidence that with reasonable

13  diligence could not have been discovered in time" of the

14  decision; (2)"fraud whether previously called intrinsic or

15  extrinsic misrepresentation or misconduct by an opposing

16  party"; or (3)"any other reason that justifies relief".

17          Courts in this district and elsewhere have long held

18  that relief under 60(b) should only be granted only -- should

19  only be granted only "upon a showing of exceptional

20  circumstances".  In re Chipwich, Inc., 64 B.R. 670,675 (Bankr.

21  S.D.N.Y. 1986).

22          The movants assert that such circumstances are present

23  here because "their recent discovery" of the facts relating to

24  Norman Levy's transactional history with BLMIS justifies

25  vacating the settlement approval order.  The gist of their

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 18

1    argument is that not only was the trustee's failure to disclose

2    this information to the Court "tantamount to a

3    misrepresentation to the Court of Levy's innocence" but that

4    the Levy settlement is standing in their way "from potentially

5    recovering billions of dollars to compensate them for the

6    tremendous loss incurred as a result of Madoff's Ponzi scheme."

7           I disagree and note, for one thing, that their

8    argument falsely assumes that because billions of dollars

9    flowed between BLMIS and Norman Levy and the Chase account, the

10   ultimate fraudulent transfer liability of Norman Levy would

11   have been adjudicated to be in that range.  Such an assumption

12   rings false given the extant circumstances.

13          The trustee's lack of a blow-by-blow account of the

14   transactional history between BLMIS and Norman Levy does not

15   justify the extraordinary relief sought by the movants today.

16   Another equally compelling reason is that they have failed to

17   explain why the specifics of these transactions between Levy

18   and BLMIS disturb or otherwise alter the trustee's business

19   judgment to settle his claims against the Levy heirs or this

20   Court's approval of the same.

21          At bottom, the trustee's "business judgment decision"

22   is based upon the opportunity to conduct appropriate due

23   diligence during his investigation.  That opportunity was

24   availed of and the determination to settle was based upon that

25   due diligence.  There is nothing shown by the movants in their

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 19

1    motion to undermine the trustee's determination.  Indeed, the

2    movants do not appear to dispute that the "newly discovered

3    facts" were not "new" at all to the trustee but were, in fact,

4    considered by the trustee when he decided to enter into the

5    Levy settlement.

6         To this end, I find that the grounds on which the

7    trustee sought and won approval of the Levy settlement pursuant

8    to Rule 9019(a) are sufficient today as they were a year ago or

9    exactly when I entered the settlement approval order.

10        Before a settlement can be approved under 9019(a) the

11   Court must first determine whether that settlement is fair and

12   equitable, reasonable and in the best interest of the debtor's

13   estate.  To come to this determination, the Court need not

14   conduct a mini-trial nor "assess the minutia of every claim".

15   Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994).  Instead,

16   as the Second Circuit directs, it must canvas the issues and

17   see whether the settlement falls below the lowest point in a

18   range of reasonableness.  Liu v. Silverman, 1998 U.S. App.

19   LEXIS 31698 at *3 (2d Cir. Dec. 18, 1998).

20        This "range of reasonableness" is determined by (1)the

21   probability of success in litigation; (2)the difficulties

22   associated with collection; (3)the complexity of the litigation

23   and the attendant expense and inconvenience and delay; and

24   (4)the paramount interest of creditors.  Nellis, 165 B.R. at

25   122.

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 20

1         Additional factors suggested by Courts in this

2    district include whether the proposed settlement is supported

3    by an adequate record and the extent to which the settlement is

4    not the product of fraud or collusion.  In re Remsen Partners,

5    Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003).

6         In approving the Levy settlement, I found that "it is

7    clear that this settlement is well above the lowest rung in a

8    range of reasonableness".  (The February 18, 2010 transcript at

9    9.5 to 8.)  This finding was "based upon the papers before me

10   and representations" made by the trustee at the February 8,

11   2010 hearing at which time he stated in no uncertain terms that

12   it was his belief that the Levy settlement represented a fair

13   compromise and avoided the need for a long and protracted

14   litigation.  The trustee explained then that the information he

15   had available to him showed inter alia that after Mr. Levy's

16   death, Madoff, acting as executor of the Levy estate,

17   transferred more than 250 million dollars to BLMIS from Mr.

18   Levy's estate essentially "stealing" this amount from Mr.

19   Levy's heirs and beneficiaries.

20        This could possibly be viewed by someone not

21   intimately involved in all the litigation as a fraud or money

22   laundering by Madoff personally to the detriment of the parties

23   in interest.  That's a speculation that's already come out in

24   connection with another Madoff proceeding.  And it was after

25   assessing the litigation risks and potential difficulties

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 21

1    associated with the collection of these funds that the trustee,

2    in an exercise of his business judgment, decided to pursue a

3    settlement agreement with the Levy heirs which resulted in the

4    recovery of a substantial amount of funds to the estate, to wit

5    220 million dollars.

6            The trustee settled his claims against the Levy heirs

7    without the need for litigation well in advance of the statute

8    of limitations for his avoidance claims.

9            For all of the foregoing reasons, this Court finds

10   that the movants have failed to adequately plead grounds under

11   Rule 60(b) to justify vacating the settlement approval order.

12   The motion is hereby denied.  Accordingly, there are no

13   appropriate grounds or justification to vacate the prior

14   determination that the 220 million dollar settlement is fair,

15   equitable and well above the lowest rung in the range of

16   reasonableness and, indeed, is in the best interest of the

17   estate.

18           You may submit an order or, if you desire --

19           MR. SHEEHAN:  I will, Your Honor.

20           THE COURT:  -- I can so order this record.

21           MR. SHEEHAN:  So order the record would be fine with

22   me, Your Honor.

23           MS. CHAITMAN:  That's fine.

24           THE COURT:  All right.

25           MS. CHAITMAN:  Thank you very much.

BERNARD L. MADOFF; SIPC v. BLMIS, LLC.

Page 22

1           THE COURT:  It is so ordered.  The motion is denied.

2           MR. LERMAN:  Thank you, Your Honor.

3           MR. SHEEHAN:  Thank you, Your Honor.

4           THE COURT:  Thank you all.

5           (Whereupon these proceedings were concluded at 10:49 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

1

2                           I N D E X

3

4                         R U L I N G S

5   DESCRIPTION                              PAGE      LINE

6   Motion of Marsha Peshkin seeking order to    21       12

7   vacate February 18, 2010 order approving

8   settlement between trustee and the Levy heirs

9   denied

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-145

1

2                            C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6     Lisa Bar-Leib   Digitally signed by Lisa Bar-Leib
                      DN: cn=Lisa Bar-Leib, o, ou,
                      email=digital1@veritext.com, c=US
7                     Date: 2011.03.31 14:51:15 -04'00'

8     LISA BAR-LEIB

9     AAERT Certified Electronic Transcriber (CET**D-486)

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date:  March 31, 2011

17

18

19

20

21

22

23

24

25

A-146

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# Minutes of Proceedings

Date:  **March 30, 2011**

--------------------------------------------------------------X

**SECURITIES INVESTOR PROTECTION
CORPORATION,**

                    **Plaintiff,**

     **v.**

**BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,**

                  **Defendant.**

--------------------------------------------------------------X

**SIPA LIQUIDATION**

**No. 08-01789 (BRL)**

**(Substantively Consolidated)**

In re:

**BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,**

                  **Debtor.**

--------------------------------------------------------------X

**Present:**  **Hon.**  **Burton R. Lifland**  **Monica Saenz de Viteri**  **ECRO**
                      **Bankruptcy Judge**  **Courtroom Deputy**  **Court Reporter**

**Proceedings:**

        ⊠ **Customers' Motion to Set Aside the Order Approving the Trustee's
Settlement With the Levy Heirs for Failure to Disclose Material Information**

**Orders:**     ¤ **Relief sought in the Motion:**
        ⊠ **Denied**  ¤ **Granted**  ¤ **Dismissed**    ¤ **Awarded by Default**
     ¤ **Matter taken under advisement**
     ¤ **Formal order or Judgment to enter**
     ¤ **Confirmation/modification of plan**    ¤ **granted**   ¤ **denied**
     ⊠ **As per the record of today's hearing, the Customers' motion to set aside
the order approving the Trustee's settlement with the Jean Levy-Church
and Francis N. Levy, the heirs of Norman F. Levy, pursuant to Federal Rule
of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024 is
denied, as set forth in detail in the record of these proceedings.**

     **The Record is So Ordered.**

**BY THE COURT**                    **FOR THE COURT:** Vito Genna, Clerk

  **/s/ Burton R. Lifland**         **March 30, 2011**     By: **/s/ Monica Saenz de Viteri**
**United States Bankruptcy Judge**      **Date**           **Deputy Clerk**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jessie M. Gabriel
Email: jgabriel@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jennifer A. Vessells
Email: jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email: lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email: ldandrea@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>           Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>           Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>           Debtor. | **COMPLAINT**<br><br>**SECOND REDACTED VERSION** |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. |
| v. | |
| JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

centers or financial secrecy havens. The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

223.    In addition, much of this account activity occurred between BLMIS and other JPMC customers. Most notably, the party transacting with BLMIS most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, Norman Levy.

**Account Activity Red Flags**

224.    *Repetitive Transactions:* BLMIS frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose. For example, during 2002, BLMIS initiated outgoing transactions to Levy in the precise amount of $986,301 hundreds of times—318 separate times, to be exact. These highly unusual transactions were often sent multiple times on a single day.

225.    As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from Levy were almost always equal to the total monthly dollar amounts going out of the 703 Account to Levy. There was no clear economic purpose for such repetitive transactions that had no net impact on Levy's account at BLMIS.

226.    *Large Dollar Transactions:* The 703 Account reflected a pattern of large dollar transactions. Between 1998 and 2008, BLMIS transferred $84 billion out of the 703 Account to just four customers. These transactions represented over 75% of the wires and checks that flowed out of the 703 Account. It also was typical for BLMIS, through the 703 Account, to enter into individual transactions with the BLMIS feeder funds for hundreds of millions of dollars.

227.    *Spikes in Activity:* The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMC. Shortly before the beginning of the

61

credit crisis, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account. This increase in activity included a significant increase not only in third party wires but also in book transfer activity. During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

228. There was also a downward spike in activity between the 703 Account and Levy's account at the Private Bank after December 2001. In December 2001 alone, BLMIS engaged in approximately $6.8 billion worth of transactions with Levy. Shortly thereafter, Levy's activity with the 703 Account decreased dramatically.

229. *Wire Activity with Offshore Entities:* Incredible spikes in the 703 Account's overall activity were accompanied by incredible spikes in offshore activity as well. Between 2004 and 2008, the dollar amount and volume of the 703 Account's international wire transfers with high and medium risk jurisdictions increased 83% and 67%, respectively.

230. *Check Activity:* In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day. This is not only unusual on its face, but it is particularly unusual given that BLMIS would issue multiple checks on the same day to the same customer. At the very least, this activity should have prompted a check-kiting investigation, which undoubtedly would have revealed more suspicious behavior.

231. In addition, the majority of Levy's transactions with the 703 Account were conducted by check. For example, in December 2001, the 703 Account received checks from Levy, each in the amount of $90 million, on a daily basis—a pattern of activity with no identifiable business purpose.

62

232.    *Private Banking:*  JPMC should have also been monitoring transactions from the perspective of certain JPMC customers that were also BLMIS customers.  A number of BLMIS customers held accounts at JPMC's Private Bank, including Levy.  Private banking has long been considered a high risk activity.  That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client activity that is illegal or violates internal bank policy.  Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.

233.    Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious.  Given that those accounts were held by JPMC, the bank was in a perfect position to investigate.  It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

234.    *Automated Account Monitoring:*  The 703 Account's unusual activity should have triggered JPMC's automated account monitoring system as well.            REDACTED

235.    JPMC's transaction monitoring system appears to have been critically flawed in that the formula JPMC programmed into the system failed to issue alerts even when analyzing highly suspicious activities.            REDACTED

However, even though the formula identified many instances of suspicious activity in the 703 Account, the system almost never issued alerts.  This prompted compliance

63

personnel at JPMC to ask, after Madoff's arrest, "Why didn't the DDA Account (xxxxx1703) alert . . . ?"

236.    Between June 2005 and September 2008,    REDACTED

Yet, during that period, only one account alert was generated.

237.    Taking March 2008 as an example, during that month there were approximately $1.1 billion in transactions in the 703 Account.  This value was so high    REDACTED

Remarkably, JPMC's transaction monitoring system noted the unusual activity but did not consider it unusual enough to warrant an alert.  No alert was generated in March 2008.

**JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account**

238.    Once suspicious activity is identified, a bank must further investigate to determine whether there could be a legitimate explanation for the activity or, rather, if it is indicative of illegal activity.    REDACTED

Upon information and belief, in the face of repeated indications of suspicious transaction activity in the 703 Account, as well as comments from individuals within JPMC regarding the legitimacy of BLMIS's operations, JPMC never conducted any serious investigation of the activity in the 703 Account or filed a SAR with the United States government.

239.    Despite the frequency with which transactions in the 703 Account were far

outside the normal levels, the system issued only **a single account alert**.   REDACTED

240.                                          REDACTED

241.    Finally, the reviewer noted that he could not locate a KYC file for BLMIS and,

regardless, concluded the investigation.              REDACTED

242.    Even when Zames raised the issue in 2007 that Madoff was operating a Ponzi

scheme, no one at JPMC appears to have looked at the transactions in the 703 Account, even

though it was a JPMC account.  BLMIS's Client Relationship Manager and account sponsor,

Cassa, learned of Zames's claim, but took no action whatsoever.

243.    Not only did JPMC have access to BLMIS's account history, but JPMC also had

access to the bank accounts of a number of BLMIS customers, and was thus provided with even

more information indicating fraud.  In fact, JPMC had an extremely close relationship with one

of BLMIS's largest and most active customers, Levy.

244.    Levy was a client of JPMC's Private Bank for over 64 years.  Levy had close

business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC.

These individuals included William Harrison, Chief Executive Officer (succeeded by Jamie Dimon), Walter Shipley, Chief Executive Officer from 1996 to 1999, and John McGillicuddy, former Chairman and Chief Executive Officer of Manufacturers Hanover. Levy was even provided an office with the Private Bank group, which JPMC maintained for Levy even after the Private Bank had relocated.

245.    Levy had two Premier Checking accounts with JPMC's Private Bank: account XXX-XXXX86 and account XXX-XXXX30.

246.    JPMC was acutely aware of Levy's close relationship with Madoff, identifying Madoff as "Levy's close friend and trader," who had helped increase Levy's wealth from $180 million in 1986 to $1.5 billion in 1998.

247.    Upon information and belief, JPMC never meaningfully investigated the connection between Madoff and Levy. The activity in Levy's account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.

248.    Instead of investigating these transactions, JPMC was primarily concerned about maintaining a relationship with Levy and Madoff and maintaining a role in the Levy family's finances after Levy's death in 2005. Knowing that Madoff would be the executor of Levy's estate after Levy's death, upon information and belief, JPMC prioritized its relationships with Levy and Madoff over its compliance with regulations that required banks to monitor customer accounts.

**JPMC Had a Duty to Take Action**

249.    Suspecting that illegal activity was occurring, JPMC had a duty to take action. JPMC should have notified Madoff and then closed the account.

250.     Instead, JPMC took no action.  The 703 Account was still operating without any restrictions when Madoff was arrested on December 11, 2008.  Upon information and belief, JPMC did not convey its concerns to authorities or regulators other than SOCA.

## JPMC'S VIEW OF MADOFF THROUGH LOAN ACTIVITY

### JPMC's Loans to Levy for BLMIS Investments

251.     In addition to the activity in the 703 Account, red flags should have been raised for JPMC as a result of Madoff's suspicious loan activity, which involved Levy and another longtime friend of Madoff, Carl Shapiro.  However, as with all red flags surrounding Madoff's activity within the bank, JPMC willingly turned a blind eye.

252.     From at least 1996 through 2005, Levy and his children obtained credit facilities through JPMC and other banks, using funds borrowed under these credit lines to leverage investments with BLMIS.

253.     In 1996, for example, the same year Chemical Bank acquired The Chase Manhattan Bank, N.A., Levy had $188 million in outstanding loans, which he used to fund BLMIS investments.

254.     JPMC appropriately referred to these investments as "special deals."  Indeed, these deals were special for all involved:  (a) Levy enjoyed Madoff's inflated return rates of up to 40% on the money he invested through BLMIS; (b) Madoff enjoyed the benefits of large amounts of cash to perpetuate his fraud without being subject to JPMC's due diligence processes; and (c) JPMC earned fees on the loan amounts and watched the "special deals" from afar, escaping responsibility for any due diligence on BLMIS's operation.

255.     On the one hand, JPMC endorsed and helped fuel Levy's "special deals" with Madoff, continuously extending loans to Levy to finance these deals.  On the other hand, JPMC

xx.   Awarding the Trustee all applicable interest, costs, and disbursements of

this action; and

xxi.   Granting the Trustee such other, further, and different relief as the Court

deems just, proper, and equitable.

Dated:   New York, New York
      December 2, 2010

/s Deborah H. Renner_____
Baker & Hostetler LLP
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Deborah H. Renner
Email:  drenner@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Estate of
Bernard L. Madoff*

and

Jessie M. Gabriel
Email:  jgabriel@bakerlaw.com
Jennifer A. Vessells
Email:  jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email:  lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email:  ldandrea@bakerlaw.com

*Of Counsel*:

Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
Email:  gzeballos@bakerlaw.com
Timothy Scott Pfeifer
Email:  tpfeifer@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com

Capitol Square, Suite 2100
65 East State Street
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

A-157

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SECURITIES INVESTOR PROTECTION
CORPORTION,

       Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC,

       Defendant.

------------------------------------x
In re:

BERNARD L. MADOFF,

       Debtor.

------------------------------------x
MARSHA PESHKIN, and a large group
of other customers of Bernard L.
Madoff Investment Securities LLC.,

       Appellants,

JEANNE LEVY-CHURCH, FRANCIS N. LEVY,
and IRVINGH. PICARD, as Trustee for
the Liquidation of Bernard L. Madoff
Securities LLC,

       Appellees.

------------------------------------x
Deborah A. Batts, United State District Judge.

11 Civ 3313 (DAB)
**MEMORANDUM & ORDER**

1

Appellants, Marsha Peshkin and a large group of other customers of Bernard L. Madoff Investment Securities LLC ("BLMIS"), appeal the March 30, 2011 order of Bankruptcy Judge Burton R. Lifland (the "Order"), which denied Appellants' motion to set aside a prior bankruptcy court order approving a settlement between Trustee Irving H. Picard and the heirs of Norman F. Levy.  For the reasons set forth herein, the Order of the Bankruptcy Court is AFFIRMED.


## I. BACKGROUND

Norman F. Levy ("Mr. Levy"), a New York City commercial real estate broker, invested a significant amount of his assets with BLMIS from the mid-1970s until the time of his death in 2005.  Mr. Levy had established a number of accounts at BLMIS in his name, the names of his children, and for family and charitable trusts.  (Mot. for Entry of Order Pursuant to Section 105(a) (Docket #1833[1]), Ex. A ("Settlement Agreement") ¶ H.) During the six years prior to December 11, 2008, when the Securities and Exchange Commission filed a complaint against BLMIS and Bernard L. Madoff, approximately $305,000,000.00 was withdrawn from these accounts in excess of the amount deposited in them.  (Settlement Agreement ¶ I.)  Furthermore, the Betty &

---

[1] References to docket numbers refer to 08-1789 (Bankr. S.D.N.Y.).

2

Norman F. Levy Foundation, a charitable organization, withdrew approximately $84,000,000.00 during this time period. (Settlement Agreement ¶ I.)

In the Trustee's judgment, the transfers made over this six-year period were recoverable, less the $84,000,000.00 donated to charity through the Betty and Norman Levy Foundation, pursuant to 11 U.S.C. §§ 544(b), 547, 548 and 550 ("Avoiding Powers Claims"). (Settlement Agreement ¶ M.)[2] As heirs to the Levy estate, Mr. Levy's children, Jeanne Levy-Church and Francis N. Levy (collectively, the "Levy Heirs" or "Levys"), approached the Trustee to settle all disputes pertaining to BLMIS without admitting liability.  (Settlement Agreement ¶ N.)

Pursuant to the Settlement Agreement with the Trustee, the Levy Heirs agreed to pay $220,000,000.00 to customers of BLMIS in exchange for the Trustee's full release.  (Settlement Agreement ¶¶ 2, 4.)  On February 18, 2010, Judge Lifland approved the Settlement Agreement under Bankruptcy Rule 9019. (Feb. 18, 2010 Hr'g Tr. (Docket #1969) at 8:16-17.)  In approving the settlement, Judge Lifland asserted, "It is clear that the Trustee has done his due diligence in recommending the

---

[2] This Court notes that in light of Judge Rakoff's recent decision in Picard v. Katz, __ F. Supp. 2d __, 2011 WL 4448638, at *2-*3 (S.D.N.Y. Sept. 27, 2011), finding that the "safe harbor" provision in section 546(e) of the Bankruptcy Code limits fraudulent transfer recovery from BLMIS customers to transactions within two years, the Trustee's estimate of the amount recoverable was, if anything, an overestimation.

settlement." (<u>Id.</u> at 8:18-20.) Further, in assessing the value of the settlement, Judge Lifland explained, "[I]t is clear that this settlement is well above the lowest rung in a range of reasonableness and is right on target in that regard." (<u>Id.</u> at 9:6-9.)

On February 18, 2011, Appellants moved to vacate the order of February 18, 2010 pursuant to Federal Rule of Civil Procedure 60(b)(2),(3), and (6), and Federal Rule of Bankruptcy Procedure 9024 (applying Rule 60 to cases under the Bankruptcy Code). (Notice of Motion (Docket #3860) at 1-2.) Appellants claimed that the Trustee deliberately "concealed explosive information which should have compelled denial of the Trustee's motion." (Brief of BLMIS Customers on Appeal from Order Denying Mot. to Vacate Settlement Order (hereinafter "Appellant's Brief") at 1-2.) More specifically, referencing information conveyed in a letter from SIPC President Stephen Harbeck (Chaitman Decl. (Docket # 3862), Ex. G (the "Harbeck Letter")), Appellants assert that the Trustee concealed the following: (1) Norman Levy financed Madoff's fraudulent scheme in an amount exceeding $100 billion from 1992 through 2001, and (2) the Levy Heirs had an outstanding $2 billion margin loan from BLMIS as of December 11, 2008. <u>Id.</u>

The Bankruptcy Court denied the motion to vacate the settlement because Appellants did not "adequately plead grounds

under Rule 60(b) to justify vacating the settlement approval order." Judge Lifland also struck as procedurally improper Appellants' Reply Brief which called for removal of the Trustee and counsel. (March 30, 2011 Hr'g Tr. (Docket # 3998), at 16-22.)

## II. DISCUSSION

### A. Review of Bankruptcy Court Orders

District Courts are vested with appellate jurisdiction over final orders, decrees and judgments of bankruptcy courts under 28 U.S.C. § 158(a). Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that a district court conducting appellate review may "affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

District courts review bankruptcy court findings of fact for clear error and apply de novo review to their conclusions of law. See In re Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Adelphia Commc'ns Corp., 367 B.R. 84, 90-91 (S.D.N.Y. 2007); Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). A finding of fact is clearly erroneous if "the

reviewing court is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); In re CBI Holding Co., 529 F.3d 432, 449 (2d Cir. 2008).

When reviewing a Bankruptcy Court's decision to deny Rule 60(b) motions, the "final judgment is reviewed for abuse of discretion." Delcarpio v. Ticconic, 124 Fed. App'x 71, 72 (2d Cir. 2005); see also Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d. Cir. 1998). Furthermore, the Second Circuit has noted that, "An appeal from the denial of a Rule 60(b) motion 'raises only the question of whether the motion was properly disposed; it is not a vehicle for examining the underlying judgment itself.'" Delcarpio, 124 Fed. App'x at 72 (quoting Cody, Inc. v. Town of Woodbury, 179 F.3d 52, 56 (2d Cir. 1999). Accordingly, this Court will review the Bankruptcy Court's denial of the Rule 60(b) motion for abuse of discretion.

An abuse of discretion occurs when a bankruptcy court arrives at a decision that "(i) rests on an 'error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding,' or (ii) 'a decision that, though not necessarily the product of legal error or clearly erroneous factual finding[,] cannot be located within the range of permissible decisions.'" In re Teligent, Inc., 326 B.R. 219, 224 (S.D.N.Y. 2005)(quoting Schwartz v. Aquatic Dev. Group, Inc. (In

6

A-163

re Aquatic Dev. Group, Inc.), 352 F.3d 671, 678 (2d Cir. 2003)).

The Court finds no such abuse of discretion here.

    B.   Denial of motion to vacate based on Rule 60(b)

    Appellants argue that the Bankruptcy Court abused its

discretion in denying Appellants' motion to vacate the

settlement order under Rule 60(b)(2), (3), and (6). (Appellants'

Brief at 2-4.)  This Court disagrees.

        1. Rule 60(b) Standard for Relief

    Rule 60(b)(2), (3), and (6), provides that:

> "On motion and just terms, the court may relieve a
> party or its legal representative from a final
> judgment, order, or proceeding for the following
> reasons:
>
> (2) newly discovered evidence that, with reasonable
> diligence, could not have been discovered in time to
> move for a new trial under Rule 59(b);
>
> (3) fraud [], misrepresentation, or misconduct by an
> opposing party;
>
> (6) any other reason that justifies relief."

Fed. R. Civ. P. 60(b).

A "motion for relief from judgment is generally not favored and

is properly granted only upon a showing of exceptional

circumstances." United States v. Int'l Bhd. of Teamsters, 247

F.3d 370, 391 (2d Cir. 2001); In re Spiegel, Inc., 385 B.R. 35,

39 (S.D.N.Y. 2008).

### 2. Rule 60(b)(2)

"The movant who seeks to obtain relief from judgment under Rule 60(b)(2) must meet an 'onerous standard' by showing that: 1) the newly discovered evidence was of facts in existence at the time of the dispositive proceedings; 2) he was justifiably ignorant of those facts despite due diligence; 3) the evidence is admissible and of such importance that it probably would have changed the outcome; and 4) the evidence is not merely cumulative or impeaching." Kim v. Columbia Univ., No. 06 Civ. 5365(RPP), 2011 WL 2019801, at *4-*5 (S.D.N.Y. May 19, 2011) (citing Int'l Bhd. of Teamsters, 247 F.3d at 392).

Here, Appellants claim that the Trustee "concealed" information pertaining to (1) Norman Levy's alleged financing of Madoff's fraudulent scheme in an amount exceeding $100 billion from 1992 through 2001, and (2) the Levy Heirs' outstanding $2 billion margin loan from BLMIS as of December 11, 2008.[3]  (Appellants' Brief at 1-2.)  Appellants claim, in an entirely conclusory fashion, that "the newly discovered information is of such magnitude that if known, it should have

---

[3] In the January 24, 2011 letter submitted by Scott Harbeck, President and CEO of the SIPC, Mr. Harbeck details the transaction history between Norman Levy and Mr. Madoff in the period between 1992 and 2001 totaling approximately $100 billion. (See Chaitman Decl. (Docket # 3862), Ex. G at 14-15.) Additionally, the Harbeck letter shows $8 billion of negative equity balances in the accounts of Jeffrey Picower and the Levy Heirs (approximately $6 billion of which belonged to Picower). (Id. at 10, n.3.)

led the bankruptcy court to refuse to approve the Settlement." Id. at 13. Appellants do not attempt to explain why this would be so.

The record here demonstrates that the Bankruptcy Court expressly considered the Levy transaction history during the Rule 60(b) hearing, yet maintained its support for the Settlement. (March 30, 2011 Hr'g Tr. (Docket # 3998) at 18:7-20.) The Bankruptcy Court noted that Appellants' argument "falsely assumes that because billions of dollars flowed between BLMIS and Norman Levy . . ., the ultimate fraudulent transfer liability of Norman Levy would have been adjudicated to be in that range." (Id. at 18:7-11.) Appellants entirely fail to rebut this finding. Nor have they put forth any legal theory whatsoever that would cast doubt on the Trustee's statement that the settlement represented the entire amount recoverable from the Levy heirs. Appellants' conclusory statements that the result would have been different had the information been disclosed are entirely insufficient.

Regarding the margin loan, Appellants correctly note that the Bankruptcy Court did not consider the $2 billion liability to BLMIS. That issue, however, was raised before the Bankruptcy Court for the first time in Appellants' Reply brief in support of their 60(b) motion, (see Mem. L. Supp. Mot. Set Aside Order (Docket #3861) (making no mention of any margin loan)), and the

9

A-166

Bankruptcy Court did not err in disregarding it.  United States v. Greer, 285 F.3d 158, 170 n.3 (2d Cir. 2002) (finding an argument waived when raised for the first time in a reply brief); Chavez v. United States, 764 F.Supp.2d 638, 646 (S.D.N.Y. 2011) ("It is well-established that motions must be made in a party's moving papers, not in a reply brief.") Furthermore, even with respect to this evidence, Appellants have made no effort to explain why the information should have altered the Trustee's judgment regarding the amount recoverable from the Levy Heirs or the Bankruptcy Court's approval of the settlement.  The Bankruptcy Court did not abuse its discretion in denying Appellants' Motion under Rule 60(b)(2).

      3. Rule 60(b)(3)

Appellants next argue that the Trustee's "failure to disclose" to the Bankruptcy Court information pertaining to (1) the Levy Heirs' $2 billion debt and (2) the transaction history between Norman Levy and Madoff was "tantamount" to misrepresentation.  (Appellants' Brief at 6.)  As such, Appellants claim that the Bankruptcy Court abused its discretion in denying their 60(b)(3) motion.  (Id.)  This Court disagrees.

Rule 60(b)(3) allows the court to vacate an order upon a showing of "fraud [], misrepresentation, or misconduct by an opposing party."  Fed. R. Civ. P. 60(b)(3).  To prevail on a motion under Rule 60(b)(3), the movant "must show that the

A-167

conduct complained of prevented the moving party from fully and fairly presenting his case." <u>State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 176 (2d Cir. 2004). "A Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits." <u>Aneja v. M.A. Angeliades, Inc.</u>, No. 05 Civ. 9678(LAP), 2010 WL 199681, at *1 (S.D.N.Y. Jan. 12, 2010) (quoting <u>Fleming v. New York Univ.</u>, 865 F.2d 478, 484 (2d Cir. 1989)).

The Bankruptcy Court did not abuse its discretion when it found that "the [T]rustee's lack of a blow-by-blow account of the transactional history between BLMIS and Norman Levy does not justify the extraordinary relief sought by the movants . . ." (March 30, 2011 Hr'g Tr. (Docket # 3998) at 18:13-15.) Bankruptcy courts need not conduct a "mini-trial" of all the facts underlying settlement disputes. <u>In re Chemtura Corp., et al.</u>, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010) (explaining that the bankruptcy court need only be "apprised of those facts that are necessary to enable it to evaluate the settlement and make a considered and independent judgment about the settlement."). Further, in settlement cases, the court is permitted to rely upon "opinions of the trustee, the parties, and their attorneys." <u>Id.</u>; <u>See also</u> <u>Official Comm. Of Unsecured Creditors</u>

11

Case: 12-816   Document: 52   Page: 172   06/12/2012   634654   179

A-168

<u>of Int'l Distr. Ctrs., Inc. v. James Talcott, Inc.</u>, 103 B.R. 420, 423 (S.D.N.Y. 1989).

Given that there was no requirement that the Trustee present absolutely every fact underlying the Settlement Agreement to the Bankruptcy Court, Appellants' conclusory allegations of "materiality" with respect to the information regarding the transaction history and margin loan are wholly insufficient to meet the "clear and convincing evidence" standard to warrant relief under 60(b)(3). The Bankruptcy Court did not abuse its discretion in denying relief under that section.

4. Rule 60(b)(6)

Rule 60(b)(6) permits a court to grant relief from a final order for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case. Furthermore, it is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship[.]" <u>Marrero Pichardo v. Ashcroft</u>, 374 F.3d 46, 55 (2d Cir. 2004) (internal quotations and citations omitted).

Appellants' entire argument for relief under Rule 60(b)(6) is stated in one sentence, which reads, "As a result of the

A-169

Trustee's dishonest conduct, BLMIS customers have justifiably lost confidence in the judicial process." (Appellants' Brief at 19.)  The Bankruptcy Court did not abuse its discretion in finding that Appellants' "loss of confidence in the judicial process" was not an "exceptional circumstance" warranting relief, where that "loss of confidence" was based entirely on the Trustee's failure to disclose information (1) that he was under no duty to disclose, and (2) that was not relevant to the merits of the settlement approval motion in any way that Appellants have managed to articulate.

C.    Denial of reply brief

Finally, the Bankruptcy Court did not abuse its discretion when it refused to consider Appellants' reply papers. (See Appellants' Brief at 19.)  The Second Circuit has held that, "[t]he Bankruptcy Court ha[s] the discretion not to consider an argument raised for the first time in the reply papers and it was not an abuse of discretion not to consider the argument." In re Teligent, Inc., 326 B.R. 219, 229 (S.D.N.Y. 2005); see also Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999); Section B.2, supra. Since Appellants raised the issue of disqualifying the Trustee and his counsel for the first time in reply papers, the Bankruptcy Court did not abuse its discretion when it refused to consider it.

13

III. CONCLUSION

The March 30, 2011 Order of the United States Bankruptcy Court, Judge Burton R. Lifland, is hereby AFFIRMED.  The Clerk of Court is directed to CLOSE the docket in this case.


SO ORDERED.


Dated: New York, New York
February 16, 2012

_Deborah A. Batts_
Deborah A. Batts
United States District Judge

14

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

                              Plaintiff,

                -against-

BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC,

                              Defendant.
---------------------------------------------------------X
In re:

BERNARD L. MADOFF,

                              Debtor.
---------------------------------------------------------X
MARSHA PESKIN, and a large group of other
customers of Bernard L. Madoff Investment
Securities LLC.,

                              Appellants,

                -against-

JEANNE LEVY-CHURCH, FRANCIS N. LEVY, and
IRVING H. PICARD, as Trustee for the Liquidation of
Bernard L. Madoff Securities LLC,

                              Appellees.
---------------------------------------------------------X

11 **CIVIL** 3313 (DAB)

## JUDGMENT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2/22/12_

Appellants having appealed from a March 30, 2011 order of the United States Bankruptcy

Court for the Southern District of New York (Lifland, BJ), and the matter having come before the

Honorable Deborah A. Batts, United States District Judge, and the Court, on February 16, 2012,

having rendered its Memorandum Order affirming the March 30, 2011 Order of the United States

Bankruptcy Court, Judge Burton R. Lifland, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Order dated February 16, 2012, the March 30, 2011 Order of the United States

A-172

Bankruptcy Court, Judge Burton R. Lifland, is hereby affirmed; accordingly, the case is closed.

**Dated:**  New York, New York
     February 22, 2012

                                        **RUBY J. KRAJICK**
                              _____
                                        **Clerk of Court**
                        **BY:**
                              _____
                                        **Deputy Clerk**


                              THIS DOCUMENT WAS ENTERED
                              ON THE DOCKET ON _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Case No. 08-01789 (BRL) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| MARSHA PESHKIN, and a large group of other customers of Bernard L. Madoff Investment Securities LLC, | District Court Appeal No. 11-CV-3313 (DAB) (GWW) |
| Appellants, | |
| v. | |
| JEANNE LEVY-CHURCH, FRANCIS N. LEVY, and IRVING H. PICARD, as Trustee for the Liquidation of Bernard L. Madoff Securities LLC, | |
| Appellees. | |

Notice is hereby given that Marsha Peshkin, and a large group of other customers of Bernard L. Madoff Investment Securities, LLC, hereby appeal to the United States Court of Appeals for the Second Circuit from the Judgment entered in this action on the 22nd day of February, 2012 (ECF # 23), pursuant to the Memorandum and Order, dated February 16, 2012, of the Honorable Deborah A. Batts (ECF # 22), which affirmed the decision of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued on March 30, 2011 and closed Appellants' case.

{N0009574 }

February 29, 2012                              **BECKER & POLIAKOFF LLP**

                                               **/s/**  Helen Davis Chaitman
                                               Helen Davis Chaitman
                                               HCHAITMAN@BECKER-POLIAKOFF.COM
                                               45 Broadway
                                               New York, New York 10006
                                               Telephone (212) 599-3322

                                               *Attorneys for Marsha Peshkin, and a large*
                                               *group of other customers of Bernard L.*
                                               *Madoff Investment Securities, LLC*

{N0009574 }

STATE OF NEW YORK    )
                             )          ss.:      **AFFIDAVIT OF**
COUNTY OF NEW YORK  )                        **CM/ECF SERVICE**

       I, Kersuze Morancy, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

       **On June 12, 2012**

deponent served the within: **Appendix**

       **upon:**

**MUNGER, TOLLES & OLSON LLP**
*Attorneys for Appellees*
*Jeanne Levy-Church and Francis N. Levy*
**355 South Grand Avenue 35th Floor**
**Los Angeles, CA 90071**
**213-683-9100**

**BAKER & HOSTETLER LLP**
*Attorneys for Appellee Irving H. Picard*
**45 Rockefeller Plaza**
**New York, NY 10111**
**212-589-4200**

via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on June 12, 2012**

_____

     **MARIA MAISONET**
    Notary Public State of New York
       No. 01MA6204360
     Qualified in Bronx County
  Commission Expires Apr. 20, 2013

                     **Job #242257**