# 12-0816-bk

## United States Court of Appeals

*for the*

## Second Circuit

In re: BERNARD L. MADOFF INVESTMENT SECURITIES, LLC

MARSHA PESHKIN,

*Appellant,*

– v. –

JEANNE LEVY-CHURCH, FRANCIS N. LEVY, IRVING H. PICARD, Trustee
for the Liquidation of Bernard L. Madoff Investment Securities, LLC,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEES JEANNE LEVY-CHURCH
AND FRANCIS N. LEVY

CARY B. LERMAN
CARL H. MOOR
FRED A. ROWLEY, JR.
DEREK J. KAUFMAN
MUNGER, TOLLES & OLSON LLP
*Attorneys for Appellees Jeanne Levy-
Church and Francis N. Levy*
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Tel.: (213) 683-9100

**CORPORATE DISCLOSURE STATEMENT (RULE 26.1)**

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees Jeanne Levy-Church and Francis N. Levy hereby state that they are both individuals who have no parent corporation and have never issued any stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT (RULE 26.1) .................................i

INTRODUCTION ......................................................................................1

STATEMENT OF THE ISSUES PRESENTED.......................................6

STATEMENT OF THE CASE..................................................................8

STATEMENT OF FACTS .........................................................................9

      1.    The Trustee's Settlement with the Levy Heirs .......................9

      2.    The Claimants' Motion to Vacate the Settlement Order ........13

      3.    The District Court Proceedings...................................17

SUMMARY OF ARGUMENT ..............................................................18

STANDARD OF REVIEW .......................................................................21

ARGUMENT ...........................................................................................23

    A.    The Bankruptcy Court Did Not Abuse its Discretion in Denying the Claimants' Rule 60(b)(2) Relief Because the Purportedly New Information Would Not Have Changed the Settlement Approval ...........................................................................23

    B.    The Bankruptcy Court Did Not Abuse its Discretion in Rejecting the Claimants' Rule 60(b)(3) Theory Because the Record Shows That the Trustee Complied With His Disclosure Obligations and Concealed No Material Information ......................35

    C.    The Bankruptcy Court Did Not Abuse its Discretion in Rejecting the Claimants' Rule 60(b)(6) Theory, Because it Was Dependent upon Their Rule 60(b)(2), (3) Grounds and Unsupported by Extraordinary Circumstances ...............................41

CONCLUSION .........................................................................................44

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................45

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Andrulonis v. United States*,
  26 F.3d 1224 (2d Cir. 1994) ................................................................24

*Boule v. Hutton*,
  328 F.3d 84 (2d Cir. 2003) ................................................................27

*Davenport Recycling Assocs. v. C.I.R.*,
  220 F.3d 1255 (11th Cir. 2000) ........................................................36

*Denton v. Hyman (In re Hyman)*,
  502 F.3d 61 (2d Cir. 2007) ................................................................22

*Depo v. Chase Lincoln First Bank, N.A.*,
  77 B.R. 381 (N.D.N.Y. 1987),
  *aff'd*, 863 F.2d 45 (2d Cir. 1988)......................................................25

*DeVargas v. Montoya*,
  796 F.2d 1245 (10th Cir. 1986), *overruled on other
  grounds*, 827 F.2d 675 (10th Cir. 1987) ............................................37

*Fleming v. New York Univ.*,
  865 F.2d 478 (2d Cir. 1989) ..............................................................35

*Giaimo v. DeTrano (In re DeTrano)*,
  326 F.3d 319 (2d Cir. 2003) ..............................................................22

*Gleason v. Jandrucko*,
  860 F.2d 556 (2d Cir. 1988) ..............................................................36

*Hoult v. Hoult*,
  57 F.3d 1 (1st Cir. 1995)....................................................................24

*In re 310 Associates*,
  346 F.3d 31 (2d Cir. 2003) ..........................................................1, 22

*In re Adelphia Commc'ns Corp.*,
  327 B.R. 143 (Bankr. S.D.N.Y. 2005)................................................25

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Altman,*
302 B.R. 424 (Bankr. D. Conn. 2003) ................................................................26

*In re American Cartage, Inc.,*
656 F.3d 82 (1st Cir. 2011) ................................................................26

*In re Bernard L. Madoff Inv. Sec.*
LLC, 424 B.R. 122 (Bankr. S.D.N.Y. 2010),
*aff'd* 654 F.3d 229 (2d Cir. 2011) ................................................................34

*In re Bernard L. Madoff Inv. Sec. LLC,*
654 F.3d 229 (2d Cir. 2011),
*cert. denied,* 132 S.Ct. 2712 (2012) ................................................................passim

*In re DBSD N. Am., Inc.,*
634 F.3d 79 (2d Cir. 2011) ................................................................21

*In re Healthco Int'l,*
136 F.3d 45 (1st Cir. 1998) ................................................................29

*In re Hilsen,*
404 B.R. 58 (Bankr. E.D.N.Y. 2009) ................................................................26

*In re Indian Motorcycle, Inc.,*
289 B.R. 269 (B.A.P. 1st Cir. 2003) ................................................................26

*In re Int'l Distrib. Ctrs., Inc.,*
103 B.R. 420 (S.D.N.Y 1989) ................................................................38, 40

*In re Iridium Operating LLC,*
478 F.3d 452 (2d Cir. 2007) ................................................................22

*In re Justice Oaks II, Ltd.,*
898 F.2d 1544 (11th Cir. 1990) ................................................................31

*In re Lawrence,*
293 F.3d 615 (2d Cir. 2002) ................................................................21

-iv-

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Moorhead Corp.*,
208 B.R. 87 (B.A.P. 1st Cir. 1997)...................................................25

*In re Refco, Inc.*,
505 F.3d 109 (2d Cir. 2007) .........................................................22

*In re Teligent Inc.*,
306 B.R. 752 (Bankr. S.D.N.Y. 2004)..............................................30

*In re Teltronics Servs., Inc.*,
762 F.2d 185 (2d Cir. 1985) ...........................................................1

*In re Thomson*,
965 F.2d 1136 (1st Cir. 1992)........................................................38

*In re W.T. Grant Co.*,
699 F.2d 599 (2d Cir. 1983) ....................................................25, 38

*Ins. Co. of N. Am. v. Public Serv. Mut. Ins. Co.*,
609 F.3d 122 (2d Cir. 2010) .........................................................23

*King v. First Am. Investigations, Inc.*,
287 F.3d 91 (2d Cir. 2002) ...........................................................36

*Klapprott v. United States*,
335 U.S. 601 (1949)....................................................................42

*Kotlicky v. U.S. Fid.. & Guar. Co.*,
817 F.2d 6 (2d Cir. 1987) .............................................................24

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
126 F.3d 380 (2d Cir. 1997) .........................................................22

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)..........................................................21, 42, 43

*Maduakolam v. Columbia Univ.*,
866 F.2d 53 (2d Cir. 1989) .....................................................42, 43

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Masella v. Blue Cross & Blue Shield of Conn., Inc.*,
936 F.2d 98 (2d Cir. 1991) ................................30

*Matter of New York, New Haven & Hartford R.R. Co.*,
632 F.2d 955 (2d Cir. 1980) .............................27

*Melo v. United States*,
825 F.Supp.2d 457 (S.D.N.Y. 2011) ...................30

*Mercer Tool Corp. v. Friedr. Dick GmbH*,
179 F.R.D. 391 (E.D.N.Y. 1998).......................30

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ..........................38

*Nemaizer v. Baker*,
793 F.2d 58 (2d Cir. 1986) ....................6, 35, 43

*Novick v. Bankers Life Ins. Co. of New York*,
450 F.Supp.2d 196 (E.D.N.Y. 2006) .................30

*Otal Invs. Ltd. v. M/V CLARY*,
673 F.3d 108 (2d Cir. 2012) .............................22

*PRC Harris, Inc. v. Boeing Co.*,
700 F.2d 894 (2d Cir. 1983) ........................42, 43

*Protective Comm. for Indep. Stockholders of
TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)...........................20, 25, 38

*Ruotolo v. City of New York*,
514 F.3d 184 (2d Cir. 2008) .............................21

*Schwartz v. Capital Liquidators, Inc.*,
984 F.2d 53 (2d Cir. 1993) ...............................39

*Speaks v. Donato*,
214 F.R.D. 69 (D. Conn. 2003) .........................36

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
    374 F.3d 158 (2d Cir. 2004) .................................................................36

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
    162 F.3d 724 (2d Cir. 1998) ................................................................21

*United States v. Cirami*,
    563 F.2d 26 (2d Cir. 1977) ..................................................................42

*United States v. Int'l Bhd. of Teamsters*,
    247 F.3d 370 (2d Cir. 2001) ..........................................................passim

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948).............................................................................22

*Warren v. Garvin*,
    219 F.3d 111 (2d Cir. 2000) ..........................................................42, 43

## FEDERAL STATUTES

15 U.S.C. § 78eee(a)(4) ..............................................................................9

15 U.S.C. § 78eee(b)(3) ..............................................................................9

15 U.S.C.§ 78eee(b)(4) ..............................................................................10

## FEDERAL RULES

Fed. R. Bankr. P. 9019..............................................................................25

Fed. R. Bankr. P. 9019(a) .....................................................................16, 26

Fed. R. Bankr. P. 9024..............................................................................8

Fed. R. Civ. P. 60(b) .........................................................................passim

Fed. R. Civ. P. 60(b)(1)-(3)......................................................................42

Fed. R. Civ. P. 60(b)(1)-(5)...................................................................42, 43

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Civ. P. 60(b)(2)........................................................................passim

Fed. R. Civ. P. 60(b)(3)........................................................................passim

Fed. R. Civ. P. 60(b)(6)........................................................................passim

# INTRODUCTION

By their appeal, Appellants/Claimants Marsha Peshkin *et al.* (the "Claimants") seek to revisit a bankruptcy settlement that was urged by a bankruptcy trustee following a detailed investigation, approved not once, but twice by a bankruptcy court, and endorsed again by a district court exercising review. The burden the Claimants bear on appeal is a heavy one, for their appeal lies not from the settlement approval itself, but from the denial of a motion under Federal Rule of Civil Procedure 60(b) to vacate the judgment and settlement. The Bankruptcy Court's denial of that motion is reviewed with deference, and may be reversed "only if [this Court] determine[s] that it has abused its discretion." *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003).

Here, the Bankruptcy Court reasonably exercised its discretion, and certainly did not abuse it, in rejecting the Claimants' Rule 60(b) motion. A bankruptcy settlement may not be disturbed unless it falls "below the lowest point in the range of reasonableness," *In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985), and the settlement between the bankruptcy trustee, Irving H. Picard (the "Trustee"), and Appellees Jeanne Levy-Church and Francis N. Levy (collectively, the "Levy Heirs") readily satisfied that standard. The settlement garnered $220 million for the bankruptcy estate, an amount that the Trustee believed, in the exercise of his business judgment, represented the full extent of the Levy Heirs'

potential liability to the bankruptcy estate. The settlement avoided what would have been protracted litigation over the Levy Heirs' liability. And, in exchange, it permitted the Levy Heirs to put their family's tragic dealings with Bernard L. Madoff Investment Securities, LLC ("BLMIS") behind them. In seeking to scuttle this settlement and to revisit the Bankruptcy Court's ruling, the Claimants offer no outcome-changing evidence and identify no fundamental defect with either the settlement proceedings or the resulting compromise. Rather, they rely upon speculative theories of recovery that the Trustee considered and rejected in the first instance, and which Claimants have *still* failed to develop or support despite having presented them to *three* different tribunals. This Court should affirm.

This case arises from the liquidation proceedings convened for BLMIS in the wake of Bernard Madoff's massive fraud. The Levy Heirs were among the scheme's victims: as the Trustee noted, "Madoff stole [$250] million from Mr. Levy's heirs." (2/18/10 RT 4; A14.)[1] Nonetheless, in late 2009, the Levy Heirs voluntarily approached the Trustee in an effort to quickly and fairly resolve all potential claims arising from the family's prior withdrawals from BLMIS accounts. The Trustee conducted an investigation into the Levy Heirs' accounts, including a

---

[1] "A" refers to the Appendix filed by the Appellants, and AOB" refers to the Appellants' Opening Brief. "RT" refers to a particular record transcript, and is preceded by the applicable hearing date and followed by the page reference. "BR" refers to the record from the Bankruptcy Court, and "DR" to the record from the District court; both are followed by the applicable docket number.

forensic analysis, and the parties engaged in extensive settlement negotiations. Under the terms of the resulting settlement, the Levy Heirs agreed to pay $220 million to the bankruptcy estate in exchange for a full release from liability. It was one of the first significant settlements for the BLMIS estate.

In moving for approval of the settlement, the Trustee stressed that the settlement amount "represents nearly one-hundred percent of the amount" the Trustee could have sought in an avoidance action, that "[l]itigating the claims would undoubtedly be expensive and would require a significant commitment of time" (A80), and that the settlement thus "represents a reasonable compromise of the claims that benefits the estate and the customers of BLMIS" (A61).

Neither the Claimants nor any other party lodged an objection to the proposed settlement. After conducting a hearing, the Bankruptcy Court approved the settlement, finding it "clear that this settlement is well above the lowest rung in a range of reasonableness and is right on target in that regard." (2/18/10 RT 9; A19.) The Court noted that the Trustee had "done an appropriate level of due diligence in recommending the settlement," and that the settlement "resolve[d] the spectre of an expensive and protracted litigation" (2/18/10 RT 8; A18).

A year after the settlement was approved, the Claimants—a group of former BLMIS customers who were "net winners" from the Madoff scheme—brought a Rule 60(b) motion to vacate the settlement. In support of their motion, the

Claimants invoked a letter written by Stephen Harbeck, the president of the Securities Investor Protection Corporation ("SIPC"), in response to a congressional committee's inquiry into the Madoff scandal and the failure of BLMIS (the "Harbeck Letter"). (AOB 4; A85.) Although the Harbeck Letter did not specifically challenge or even address the propriety of the Trustee's settlement with the Levy Heirs, the Claimants seized on (1) the Harbeck Letter's description of $100 billion in largely offsetting deposits into and withdrawals from Norman F. Levy's account between 1992 and 2001, and (2) a footnote in the Harbeck Letter that the Claimants read to suggest the Levy Heirs held an alleged $2-billion margin loan from BLMIS as of December 11, 2008. (*Id.*) As the Claimants would have it, this information showed that the potential claims against the Levy Heirs were worth more than $220 million, and justified setting aside the order approving the settlement.

The Bankruptcy Court rejected these Rule 60(b) theories, the District Court affirmed that ruling, and this Court should do the same. The Bankruptcy Court acted squarely within its discretion in concluding that the information in the Harbeck Letter "would [not] have changed the outcome" of its settlement ruling, as required by Rule 60(b)(2). *See United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001). As the court found, the Claimants merely assumed that the offsetting transactions would have increased "the ultimate fraudulent transfer

- 4 -

liability of Norman Levy['s Heirs]," without offering any concrete explanation as to why.  (3/30/11 RT 18; A139.)  The transactions on their face largely cancelled each other out, and the Trustee expressly found that they were "inexplicable," did not involve the Levy Heirs at all, and were a tenuous basis for seeking recovery from the Levy Heirs.  (*See* Trustee's Opp'n to Customers' Mot. to Set Aside the Order Approving the Trustee's Settlement (BR 3942) ("Trustee Opp'n") at 7.)  The Bankruptcy Court found that these speculative contentions did not change the reasonable and fair nature of the settlement, particularly when weighed against the "recovery of a substantial amount of funds"  (3/30/11 RT 21; A142.)

The margin-loan contentions stand on even weaker footing.  Because the Claimants advanced the purported margin loan for the first time in their Rule 60(b) reply brief, those contentions were waived.  (3/30/11 RT 16; A137, A165-66.)  Moreover, the Claimants' margin-loan theory rested on an undeveloped footnote reference, and would have required the Trustee and the Bankruptcy Court to rely on BLMIS account statements that inherently reflected "fictitious and arbitrarily assigned paper profits."  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011), *cert. denied*, 132 S.Ct. 2712 (2012).

The Claimants have done nothing on appeal to shore up their speculative— and, in the case of the margin-loan contentions, waived—theories of recovery, or to explain further why they justify the "extraordinary" remedy of vacatur.

*Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). Rather, they engage in the same conjecture that both the Bankruptcy Court and District Court rejected. The same is true of the Claimants' contention that the Trustee "concealed material information" within the meaning of Rule 60(b)(3). (AOB 31, 27.) Far from showing the requisite clear and convincing evidence of fraud, the record showed that the Trustee considered the offsetting transactions and margin-loan information, but concluded it did not justify forgoing a reasonable settlement in favor of litigation. The Trustee noted that the information was more relevant, if anything, to a potential claim against JPMorgan Chase Bank ("Chase Bank") than to seeking a greater recovery from the Levy Heirs. Because this information was demonstrably immaterial, and because the Claimants have not shown otherwise in three levels of court review, the Trustee had no obligation to disclose it.

The Bankruptcy Court concluded that the settlement was "fair, equitable and well above the lowest rung in the range of reasonableness and, indeed, is in the best interest of the estate." (3/30/11 RT 21; A142.) Nothing in the Opening Brief casts doubt on the soundness of this determination, much less does it demonstrate an abuse of discretion.

## STATEMENT OF THE ISSUES PRESENTED

Whether the District Court erred in determining that the Bankruptcy Court did not abuse its discretion in finding that:

1.  The Harbeck Letter's reference to offsetting transactions and references to margin loans derived from BLMIS's final account statements did not constitute "newly discovered evidence" warranting relief under Rule 60(b)(2) because they would not have changed the settlement approval;

2.  The Claimants failed to establish by clear and convincing evidence that the Trustee made any material misrepresentations to the Bankruptcy Court, in connection with his request for approval of the settlement with the Levy Heirs, under Rule 60(b)(3); and

3.  The Claimants failed to establish "extraordinary circumstances," separate from their Rule 60(b)(2) and 60(b)(3) grounds, as required for relief under Rule 60(b)(6).

## STATEMENT OF THE CASE

The Trustee filed his motion seeking approval of the settlement with the Levy Heirs (the "Settlement Motion") in the Bankruptcy Court on January 27, 2010.  (BR 1833; A51-112.)   No oppositions or objections were filed.   On February 18, 2010, the Bankruptcy Court held a hearing on the Settlement Motion, approved the settlement, and entered the order approving the settlement with the Levy Heirs (the "Settlement Order").  (BR 1964; A11-22.)

One year later, on February 18, 2011, the Claimants filed a motion seeking to set aside the Settlement Order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure. (BR 3860-62; A23-112.)  The Levy Heirs filed their opposition to the Rule 60(b) motion on March 15, 2011 (BR 3935), and the Trustee filed a separate opposition on March 16, 2011 (BR 3942).  The Claimants then filed a reply brief in support of their Rule 60(b) motion.    (BR 3960; A113-20.)   On March 30, 2011, the Bankruptcy Court held a hearing on the motion and issued an oral ruling denying it.  (3/30/11 RT 21; A142.)  On the same day, the Court entered a minute order incorporating its oral findings and ruling.  (BR 3984; A146.)

The Claimants timely filed an appeal from the minute order to the District Court on April 11, 2011.  (BR 4005.)  The Claimants filed their opening brief on June 20, 2011 (DR 8), and the Trustee and Levy Heirs filed their answering brief

on July 20, 2011 (DR 12, 13).  The Claimants filed their reply brief on August 4, 2012.  (DR 20.)  On February 16, 2012, the District Court issued a 14-page memorandum and order affirming the Bankruptcy Court's denial of the relief sought in the Rule 60(b) motion.  (DR 22; A157-70.)  In accordance with the District Court's order, the clerk entered judgment on February 22, 2012.  (DR 23; A171-72.)  On February 29, 2012, the Claimants filed their notice of appeal to this Court.  (DR 24; A173-74.)

## STATEMENT OF FACTS

### 1.    The Trustee's Settlement with the Levy Heirs

On December 11, 2008, Bernard L. Madoff was arrested by federal agents for violation of criminal securities laws, and the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York.  (A52.)  The SEC alleged that Madoff and BLMIS had perpetrated a multi-billion dollar fraud through the BLMIS investment advisory business.  (*Id.*)  Shortly thereafter on December 15, 2008, the SIPC filed an application pursuant to 15 U.S.C. § 78eee(a)(4) alleging, in part, that BLMIS was unable to meet its obligations to securities customers and that these customers needed the protections afforded under the Securities Investor Protection Act ("SIPA").  (A53.)  The district court granted the SIPC's application, appointed Irving H. Picard as the SIPA Trustee pursuant to 15 U.S.C. § 78eee(b)(3), and

- 9 -

transferred the liquidation case to the Bankruptcy Court in accordance with 15 U.S.C. § 78eee(b)(4). (*Id.*)

The Trustee's chief objective in the BLMIS liquidation case has been to return customer property to the victims of Madoff's fraudulent schemes. To this end, the Trustee has pursued recoveries from so-called "net winners"—a term that has been used in the proceedings to describe former BLMIS customers whose total withdrawals from their BLMIS accounts exceed their total deposits. Norman F. Levy, a commercial real estate broker, began investing with BLMIS in the mid-1970s. (A53-54.) Over the next 35 years until his death in 2005, Mr. Levy allowed Madoff to manage a large portion of his and his family's accumulated wealth, even designating Madoff an executor of his estate with power to make unilateral investment decisions regarding its non-real estate assets. (A54.) Madoff eventually stole more than $250 million from Mr. Levy's estate. (*Id.*)

Despite being victims of Madoff's fraudulent schemes, the Levy Heirs technically fall into the category of "net winners" based on their net withdrawals during the six-year lookback period applied by the Trustee.[2] (A54.) According to Trustee, the Levy family and its affiliated entities withdrew approximately $305 million more than they deposited in such accounts during this period. (*Id.*) The

---

[2] The six-year lookback period derives from the New York Uniform Fraudulent Conveyance Law, which the Trustee asserted as a possible theory for recovery against the Levy Heirs. (A55.)

$305 million in net withdrawals during the period consisted of (1) approximately $84 million withdrawn by the Betty & Norman F. Levy Foundation (the "Foundation") and (2) approximately $220 million in net withdrawals by the Levy family and its affiliated entities.  (*Id.*)  The Foundation maintained a separate account at BLMIS, which was distinct from the accounts established in the names of the other members of the Levy family.  (*Id.*)  Because the Foundation's entire assets were tied to BLMIS, the Foundation had no assets once Madoff's fraudulent schemes were revealed and immediately wound down its activities in the wake of the collapse.  (A54-55.)  After the Levy Heirs furnished evidence that the $84 million withdrawn by the Foundation had actually been donated to various charitable organizations, the Trustee decided against seeking recovery from the Levy Heirs.  (A56-57.)  The Trustee contended that the remaining $220 million was recoverable because such amounts constituted fraudulent transfers under federal bankruptcy law and applicable state law.  (A55.)

The Levy Heirs had numerous potential grounds to contest the Trustee's fraudulent-transfer claims and have never admitted liability.  Specifically, the Levy Heirs disputed the Trustee's $220-million settlement demand, arguing that (1) they bore no liability for good-faith withdrawals made more than two years before the bankruptcy petition was filed; (2) their withdrawals were comprised of investment principal and earnings to which they were legally entitled; and (3) their account

balances were real as of December 31, 1991. (A56-57.) Rather than attempt to litigate the actual extent of their liability to the BLMIS bankruptcy estate, however, the Levy Heirs voluntarily approached the Trustee in the spring of 2009 to settle the clawback claims without the need for protracted litigation. (A56.)

Notwithstanding their potential defenses, the Levy Heirs had a sincere desire to put the entire affair behind them without the need for litigation. (A56.) As a result, after reaching out to the Trustee, the Levy Heirs accepted the Trustee's settlement demand and agreed to return $220 million to the bankruptcy estate in exchange for full releases for them and affiliated family members and entities, including the estate of Mr. Levy, from the fraudulent-transfer claims. (A57.) The Trustee's settlement with the Levy Heirs consensually resolved all of the BLMIS bankruptcy estate's potential claims against the Levy Heirs and affiliated family members and entities arising from their relationship with BLMIS and their withdrawals from BLMIS accounts. (A57-58.)

The Bankruptcy Court conducted a hearing on the Settlement Motion on February 18, 2010. No parties in interest filed or asserted any opposition to the Settlement Motion. After a presentation from the Trustee, the Bankruptcy Court approved the settlement with the Levy Heirs and specifically commended the Trustee on his exercise of business judgment:

> It is clear that the Trustee has done an appropriate level
> of diligence in recommending the settlement. Especially

- 12 -

> with respect to the concept of abandoning certain actions
> based upon the difficulties associated with the collection,
> that is with respect to the foundation. . . . [I]t is clear that
> this settlement is well above the lowest rung in a range of
> reasonableness and is right on target in that regard[.]

(2/18/10 RT 8-9; A18-19.)  On the same day as the hearing, the Bankruptcy Court

entered an order approving the settlement and directing the parties to comply with

the terms of the agreement.  (A21-22.)

## 2.    The Claimants' Motion to Vacate the Settlement Order

Nearly a full year after its entry, the Claimants filed a Rule 60(b) motion

seeking to set aside the Settlement Order on the grounds that the Trustee failed to

disclose two "new" pieces of information from the Harbeck Letter released by the

SIPC in January 2011.  (A23-24.)  *First*, the Harbeck Letter identified a series of

large deposits and withdrawals in Norman F. Levy's investment advisory account

between 1992 and 2001.  (A98-99.)  On their face, the transfers largely netted each

other out on a year-to-year basis.  (*Id.*)  Nevertheless, the Claimants contend that

the gross amount of the transfers in and out of the account (totaling in excess of

$100 billion) during this period demonstrate that Mr. Levy "financed" Madoff's

fraudulent schemes.  (AOB 15.)

*Second*, extrapolating from a single footnote in the Harbeck Letter, the

Claimants asserted that BLMIS made a margin loan of more than $2 billion to the

Levy Heirs.  (A116.)  The footnote attempted to explain the approximately $8-

- 13 -

billion difference between (1) the $73.5-billion combined value of the investor accounts based on the "final fictitious statement for the 4,881 customer accounts" issued on November 30, 2008 and (2) a widely reported figure of $64.8 billion that Madoff allegedly owed BLMIS customers when his fraudulent schemes were finally revealed in early December 2008. (A94.) The Harbeck Letter attributed this difference to negative equity balances in excess of $8 billion, of which approximately 99 percent were in the name of accounts held by Jeffry Picower and the Levy Heirs. (*Id*.) Because the Trustee asserted that roughly $6 billion of this difference was attributable to margin loans of Jeffrey Picower in his subsequent complaint against Mr. Picower (A10), the Claimants speculated that the remaining $2 billion must have been a similar margin loan to the Levy Heirs (A116).

The Claimants asserted that the additional evidence from the Harbeck Letter showed the claims against the Levy Heirs were actually worth billions of dollars and, therefore, the Trustee settled too cheaply by recovering only $220 million for the BLMIS estate. (A23-33.) The Claimants maintained that this information constituted "newly discovered evidence" warranting Rule 60(b)(2) relief, that the information had been fraudulently concealed by the Trustee within the meaning of Rule 60(b)(3), and that the Bankruptcy Court should exercise its catch-all authority under Rule 60(b)(6). (A30.)

The Trustee opposed the motion on the ground that the Harbeck Letter did not contain any additional information that the Trustee had not already considered in determining that the settlement was in the best interests of the BLMIS bankruptcy estate and its creditors. (Trustee Opp'n at 3, 7.) The Trustee reasoned that the offsetting transactions in no way demonstrated "that the ultimate fraudulent transfer liability of Norman Levy would have been adjudicated to be in that range." (*Id.* at 7.) There was no reasonable basis, the Trustee found, to "hold the Levy Heirs responsible for the facially inexplicable transactions engaged in by their father." (*Id.*) Finally, given the expiration of the statute of limitations for the BLMIS estate's avoidance claims against the Levy Heirs, the Trustee argued that "the practical effect" of setting aside the settlement would be to unwind a settlement that returned $220 million for the benefit of Madoff's victims without any ability to recover anything from the Levy Heirs. (*Id.* at 8.)

In their reply, the Claimants argued, for the first time, that the Trustee should be removed and asserted, also for the first time, the Harbeck Letter's discussion of margin loans. (BR 3960.)

After hearing argument, the Bankruptcy Court denied the Rule 60(b) motion. *First*, the Court rejected the Claimants' offsetting-transaction theory because it derived from a faulty premise:

> [T]heir argument falsely assumes that because billions of dollars flowed between BLMIS and Norman Levy and the Chase account, the

- 15 -

> ultimate fraudulent transfer liability of Norman Levy would have been adjudicated to be in that range.  Such an assumption rings false given the extant circumstances.

(3/30/11 RT 18; A139.)  The Claimants, the Court explained, "failed to explain why the specifics of these transactions between Levy and BLMIS disturb or otherwise alter the trustee's business judgment to settle his claims against the Levy heirs or this Court's approval of the same."  (*Id.*)

*Second*, in view of the Claimants' deficient showing, the Bankruptcy Court concluded that "the grounds on which the trustee sought settlement and won approval of the Levy settlement pursuant to Rule 9019(a) are [as] sufficient today as they were a year ago or exactly when I entered the settlement approval order."  (*Id.* at 19; A140.)

*Third*, the Bankruptcy Court concluded that the Trustee conducted the appropriate level of due diligence with respect to the BLMIS estate's claims against the Levy Heirs, including consideration of the information contained in the Harbeck Letter, before exercising his business judgment to settle the claims.  (3/30/11 RT 18-19; A139-40.)  In arriving at this conclusion, the Court determined that the Claimants' reply brief, which raised new points for the first time, was "more than procedurally flawed" because it was "essentially an improper ad hoc motion to remove the trustee and counsel."  (3/30/11 RT 16; A137.)

Based the foregoing, the Bankruptcy Court found no basis to vacate its earlier conclusion that the settlement with the Levy Heirs was reasonable and in the best interests of the estate:

> [T]here are no appropriate grounds or justification to vacate the prior determination that the 220 million dollar settlement is fair, equitable and well above the lowest rung in the range of reasonableness and, indeed, is in the best interest of the estate.

(3/30/11 RT 21; A142.)   The minute order denying such relief (the "Rule 60(b) Order") was entered on the same day.  (A146.)

### 3.    The District Court Proceedings

In their appeal of the Rule 60(b) Order to the District Court, the Claimants again asserted that the Bankruptcy Court had abused its discretion in denying the relief requested based on the Trustee's failure to expressly disclose the offsetting transaction and margin loans when it sought approval of the settlement with the Levy Heirs.  (DR 8.)

In its Memorandum and Order affirming the Rule 60(b) Order, the District Court held that the Claimants' "conclusory" Rule 60(b)(2) arguments failed to rebut the Bankruptcy Court's findings that the Claimants' contentions about the offsetting transactions rested on "false[] assum[ptions]," and that the $220-million settlement represented the entire amount that could be recovered from the Levy Heirs.  (A165.)  With respect to the alleged margin loans, the District Court held that the Bankruptcy Court did not err in deeming the issue waived based upon the

- 17 -

Claimants' failure to raise it until reply.  (A165-66.)  The Claimants' contentions that the Trustee concealed material information from the Bankruptcy Court were "wholly insufficient" to meet the standard required to obtain relief under Rule 60(b)(3).  (A166-68.)  And the Bankruptcy Court did not abuse its discretion in denying relief under Rule 60(b)(6) because the Claimants had failed to demonstrate any "exceptional circumstances," invoking only an unsubstantiated "loss of confidence in the judicial process."  (A169.)  This appeal followed.

## SUMMARY OF ARGUMENT

1.    The Bankruptcy Court properly declined to vacate the judgment based on "newly discovered evidence" under Rule 60(b)(2).

      a.    The Claimants have failed to offer any explanation, aside from speculative theories, for how the information in the Harbeck Letter concerning the offsetting transactions and alleged margin loans would have changed the Bankruptcy Court's approval of the settlement with the Levy Heirs.  This is insufficient to meet the "onerous" standard for vacating a judgment under rule 60(b)(2).  *Teamsters*, 247 F.3d at 392.  The Bankruptcy Court's decision to approve the settlement as fair and equitable for the BLMIS estate was a fact-intensive determination.  Among other things, it  considered the size of recovery for the estate, the basis for the Trustee's claims, the defenses available to the Levy Heirs, and the expense and uncertainty of protracted litigation.  The Claimants

have failed to articulate how the offsetting transactions or purported margin loans would have led the Bankruptcy Court to deem the settlement unfair or inequitable for the BLMIS estate.

        b.    The Bankruptcy Court did not abuse its discretion in finding that the Claimants had waived their arguments related to the alleged margin loans by raising them for the first time in their reply in support of the Rule 60(b) motion. Even if such arguments were preserved, the Claimants offered no independent evidence demonstrating that this information objectively enhanced the Trustee's likelihood of success or potential recovery against the Levy Heirs in litigation, so as to affect the Bankruptcy' Court's settlement approval.  Indeed, the record refutes that theory:  the Claimants' margin-loan theory ultimately rested on BLMIS's final account statements, which, as this Court has already recognized, were entirely fictitious and themselves instruments of Madoff's fraudulent schemes. *Madoff*, 654 F.3d at 235.  Claimants offered no evidence that any such loans had ever been made or that any securities were purchased by BLMIS based on proceeds from the alleged loans.  The Claimants' speculation is as fanciful as the BLMIS statements themselves.

        2.    The Bankruptcy Court did not abuse its discretion in rejecting the Claimants' request for relief under Rule 60(b)(3) because the Trustee satisfied his disclosure obligations with respect to the settlement with the Levy Heirs.

a.   The record shows that the Trustee investigated all of the available facts (including the information from the Harbeck Letter), conducted an appropriate forensic investigation of the information, weighed the strength of the evidence in support of the estate's claims against the Levy Heirs, and exercised his business judgment to enter into a settlement that garnered a $220-million recovery for the estate.   In seeking approval of the settlement, the Trustee provided sufficient evidence for the Bankruptcy Court to reach an independent judgment that the settlement was reasonable under the circumstances.

b.   The Claimants have failed to adduce any evidence that the purportedly concealed information about the offsetting transactions and alleged margin loans were material to the approval of the settlement.   Nor was the Trustee obligated to disclose each and every piece of information, regardless of its materiality to the settlement, that was considered in deciding to execute the settlement with the Levy Heirs.   Rather, in moving for approval of the settlement, he was required only to provide "all facts necessary for an intelligent and objective opinion on the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

3.   The Claimants cannot prevail under Rule 60(b)(6) because this catch-all provision applies only where one of the more specific grounds for relief is

unavailable under the circumstances. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). Because the Claimants simply rehash the same arguments for relief under Rule 60(b)(6), their grounds are adequately covered under Rule 60(b)(2) and (b)(3). In any event, the issuance of the Harbeck Letter does not present the type of "extraordinary circumstances" required for relief under Rule 60(b)(6). The "new" information from that letter already had been considered by the Trustee and had no impact on the soundness of the settlement. And the settlement with the Levy Heirs has now been reviewed and approved on three separate occasions in front of two different courts.

## STANDARD OF REVIEW

The denial of a Rule 60(b) motion to vacate a judgment is generally reviewed for abuse of discretion. *E.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 729 (2d Cir. 1998)). When, as in this instance, the District Court has affirmed the Bankruptcy Court's denial of a Rule 60(b) motion, it is the Bankruptcy Court's discretionary ruling that is reviewed with deference. *See In re Lawrence*, 293 F.3d 615, 623 (2d Cir. 2002).

Because the District Court sits in appellate review of the Bankruptcy Court, this Court stands in the shoes of the district court, *In re DBSD N. Am., Inc.*, 634 F.3d 79, 94 (2d Cir. 2011) ("We look through the district court to the bankruptcy

court's decision...."), and independently reviews its order affirming the denial of a Rule 60(b) motion. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997); *see also Giaimo v. DeTrano (In re DeTrano)*, 326 F.3d 319, 321 (2d Cir. 2003) ("Review of an order of a district court issued in its capacity as an appellate court is plenary."). But while this Court "owe[s] no deference to the district court's determination that the bankruptcy court was not in error, [it] should reverse the bankruptcy court *only* if [it] determine[s] that it has abused its discretion." *310 Associates*, 346 F.3d at 34 (emphasis added). That is especially so because the underlying decision here—the trial court's assessment and approval of a bankruptcy settlement—is also subject to deferential, abuse-of-discretion review. *See In re Refco, Inc.*, 505 F.3d 109, 116 (2d Cir. 2007); *accord In re Iridium Operating LLC*, 478 F.3d 452, 461 n.13 (2d Cir. 2007).

Under the abuse-of-discretion standard, the Bankruptcy Court's factual conclusions are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007). A factual finding is not 'clearly erroneous' unless, upon review of the entire evidence, this Court "'is left with the definite and firm conviction that a mistake has been committed.'" *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 113 (2d Cir. 2012) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## ARGUMENT

### A.    The Bankruptcy Court Did Not Abuse its Discretion in Denying the Claimants' Rule 60(b)(2) Relief Because the Purportedly New Information Would Not Have Changed the Settlement Approval

The Bankruptcy Court did not abuse its discretion in declining to vacate the judgment based upon Rule 60(b)(2)'s "newly discovered evidence" ground.  The Claimants offered no cogent explanation, beyond assumption and conjecture, as to how either the offsetting transactions or margin loans referenced in the Harbeck Letter would have affected the Bankruptcy Court's decision to approve the settlement.  The record fully supports the Bankruptcy Court's determination that this purportedly "new" information—which the Trustee already had considered— would not have changed its view that settlement best served the interests of the creditors and was "fair, equitable and well above the lowest rung in the range of reasonableness."  (3/3/11 RT 21; A142.)  This intensely factual determination, and the Trustee's underlying recommendation, are owed deference and ought to be affirmed.

The standards controlling a Rule 60(b)(2) challenge are settled and "onerous."  Rule 60(b) vacatur "is generally not favored and is properly granted only upon a showing of exceptional circumstances."  *Teamsters*, 247 F.3d at 391; *accord Ins. Co. of N. Am. v. Public Serv. Mut. Ins. Co.*, 609 F.3d 122, 131 (2d Cir. 2010).  The party seeking to set aside the judgment must demonstrate that:  (1) the

facts were in existence at the time of the dispositive proceeding; (2) the movant was justifiably ignorant of these facts despite due diligence; (3) the evidence was admissible and of such importance that it probably would have changed the outcome; and (4) the evidence was not merely cumulative or impeaching. *Teamsters*, 247 F.3d at 392.  These factors reflect the need to "balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality."  *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987).

Even assuming that the Claimants could not have discovered the offsetting transactions and margin loans before the settlement with the Levy Heirs was approved, the Bankruptcy Court properly determined that the Claimants had failed to establish that this information "was 'of such a material and controlling nature as would probably have change[d] the outcome.'"  *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995) (citation omitted; modifications in original).  To make out this required showing, the Claimants cannot merely decry their prior inability to make arguments based on the purportedly new information.  Because Rule 60(b) "does not allow district courts to 'indulge a party's discontent over the effects of its bargain,'" *Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir. 1994), the Claimants had to show that the Bankruptcy Court would have viewed the information as fundamentally altering its assessment of the costs and benefits of the Levy Heirs settlement.  In other words, the Bankruptcy Court would have had

- 24 -

to decide that the information so strengthened the Trustee's prospects for success in litigating the bankruptcy estate's avoidance claims against the Levy Heirs that it justified vacating the settlement and the $220 million it garnered for creditors.

This inquiry by its nature turns on the facts, and it is interwoven with the Trustee's equally fact-bound judgment and reasoning in considering whether to enter into the settlement. In weighing a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure, a bankruptcy court must make an informed and independent judgment that the proposed compromise is "fair and equitable" in light of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer Ferry*, 390 U.S. at 424. This standard does not require the bankruptcy court to "conduct a 'mini-trial' of the facts or the merits of the underlying dispute." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005). Rather, the court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness" from the perspective of the estate and its creditors. *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

Although a bankruptcy court's settlement approval must be "informed and independent," *TMT Trailer*, 390 U.S. at 424, the case law makes clear that a bankruptcy judge "is not to substitute her judgment for that of the trustee." *In re Moorhead Corp.*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997); *accord, e.g.*, *Depo v.*

*Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y. 1987), *aff'd*, 863 F.2d 45 (2d Cir. 1988).  Because trustees owe fiduciary duties to, and have a unique understanding of, the assets and liabilities of their estates, they "play[] a special role in the approval process," and their "judgment is entitled to some deference," *In re American Cartage, Inc.*, 656 F.3d 82, 92 (1st Cir. 2011).  The bankruptcy court therefore "need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that a compromise is fair and equitable and to the competency and experience of counsel who support the settlement."  *In re Altman*, 302 B.R. 424, 425-26 (Bankr. D. Conn. 2003); *accord In re Hilsen*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) (citing *In re Indian Motorcycle, Inc.*, 289 B.R. 269, 283 (B.A.P. 1st Cir. 2003) ("Compromises are generally approved if they meet the business judgment of the trustee.")).

Here, the Bankruptcy Court determined that the information the Claimants invoked from the Harbeck Letter would not have altered its approval of the settlement with the Levy Heirs, and that "the grounds on which the trustee sought and won approval of the Levy settlement pursuant to Rule 9019(a) are sufficient today as they were a year ago."  (3/30/11 RT 19; A140.)  The Claimants have failed to show, and cannot possibly establish, that the offsetting transactions or margin-loan information was so strong that the only reasonable exercise of

- 26 -

discretion was to vacate the settlement and pursue claims against the Levy Heirs. To the contrary, the record firmly supports both the Trustee's and the Bankruptcy Court's determination that this information "would not in any event have changed the decision." *Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir. 2003); *see also Teamsters*, 247 F.3d at 392.

   ***Benefits of Settlement***:   As the Bankruptcy Court noted, the Trustee's settlement with the Levy Heirs gave the creditors substantial benefits. "The courts generally favor compromise as compromises are a normal part of the process of reorganization." *Matter of New York, New Haven & Hartford R.R. Co.*, 632 F.2d 955, 959 (2d Cir. 1980) (internal quotations omitted). By settling with the Levy Heirs, the Trustee was able to recover a "substantial amount of funds to the estate, to wit 220 million dollars." (3/30/11 RT 21; A142.) As the record makes clear, that sum represented essentially the full amount sought by the Trustee. In contrast, the alternative path of litigation was fraught with uncertainty and risk. While the Levy Heirs preferred to settle, they were prepared, if necessary, to interpose vigorous defenses. These included defenses based upon their good-faith withdrawal of funds more than two years before the bankruptcy petition was filed, and the fact that they were legally entitled to the withdrawal funds. (A56-57.) The Trustee specifically considered the cost of "burdensome and expensive litigation" (A61), noting, in his supporting affidavit, that "[l]itigating the Claims would

undoubtedly be expensive and would require a significant commitment of time" (A60). Consistent with this concern, the Bankruptcy Court found that settlement "resolve[d] the spectre of an expensive and protracted litigation. " (2/18/10 RT 8; A18.)

The Bankruptcy Court also found that settlement was "fair and equitable" to the estate. The $220 million reflects "nearly one-hundred percent of the amount that the Levy BLMIS Account Holders withdrew from BLMIS during the six-year period before the filing" (A60-61), which is the operative period here (*infra*, n.2). What is more, the Levy Heirs agreed to pay that amount despite the fact that, as the Trustee noted, "Madoff stole [$250] million from Mr. Levy's heirs." (2/18/10 RT 4; A14.) As part of the settlement, the Levy Heirs gave up their claim against the BLMIS estate for this theft.

Neither of the factors identified by the Claimants alters this careful and balanced settlement judgment.

***The Offsetting Transactions***: As the Bankruptcy Court observed, the Claimants "falsely assume[] that because billions of dollars flowed between BLMIS and Norman Levy and the Chase account, the ultimate fraudulent transfer liability of Norman Levy would have been adjudicated to be in that range." (3/30/11 RT 18; A139.) These transactions were, on their face, offsetting. Even after having conducted a forensic analysis of the Levy accounts with BLMIS, the

Trustee concluded that the transactions were "facially inexplicable." (Trustee Opp'n at 7.) In the Trustee's informed business judgment, it was not appropriate "to hold the Levy Heirs responsible for the facially inexplicable transactions engaged in by their father." *(Id.* at 7-8.)

The Claimants never articulated a coherent theory of how the offsetting transactions could support a claim against the Levy Heirs—let alone a claim carrying a real probability of success. The assumption underlying Claimants' position is that the Trustee was obligated to litigate, and the Bankruptcy Court to resolve, the reasons why "billions of dollars flowed between BLMIS and Norman Levy" before settling with the Levy Heirs. (Trustee Opp'n at 7-8.) But the courts have specifically rejected the "notion that the Trustee or the bankruptcy court was obliged to fix the value of the [estate's] claim with near mathematical precision before it could be settled." *In re Healthco Int'l*, 136 F.3d 45, 51 (1st Cir. 1998). Because the mere existence of the offsetting transactions falls far short of demonstrating that they would have led the Bankruptcy Court to deem the Levy Heirs settlement unfair or imprudent, the court acted well within its discretion in refusing to vacate the settlement on this ground.

***The Purported Margin Loan*:** The Claimants' arguments based upon the purported margin loan to the Levy Heirs are, if possible, even more tenuous.

- 29 -

*First*, the Bankruptcy Court did not abuse its discretion in declining to consider this purportedly new evidence because the Claimants raised it for the first time in their reply brief in support of their Rule 60(b) motion.  (3/30/11 RT 16; A137); *see In re Teligent Inc.*, 306 B.R. 752, 757 n.5 (Bankr. S.D.N.Y. 2004).  As the District Court noted in rejecting the Claimants' appeal, arguments raised for the first time in reply are waived.  (A165-66); *see, e.g.*, *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991) (holding that district court did not err in holding that appellant waived a claim raised only in reply); *Melo v. United States*, 825 F.Supp.2d 457, 464 (S.D.N.Y. 2011) (finding argument waived where defendant "raised it for the first time in his Reply"); *Novick v. Bankers Life Ins. Co. of New York*, 450 F.Supp.2d 196, 198 (E.D.N.Y. 2006) (finding that plaintiffs waived argument that was raised "for the first time in their reply papers"); *Mercer Tool Corp. v. Friedr. Dick GmbH*, 179 F.R.D. 391, 398 (E.D.N.Y. 1998) (finding it "procedurally improper to raise [an] issue for the first time in reply papers").

*Second*, the Claimants failed to support their margin-loan contentions with the sort of evidence necessary to override the demonstrated and concrete benefits of the settlement with the Levy Heirs.  The Claimants based their contention that the Levy Heirs were the beneficiaries of a $2-billion margin loan on a footnote in the Harbeck Letter.  That footnote does not itself make such a finding, but merely

- 30 -

hypothesizes the differences between the value of the investor accounts on the BLMIS books and the widely reported investor balances is due to "negative equity" balances held by Jeffrey Picower and the Levy Heirs. (A94.) But the Claimants offered no independent evidence indicating that BLMIS ever in fact made any margin loans or that the Levy Heirs had in fact drawn on a $2-billion margin loan. Indeed, as the District Court noted, they "made no effort to explain why the information should have altered the Trustee's judgment regarding the amount recoverable from the Levy Heirs or the Bankruptcy Court's approval of the settlement." (A166.)

*Third*, even if the Claimants' margin-loan theory was not waived (and it is) and even if they had offered any evidence to support it (and they did not), it still would be inadequate to justify vacating the settlement and judgment. It was reasonable for the Trustee to decide against pursuing a theory of recovery that turned on the validity of BLMIS statements. It was equally reasonable, and certainly no abuse of discretion, for the Bankruptcy Court to decide that Claimants' contentions about the evidentiary value of the margin loan was too speculative to risk litigation. A bankruptcy court weighing settlement need not "*decide* the merits of those claims—only the *probability* of succeeding on those claims." *In re Justice Oaks II*, *Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990). On the record presented, the Bankruptcy Court properly determined that this information did not significantly

enhance its probability of success, and that its prior grounds for approving the settlement were as sufficient today as they were "when [the court] entered the settlement approval order." (3/30/11 RT 19; A140.)

Because the Claimants' margin-loan theory rests on net positions in BLMIS's final account statements, it would have required the Bankruptcy Court to depart from the accepted methodology for assessing a fraud scheme's net effect on a party: the Net Investment Method. The Net Investment Method calculates the amount of cash deposited by the particular customer into his or her BLMIS account, less any amounts withdrawn from it during the six years prior to the bankruptcy filing. *See Madoff*, 654 F.2d at 233. Because any Ponzi scheme will invariably enrich some people at the expense of others, the principal virtue of the Net Investment Method is that it establishes a simple formula for separating investors who benefitted from Madoff's fraud ("net winners" whose total withdrawals exceeded their total deposits) from those investors who were directly harmed by the fraud ("net losers" whose total deposits exceeded their total withdrawals). By providing a basis for the Trustee to separate the former BLMIS customers into these two groups, the Net Investment Method could also be used to formulate demands on "net winners" to ensure equitable treatment of both groups in the liquidation.

In an opinion issued after the challenged rulings, this Court expressly endorsed the Net Investment Method as a methodology for calculating claim amounts and, by extension, the baseline for the Trustee to pursue recoveries against third parties. *Madoff*, 654 F.3d at 233. In so holding, the Court specifically rejected a competing methodology known as the Last Statement Method. In contrast to the Net Investment Method, the Last Statement Method posits that claim amounts should be determined based on the final account statements issued by BLMIS. The Court reasoned that such an approach was inherently flawed because such account statements were themselves instruments of Madoff's fraud and therefore wholly unreliable. *Id.* at 235 ("Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations.").

In asserting that the Trustee should have relied on margin-account balances from these BLMIS statements, the Claimants are essentially asking the Court to substitute the Last Statement Method for the Net Investment Method in an effort to overturn the Settlement Order. According to the Harbeck Letter, the starting point for the calculation of the alleged $2-billion margin account is the total balance of all BLMIS customer accounts as of the last statement issued on November 30, 2008, which summed to approximately $73.5 billion. (A94.) Following the

collapse of BLMIS, however, the Trustee quickly discerned that "the only verifiable transactions were the customers' cash deposits into, and cash withdrawals out of, their particular accounts." *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 128 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011). The Claimants' argument that the margin loan would support a claim against the Levy Heirs in that amount necessarily proceeds from a faulty premise because the account statements were themselves instruments of Madoff's fraud.

\* \* \*

Because the Claimants' Opening Brief does little more than rehash the same arguments they unsuccessfully advanced before both the District Court and the Bankruptcy Court, there is no basis to disturb the Bankruptcy Court's ruling on appeal. The Bankruptcy Court reconsidered its earlier decision in light of the information from the Harbeck Letter and specifically held that it would have made the same determination. On review, the District Court stressed that "[t]he record here demonstrates that the Bankruptcy Court expressly considered the Levy transaction history during the Rule 60(b) hearing, yet maintained its support for the settlement." (A165); *cf. Teamsters*, 247 F.3d at 395-96 (emphasizing, in rejecting a Rule 60(b)(2) theory, that the lower court reconsidered its earlier decision in light of newly discovered information and reaffirmed the earlier decision). Having offered no new arguments on appeal, Claimants cannot overcome these

determinations or demonstrate the "exceptional circumstances" necessary to set aside the previous approval of the settlement with the Levy Heirs. *See Teamsters*, 247 F.3d 370 at 391; *Nemaizer*, 793 F.2d at 61 ("Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances.").

### B. The Bankruptcy Court Did Not Abuse its Discretion in Rejecting the Claimants' Rule 60(b)(3) Theory Because the Record Shows That the Trustee Complied With His Disclosure Obligations and Concealed No Material Information

The Claimants maintain that the same information grounding their Rule 60(b)(2) theory also justifies relief under Rule 60(b)(3), which permits trial courts to vacate judgments for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." FED. R. CIV. P. 60(b)(3). As the Claimants would have it, the Trustee was obligated to disclose the offsetting transactions and margin loan to the Bankruptcy Court in seeking approval, and his failure to do so "compels a finding of fraud." (AOB 27.) This argument fails not only for the reasons the Claimants' Rule 60(b)(2) theory fails—including the Claimants' failure to offer a viable theory of materiality—but also because it rests on a fundamentally erroneous understanding of the Trustee's disclosure obligations.

"[A] Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of *material misrepresentations* and cannot serve as an attempt to relitigate the merits." *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir.

- 35 -

1989) (emphasis added and citations omitted); *see also King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002) (providing that, to prevail under Rule 60(b)(3), the "[f]raud upon the court must be established by clear and convincing evidence"). These same principles apply when a movant seeks to set aside a judgment based on allegations of fraud on the court. *See State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004) (citing *Davenport Recycling Assocs. v. C.I.R.*, 220 F.3d 1255, 1262 (11th Cir. 2000)). This Court has made clear that "the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion." *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir. 1988). Specifically, fraud on the court is actionable under Rule 60(b)(3) only if it "*seriously affects* the integrity of the normal process of adjudication." *Id.* at 559.

The Bankruptcy Court acted well within its discretion in determining that the Claimants failed to meet the "heavy burden" of proving a fraud on the court. *Speaks v. Donato*, 214 F.R.D. 69, 77 (D. Conn. 2003). The Claimants failed to show at all, let alone by clear and convincing evidence, that the purportedly concealed information was even material to the settlement approval. They failed to offer a theory of how the offsetting transactions would tip the mix of factors— which were manifold and highly factual—against settlement and in favor of

litigation.  That would have required some proof that the evidence would likely shore up the prospect of prevailing against the Levy Heirs in litigation or lead to a greater recovery.  The Claimants offered none.

That deficiency applies equally to the Claimants' waived margin-loan contentions, which are based on an undeveloped footnote in the Harbeck letter. Mere speculation about the possible litigation value of information about a purported margin loan reflected in financial statements that this Court has acknowledged are inherently unreliable, *Madoff*, 654 F.3d at 238, is not the sort of evidence that can support a finding of material concealment, *see DeVargas v. Montoya*, 796 F.2d 1245, 1258 (10th Cir. 1986) (rejecting 60(b)(3) fraud theory where moving party failed to furnish "clear and convincing proof" of misconduct beyond conjecture), *overruled on other grounds*, 827 F.2d 675, 678 (10th Cir. 1987).

The Claimants' fraud theory ultimately rests on the notion that a trustee must disclose all information that comes to his or her attention—whether material or insignificant, developed or speculative—in seeking settlement approval.  This misapprehends both a trustee's disclosure obligations and the standards for settlement approval.  As the Bankruptcy Court correctly noted, the Trustee was not obligated to present the court with "a blow-by-blow account of the transactional history between BLMIS and Norman Levy."  (3/30/11 RT 18; A139.)

The *TMT Trailer Ferry* standard does not require that a bankruptcy trustee separately disclose each and every piece of evidence, regardless of its materiality, that was considered in entering into a settlement for the benefit of the bankruptcy estate and its creditors. Rather, it requires that a bankruptcy trustee furnish "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer Ferry*, 390 U.S. at 424. That is consistent with the substantive standard for approving bankruptcy settlements. A bankruptcy trustee "realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the [bankruptcy] estate and the value of the settled claim comprise a matched set." *In re Thomson*, 965 F.2d 1136, 1145 (1st Cir. 1992). The bankruptcy court need only "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *W.T. Grant Co.*, 699 F.2d at 608 (internal quotations omitted). In other words, bankruptcy courts need only assess the overall fairness of the compromise for the estate based on the evidence submitted by the parties. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim."); *In re Int'l Distrib. Ctrs., Inc.*, 103

B.R. 420, 423 (S.D.N.Y 1989) ("A trial or 'mini-trial' on the merits is not required for court approval of a settlement.").

In seeking approval of the Levy Heirs settlement, the Trustee fully complied with his disclosure obligations to present the material information bearing on his decision to execute the settlement with the Levy Heirs.  As the Trustee explained, the information in the Harbeck Letter did not improve his prospects of recovery against the Levy Heirs and was more relevant to a possible claim against Chase Bank than the Levy Heirs.  (3/30/11 RT 12; A133.)  A failure to specifically disclose evidence regarding issues that were immaterial to the estate's claims against the Levy Heirs provides no basis for vacating a settlement yielded a $220-million recovery for BLMIS's former customers.  *See Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (holding that district court did not abuse its discretion in denying relief under Rule 60(b) where the evidence "bore on a matter that was entirely collateral to the merits of the litigation").

With respect to the material facts underlying his decision to settle with the Levy Heirs, there can be no doubt that the Trustee met, and even exceeded, his disclosure obligations.  The record below amply demonstrates that the Trustee (1) investigated *all* available facts (including the information contained in the Harbeck Letter), (2) commissioned forensic analysis of that information, (3) evaluated the import of the evidence with respect to settling the potential fraudulent-transfer

claims against the Levy Heirs, (4) determined in his business judgment that the $220-million settlement was in the best interests of the bankruptcy estate and its creditors, and (5) provided sufficient evidence that enabled the Bankruptcy Court to find that the settlement was reasonable under the circumstances. This more than adequately discharged his disclosure obligations and enabled the Bankruptcy Court to render an informed finding that the settlement was reasonable and in the best interests of the bankruptcy estate and its creditors.

Moreover, far from committing any reversible error in denying the Rule 60(b) motion, the Bankruptcy Court actually afforded the Claimants a cogent and fully reasoned assessment of the Trustee's conduct before denying the Rule 60(b)(3) relief. Consistent with this Court's standards, the Bankruptcy Court accorded some weight to the opinions of the Trustee in examining the merits of the settlement with the Levy Heirs. *Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 422-23 ("[A] court need not conduct an independent investigation in formulating its opinion as to the reasonableness of a settlement. A court may give weight to the Trustee's informed judgment that a compromise is fair and equitable."). This approach was entirely sensible in light of the Trustee's familiarity with the underlying facts, but it does not mean that the Bankruptcy Court blindly relied on this presentation in approving the settlement. To the contrary, both the Bankruptcy Court and the District Court gave the Claimants the full benefit of their independent judgments

- 40 -

on the Trustee's satisfaction of his disclosure obligations and the effect of the additional evidence on the propriety of the settlement.

The Claimants counter that the District Court improperly relied upon the same outcome-determinative test that is employed under Rule 60(b)(2) to its denial of relief under Rule 60(b)(3).  (AOB 30.)  This is both irrelevant and wrong.  It is irrelevant because this Court reviews the District Court's affirmance *de novo.*  It is also wrong, because the District Court's order shows that it carefully laid out and applied the appropriate legal standard for Rule 60(b)(3).  It specifically noted that relief under this provision cannot be granted absent "clear and convincing evidence of *material* misrepresentations" before affirming the Bankruptcy Court's denial of the relief.  (A167-68 (emphasis added).)  The Claimants' theories fail both Rule 60(b)(2) and (b)(3) not because the District Court conflated the standards governing those provisions, but because their offsetting transactions and margin-loan contentions are neither material (for purposes of Rule 60(b)(3)) *nor* outcome-determinative (for purposes of Rule 60(b)(2)).

### C.    The Bankruptcy Court Did Not Abuse its Discretion in Rejecting the Claimants' Rule 60(b)(6) Theory, Because it Was Dependent upon Their Rule 60(b)(2), (3) Grounds and Unsupported by Extraordinary Circumstances

In light of its rulings on the more specific arguments, the Bankruptcy Court's denial of relief under Rule 60(b)(6) relief was also proper under the circumstances.  Rule 60(b)(6) is a catch-all provision that authorizes a court to

vacate an order based on "any other reason that justifies relief." FED. R. CIV. P. 60(b)(6). Relief under that provision is available only if the grounds advanced by the moving party are embraced by Rule 60(b)(1)-(3) grounds. *See Liljeberg*, 486 U.S. at 863 ("Rule 60(b)(6) … grants federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5).") (citing *Klapprott v. United States*, 335 U.S. 601, 613 (1949)); *Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) ("Rule 60(b)(6) only applies if the reasons offered for relief from judgment are not covered under the more specific provisions of Rule 60(b)(1)-(5)."); *Maduakolam v. Columbia Univ.*, 866 F.2d 53, 55 (2d Cir. 1989) ("The court may treat a motion to vacate a prior judgment as having been made under 60(b)(6) only if the other, more specific grounds for relief encompassed by the rule are inapplicable."); *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 898 (2d Cir. 1983) ("Rule 60(b)(6) is a broadly drafted umbrella provision, which must be read in conjunction with the other sections of that Rule, and is applicable only where the more specific provisions do not apply.") (internal citations omitted). And while Rule 60(b)(6) has been characterized as "grand reservoir of equitable power to do justice in a particular case," *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977), the countervailing interest in finality limits it to "extraordinary

circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." *Nemaizer*, 793 F.2d at 63 (citations omitted).

The Claimants can satisfy neither of these requirements. As an initial matter, the grounds they advance—that the Trustee improperly failed to disclose information from the Harbeck Letter, and that this information constitutes "new evidence" warranting vacatur—are plainly covered by provisions (b)(2) and (b)(3). For this reason alone, Rule 60(b)(6) relief is unavailable. *See Liljeberg*, 486 U.S. at 863; *Warren*, 219 F.3d at 114; *Maduakolam*, 866 F.2d at 55; *PRC Harris*, 700 F.2d at 898. In any event, the Claimants also cannot demonstrate that the issuance of the Harbeck Letter constitutes the kind of extraordinary circumstances contemplated by Rule 60(b)(6). This settlement has been reviewed and approved on three separate occasions in front of two different tribunals. At this point, there can be little doubt that the Levy Heirs' interest in finality outweighs the Claimants' unfounded efforts to unwind the settlement.

Given the basic shortcomings of their other arguments and failure to raise any additional specific grounds for vacating the Settlement Order, the Claimants have simply failed to demonstrate any of the extraordinary circumstances or extreme and undue hardship necessary to obtain relief under Rule 60(b)(6).

- 43 -

Accordingly, this Court should affirm the Bankruptcy Court's denial of relief under this provision, as well.

## CONCLUSION

For the foregoing reasons, the Levy Heirs respectfully request that this Court affirm the District Court's order affirming the Bankruptcy Court's order denying the Claimants' request pursuant to Rule 60(b) to vacate the settlement.

DATED: September 11, 2012          Respectfully submitted,

MUNGER, TOLLES & OLSON LLP
  Cary B. Lerman
  Carl H. Moor
  Fred A. Rowley, Jr.
  Derek J. Kaufman


By:   /s/ *Cary B. Lerman*


Attorneys for Appellees
Jeanne Levy-Church and Francis N. Levy

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 10,187 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

DATED: September 11, 2012          MUNGER, TOLLES & OLSON LLP

                                   By:  /s/      *Cary B. Lerman*

                                   Attorneys for Appellees
                                   Jeanne Levy-Church and Francis N. Levy